# Exhibit 1

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**ANTIGUA AND BARBUDA**

**IN THE HIGH COURT OF JUSTICE**

ANUHCV 2018/0120

BETWEEN:

**1 GLOBE CAPITAL, LLC.**

Claimant

**and**

**SINOVAC BIOTECH LTD.**

Defendant

**Interested Parties:**
Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li

**APPEARANCES**:
Mr. Stephen Houseman QC, Mr. Lenworth Johnson and Ms. Andreen Vanriel for the Claimant
Mr. Stewart Alford QC, Mr. Rushaine Cunningham and Ms. Yoshi Rampersad for the Defendant
Mr. Craig Jacas holding watching brief for the Interested Parties

_____

2018:    December 3rd, 4th 5th
December 19th

_____

**JUDGMENT**

[1]    **SMITH J:**  This case is about a fight to control the board of directors of the defendant, Sinovac Biotech Ltd, a China-based, biopharmaceutical company, with about 3,300 shareholders and a market capitalization of US$447.3 million, listed on the Nasdaq stock exchange (the "Company").  The Company is registered under the **International Business Companies Act**[1] ("IBCA") of Antigua and Barbuda.

---

[1] Chapter 222, Laws of Antigua and Barbuda.

[2]     The claimant, 1 Globe Capital LLC, a Delaware limited liability company and shareholder in the Company, has applied pursuant to section 122 of the IBCA, for the Court to determine a controversy with respect to an election of directors at an annual general meeting ("AGM") of the Company. The claimant seeks certain declarations and orders.

[3]     The controversy may be stated shortly.  On 6th February 2018, the Company held an AGM in Beijing, China.  The claimant contends that, at that AGM, Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li were duly elected as directors of the Company ("the New Directors").  The Company disputes this and says that Weidong Yin, Simon Anderson, Kenneth Lee, Yuk Lam Lo and Meng Mei ("the Incumbent Directors") are the valid directors of the Company. The Incumbent Directors remained in control of the Company following the disputed election.

**The section 122 Claim**

[4]     Section 122 provides as follows:

> "(1) A corporation or a shareholder or director thereof may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.
> (2) Upon an application made under this section, the court may <u>make any order it thinks fit</u> including, without limiting the generality of the foregoing -
>> (a) an order restraining a director or auditor whose election or appointment is challenged from acting pending determination of the dispute;
>> (b) an order declaring the result of the disputed election or appointment;
>> (c) an order requiring a new election or appointment and including in the order directions for the management of the business and affairs of the corporation until a new election is held or appointment made; and
>> (d) an order determining the voting rights of shareholders and of persons claiming to own shares." (Underlining supplied)

[5]     The claimant sought the following declarations and orders under section 122:

> "1.  A declaration that the following persons were duly elected at the AGM: Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li
>
> 2.  An order that Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pingfei Li be installed as the Company's Board of Directors.
>
> 3.  A declaration that Weidong Yin, Simon Anderson, Kenneth Lee, and Meng Mei are no longer the Company's directors, and an order that any actions taken on behalf of the Company at their direction after the AGM are null and void."

[6]     The Company resists the claim and contends that the votes cast by those shareholders ("the Dissenting Shareholders") in favor of the New Directors were not valid because:

1.  Their method of nominating individuals to the Company's board of directors, the proxy forms they used and the ballots they voted on did not conform to Antiguan law;

2.  There was no full, fair and plain disclosure to shareholders, in breach of section 71(2) of the IBCA, to enable them to make a fully informed decision regarding the election of the Company's board of directors;

3.  A Rights Agreement, governed by Delaware Law, was triggered by the conduct of the Dissenting Shareholders prior to, during and after the AGM, which affected the vote at the AGM by dilution of the shareholding of a significant proportion, if not all, of the Dissenting Shareholders who voted to elect the New Directors;

4.  The claimant, and other shareholders, breached United States securities laws by failing to make appropriate filings and, as a result, the business purportedly conducted at the AGM and/or the votes cast by those shareholders have been invalidated.

**Issues**

[7]     The parties agreed, in a pre-trial memorandum, that the following issues arise for determination:

3

1. Was section 71(2) of the IBCA complied with in relation to notices of the AGM? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace the Incumbent Directors?

2. Was the vote to remove and replace the Incumbent Directors in conformity with Antigua and Barbuda law? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace them?

3. Is the Rights Agreement valid and effective as a matter of Antigua and Barbuda law? If so, could the Rights Agreement, if triggered, affect the vote at the AGM?

4. Was there a breach of the US Securities laws, namely, section 13 of the United States **Securities Exchange Act 1934**, by the claimant? If so, what is the relevance, if any, to the outcome of the vote at the AGM?

[8]   At the commencement of the trial, the claimant applied to adduce two fresh affidavits and to be relieved from sanctions.  The Court refused the application and promised to provide the reasons for so doing in this judgment.  Firstly, the claimant had failed to file its affidavits in accordance with the deadlines set in the Court's case management directions.  On 23rd November 2018, at the pre-trial review of this matter, the claimant applied for permission to file those affidavits on 20th November 2018.  The Court therefore ordered those affidavits to be deemed properly filed and served on 20th November 2018.  At that pre-trial review, the claimant gave no indication that it wished to file further evidence.  Secondly, the Court is satisfied that the fresh evidence in one of the affidavits sought to be adduced has been available to the claimant for some time and, in fact, is already before the Court in another document.  Thirdly, I am satisfied that the application is not being made promptly and that no prejudice whatsoever will befall the claimant if it is not permitted to rely on this fresh evidence.

**Proceedings of the AGM**

[9]   The Company issued formal notice of the AGM on 28th December 2017.  That notice identified three items of business, namely: (1) the re-election of the existing

4

board of directors; (2) approval of the audited, consolidated financial statements of the Company for 2017; and (3) the appointment of Ernst & Young Hua Ming LLP as independent auditor for 2017. The AGM took place in Beijing at 9 am (local time) on 6th February 2018. A transcript of those proceedings, translated from Mandarin to English, was produced to the Court based on an audio recording of the AGM. At the trial, both parties accepted and relied on that transcript which I shall therefore treat as part of the *res gestae*.

[10]    Given that much turns on what transpired at the AGM, I cannot avoid burdening the judgment with a lengthy extract from those proceedings:

"119.    James Chang: Everyone of us needs to sign in.

120.    James Chang: We need two, because he is together with me.

121.    Yang Guang: But, you have one legal proxy. One proxy, one ballot.

122.    Yang Guang: Yes, I will collect all the ballots and legal proxies I have given you, and then they will be placed on file.

123.    James Chang: But I have a question. If you collect all the present shareholders' legal proxies, you should have known the corresponding number of ballots who attend the meeting in person, right? And you also know the share numbers for online [vote]. Could you please tell us the quorum?

124.    Yang Guang: Certainly. Now let's go to the result. As of December 26th, 2017, by far the aggregate shares held by all registered shareholders are 57,269,861. Let me project this data on the computer.

125.    Yang Guang: Well this is the date for our meeting and this represents the number of total share outstanding. Our record date is December 26th, 2017.

126.    James Chang: They are all outstanding shares, right?

127.    Yang Guang: Yes, all issued and outstanding shares as of the date of the record day of December 26, 2017. We have 21,000,000 shares who voted online. The number on site has 28,900,000 shares.

128.    James Chang: You mean the ones [who attend AGM] in person, right?

129.    Yang Guang: Yes, at presence. So here we have over 50-million in total, [i.e.] more than 50,000,000 shares participated in the vote. And that represents 87% of the total shares, exceeding the quorum of 50% as required in the company's rules of procedures. Therefore, the legitimacy of this meeting is justified and we are allowed to proceed on the next step. Now here is what we are

5

going to do. Please fill out your ballots and then I will count the papers and declare the result.

130.    James Chang: Okay, thank you very much. On behalf of shareholders, I'd like to ask for your permission to say something. Please allow me, Mr. Chairman.

131.    James Chang: Thank you very much. Let me introduce myself first. I am James Chang, the proxy of JPMorgan, and I hold voting rights representing 118,000 shares of common stocks of the company.  First of all, I would like to point out to all of you that we are offered three options in the ballots provided by the company: For All, Withhold all and For All Except. According to what our lawyers in Antigua suggested, the "Withhold All" means abstaining from voting, so it is not quite the equivalent of a "vote against".  Given this, our first request is to change the current voting model and add an option named "Against All" next to the existing "For All" option. Second, on behalf of JP Morgan, I propose that, all of you, as shareholders, consider removing the incumbent board members, and I mean all of them except Lo Yuk Lam. Last but not least, I would like to nominate the following four candidates to board member positions and they are Wang Guowei, Qiu Haifeng, Cao Jianzeng and Li Pengfei. And that is the request from me as the proxy of JP Morgan. In short, that is all I want to say as a speaking shareholder. What I have proposed is just for your reference. So here is my question, is there anyone present who seconds me? Anyone?

132.    Zhang Yue: Yes, I second. Dear Mr. Chairman, my name is Zhang Yue and I am the proxy of Citibank, holding 856,000 shares of common stocks. As far as I am concerned, most of the incumbent board members are no longer qualified for their positions. Therefore, here I second the nominations proposed by that shareholder and agree to the new candidates proposed by him. Thank you.

133.    James Chang: Mr. Chairman, Mme. Secretary, actually, we have prepared our own ballots. And we will distribute them to the shareholders if you have no objection. We also ask for a voting by ballot instead of by hand this time.

134.    Yang Guang: Well, this meeting is held in accordance with the law in Antigua and our company's procedure rules. Your suggestion will be taken down and sent to our lawyers later. But right now, I'm afraid I cannot give you any answer for sure. Since the directors' election is one of the three subject matters of this meeting, you are free to express your opinions on that and fill out your ballot or just abstain. We will take down your suggestions and responses will be made after our discussion with lawyers in Antigua.

135.    James Chang: According to Articles 114 and 109 of Antigua law, shareholders have a constitutional right to replace board

6

members and can propose the matter on any annual general meeting. This does not need the confirmation by the company's counsel. This is our inalienable right.

136. Yang Guang: That is true. But as our procedure, we should comply with the laws in this meeting. Since you mentioned that in accordance with the Antigua law, we also need to check that before we can finish this process. And that is why we will write down your words in details.

137. James Chang: As required by Antigua law, we will hand in our legal proxies and ballots to the company's scrutineer, that is you. If you are not willing to accept, actually we also bring our own scrutineer to accept these documents. In which case, I assure you, it is in complete compliance with the legal process. If you refer to your company's articles and Antigua's International Business Corporation Act, it is clear that a shareholder has the right to raise a proposal, after the proposal, if someone else seconds it, the proposal must be decided by vote. Must be decided by vote.

138: Yang Guang: It is a regret that we did not bring a lawyer here to attend this meeting. Since I do not have Antigua's law [background] myself, nor do you, I suppose. We will take down your request. According to Antigua law, we invite you here to vote and then collect the ballots. If the number of attendees reaches quorum, which means we can proceed with the procedure, we will count the result to see whether the matter is approved by vote and announce the result.  According to the company's procedure rules, if a matter is not approved, there will be some follow-up procedures.  For example, if we all choose the "withhold" option instead of voting for incumbent directors or others, we will record that. And if the quorum and the vote approval rate are met, we will proceed and give announcements in an open manner as required by law of the country, that is, the home country, and procedure rules of our company.

139. Wang Nan: I agree. Like we said before, we will send it to our company's lawyers in Antigua and we will request their instructions as to what to do next.

140. James Chang: No problem. If it helps, my colleague the lawyer Li will send a ballot to each shareholder. The filled ballots will be given to you for your lawyers' reference. Lawyer Li, please.

141. James Chang: Did management personnel vote online or do you have a legal proxy to vote at this meeting?

142. Wang Nan: We all voted online.

143. James Chang: Everyone finished, I see. Thank you. Actually, our ballot has two copies. We hope that you can cast your vote with your genuine information and opinions.

144. Yang Guang: Then, I would like to make clear with you that please give me your legal proxies and the ballots provided by our

company after you have filled out. According to the current legal process of the company, if you abstain, we may need to confirm each final ballot of the vote.

145. James Chang: We suggest, of course, it is only a suggestion of our own, that you change the "Withhold" option provided to you by the company into "Against" option. Then you can fill it out one. Lawyer Li will assist in this regard.

146. Yang Guang: As to any modification to the ballots, we are no experts, and I remind you, that we need to confirm its validity if the current ballot is modified.

147. James Chang: Let me be noted on the record that we provided our own ballot. So in case of any disagreement, please refer to our ballots which shall control.

148. Yang Guang: We might need our lawyer to eventually confirm this. I think you are free to make your own statements. But I would like to confirm to everyone that he is not our lawyer, after all. If he has any law enforcement qualification of Antigua, I suggest he present it to us so that we can follow your suggestion. If not, then please do not forget to consider the validity of the ballot.

149. James Chang: Or if there is any concern, please feel free to leave a blank ballot provided by the company. But if you ask us, we suggest to the company filling out the ballot provided by us and filling out two copies.

150. Yang Guang: I'm sorry, I'm afraid it's unacceptable to the company. We have distributed ballots to some shareholders before and those ballots have the same effect with these we distribute today. All the ballots we have distributed before are valid.

151. James Chang: I only ask you one question today. Do you accept my ballot or not?

152. Yang Guang: If you fill in the ballot we provide, I will accept it. Then, I would like to confirm with you that.

153. James Chang: Not the company's ballots, but our own ballots. Do you accept or not?

154. Yang Guang: You listen to my question, you listen to my question is that as for the ballots you provide, you want to know how to submit and confirm them and you want to give them to me, right?

155. James Chang: We will give them to you after all stockholders have filled in the ballots because you are the scrutineer today. Meanwhile, we will give another copy to our own scrutineer.

156. Wang Nan: If you are willing to formally submit the ballots to the company, no matter the ballots are provided by us or by you, we will accept and record them. We can also submit them to the lawyer. However, we cannot use the ballots you provide as [the basis] in counting valid ballots under the guidance of our lawyer.

157. James Chang: The law has its own judgment.

158. Yang Guang: OK, I will collect the ballots provided by the company. Will you give me back a filled ballot or unfilled one?

159. James Chang: Every participant has the right to decide whether to fill in or not. If you will fill in, I suggest that you change the "Withhold" option to "Against". [The spelling is] against.

160. Yang Guang: The meeting will end at ten o'clock shortly, because we have other arrangement after the meeting.

161. Unidentified male speaker]: it will be definitely before 10:00.

162. Yang Guang: You must have made your decision. So I can take it back.

163. James Chang: If you want to fill in the company's ballots, we still suggest changing "Withhold" to "Against", and then choose "Against All" or "Against All Except". We think Lu Yulin can remain, but if you feel troublesome, you can consider [not filling in], this is our personal suggestion.

164. James Chang: Mme Secretary, as far as we know, this meeting should be held in Beijing and Antigua at the same time in theory. The meeting in Antigua is held at the address of your company's law firm, so if you arrange the meeting according to the proxy statement you have provided, the door of Antigua's law firm should be open now and there should be an Antiguan lawyer on the spot. So, I require to record these matters and I ask you to communicate with the Antiguan lawyer now. This is the first point.

165. Yang Guang: I will try.

166. James Chang: Secondly, I request that you accept the ballots we provide and record the percentage of our ballots in the present voting on the record.

167. Yang Guang: Then, that is to say, I personally have no way to confirm whether I can accept the ballots provided by you, but I can collect the ballots and then count them with the lawyer.

168. James Chang: But I request you to tell us the percentage of our ballots in the total number of present voting.

169. Yang Guang: You mean the total ballots?

170. James Chang: Yes, exactly. Thank you.

171. Yang Guang: That's OK.

172. James Chang: Great. Thank you.

173. [Unidentified Female Speaker]: do you give all of your ballots back?

174: James Chang: We will give on copy to the scrutineer.

175. Yang Guang: The filled ballots provided by JP Morgan that I have collected have 26,103,784 shares, representing 45.58% of the total share outstanding.

176. James Chang: How about the present and voting, please?

177. Yang Guang: Are you talking about the results of the election of directors?

178.   James Chang: Present and voting is a fraction whose denominator is the number of persons present in the meeting and whose numerator is us, what is it?

179.   Yang Guang: Those who attend the meeting in person today?

180.   James Chang: not in person today, I mean the numbers both from online and in person.

181.   Yang Guang: Including the numbers online?

182.   James Chang: Yes. present and voting.

183.   Yang Guang: 55.19%.

184.   James Chang: Thank you.

185.   Yang Guang: Then I can only record the ballots you provided. I really have no qualification to judge whether they are valid or not. We will raise this issue and confirm it again.

186.   James Chang: The law will judge whether they are valid or not. Thank you.

187.   Yang Guang: And today, for the emergence of the new ballots, we can't declare the outcome of the meeting now. Please give us some time to consult the lawyer to determine the outcome. We will publish the outcome of the meeting through information announcements. What does everyone think about it. The main subject matter on our side should be.

188.   James Chang: Can you find an Antigua lawyer? Theoretically, there should be at least a lawyer at the meeting in Antigua, I think.

189.   Yang Guang: We used to communicate with the lawyer to transfer the meeting. This was what we used to do in earlier years. However, he said, in recent years, we do not need this practice anymore, so we held the meeting in Beijing.

190.   Yin Weidong: We used to have teleconferences.

191.   Yang Guang: They used to make a call and he gave us the seat of the chairman. If you have any requirement, we will consult with the Antigua lawyer. We can fix a time to discuss it if necessary.

192.   James Chang: I think we should respect the opinions of the shareholders on the spot.

193.   Yang Guang: Or I have a suggestion. Now that I have given my business card, you are welcome to contact me anytime on any questions in this regard. We will respond positively, no matter you want to communicate with the lawyer or with the company, including any person at any level from our company. Ok?

194.   James Chang: Ok.

195.   Yang Guang: That's all for the meeting agenda today. Thank you.

196.   Yin Weidong: The meeting is over. (Underlining supplied)

[11]   From the above transcript, the Court makes the following factual findings:

(1)  No one at the AGM disputed the validity of the notice issued for the convening of the AGM;

10

(2) A quorum was declared by, Guang Yang (Helen Yang), the scrutineer/inspector of the election at the AGM;

(3) A motion to (a) amend the ballot to include the option of voting against the Incumbent Directors and (b) to nominate four directors to the board, was moved and seconded;

(4) The Dissenting Shareholders cast their vote on an amended version of the ballots provided by the Company;

(5) Guang Yang collected the Dissenting Shareholders' ballots but repeatedly stated that she had to confirm the validity of those ballots with the Company's Antigua attorneys;

(6) There was a tabulation of the votes cast which showed that the New Directors had obtained the majority of votes, but there was no declaration of the results of the election. Guang Yang repeatedly stated that she needed to confirm the validity of the votes cast with Antigua counsel.

**The Notice Point**

[12]   Mr. Houseman's argument can be stated succinctly. It is that, on a proper construction of the language of section 71 of the IBCA, the only notice required is the notice of the AGM to be given to directors which, in the instant case, had been provided. Mr. Alford, on the other hand, pitched his argument more broadly. He contends that section 71 must be construed against the contextual framework that shareholders should receive full, fair and plain disclosure to have a reasonable opportunity to express their will on company matters. The shareholders were deprived of this opportunity because the Dissenting Shareholders, acting in secret and colluding in breach of a Rights Agreement entered into by the Company and in breach of United States Securities law, hijacked the AGM and nominated an alternative board of directors without any notice whatsoever. This, he says, is conduct for which the Court, in the exercise of its broad powers under section 122, should refuse their claim.

[13]    Section 71 provides:

> "(1) A director of a corporation is entitled to receive notice of, and to attend and be heard at, every meeting of shareholders.
>
> (2) A director
>
>> (a) who resigns,
>>
>> (b) who receives a notice or otherwise learns of a meeting of shareholders called for the purpose of removing him from office, or
>>
>> (c) who receives a notice or otherwise learns of a meeting of directors or shareholders at which another person is to be appointed or elected to fill the office of director, whether because of his resignation or removal or because his term of office has expired or is about to expire, may submit to the corporation a written statement giving the reasons for his resignation or the reasons why he opposes any proposed action or resolution.
>
> (3) The corporation shall forthwith send a copy of the statement referred to in subsection (2) to the Director and to every shareholder entitled to receive notice of any meeting referred to in subsection (1).
>
> (4) No corporation or person acting on its behalf incurs any liability by reason only of circulating a director's statement in compliance with subsection (3)."

[14]    Mr. Houseman submitted that: (1) the Company complied with section 71 (1) as each of the Incumbent Directors was given notice of and permitted to attend the AGM; (2) section 71 (1) contains the <u>only</u> notification obligation in the whole of section 71; (3) section 71 (2) contains no additional or specific obligation to provide notice to any director; rather, it assumes that no such notification may have been given because sub-sections (b) and (c) both say "or otherwise learns of"; (4) section 71 (2) confers upon a director <u>an opportunity</u> to submit a written statement giving reasons as to why he opposes the proposed resolution; (5) sub-section (3) imposes an ancillary or contingent obligation on the Company to provide copies of any such written statement to shareholders; and (6), in any event, section 71 is silent as to the consequences, if any, of non-compliance with its obligations and therefore it cannot be said that non-compliance would somehow vitiate the conduct or outcome of a shareholders' meeting. Clear statutory language would be needed to create such legal effect. In these circumstances, it is difficult to see how the Incumbent Directors were entitled to any additional or

12

specific notification of their proposed removal at the AGM, other than notice under section 71 (1).

[15]   Mr. Alford submitted that, at the AGM, the claimant and the Dissenting Shareholders, without prior warning, proposed a motion to amend the ballot paper; impose a cap on the number of director candidates that members could vote in favour of; and to add four new candidates.  Shareholders who did not attend the AGM had no advance notice of any of these proposals and so were unable to consider, let alone vote on, them.  At previous AGMs, very few shareholders attended in person and the routine business was dealt with largely through proxy voting online in advance of the meeting and that, knowing this, the claimant and the Dissenting Shareholders ambushed the meeting with the result that the shareholders:

(a)  Had no advance warning that the AGM was going to consider anything other than the routine re-appointment of the Incumbent Directors;

(b)  Had no advance warning that a group of shareholders were planning to take control of the board;

(c)  Had no advance warning that alternative director candidates were to be proposed for election on the day of the AGM;

(d)  Had no advance warning as to identity, abilities or qualifications of any of the alternative slate;

(e)  Had no opportunity to decide, with the benefit of knowing the full facts, whether to participate in the meeting, either in person or online; and

(f)  Had no ability to exercise proxy votes against any of the alternative slate.

[16]    It does not appear that the Eastern Caribbean Supreme Court has previously considered the interpretation of sections 71 or 122 of the IBCA.  Mr. Alford assisted the Court with extracts from the **Canada Business Corporations Act**, the **Canada Non-Profit Corporations Act** and the **Ontario Business Corporations Ac**t.  From an examination of these various pieces of legislation, it appears that the IBCA is indeed based on what might be termed as the Canadian

13

model.  Section 122 of the IBCA, for example, mirrors section 145 of the **Canada Business Corporations Act**, while section 71 (2) of the IBCA mirrors section 123 of the **Business Corporations Act**.    In this regard, I consider Canadian authorities dealing with similar sections to be helpful.

[17]    Mr. Alford relied on **Kluwak v Pasternak**,[2] a decision of the Ontario Superior Court, as authority for the proposition that shareholders are entitled to full, fair and plain disclosure to make an informed decision on affairs of the company which call for a vote.  In **Kluwak**, the applicant spearheaded the dissident shareholders in a proxy fight for control of the board of directors of the respondent corporation.  The respondent, Pasternak, chaired the annual general meeting at which he disallowed the dissident proxies on the basis of what he viewed as material misrepresentations in the dissident proxy circular.  As a result, he declared the management's slate of directors elected. In that judgment, Mesbur J stated:

> "[14]    The author of *Shareholder Remedies in Canada* makes the comment that 'case law requires that <u>all information be disclosed that a reasonable investor would consider important in deciding whether to vote</u>.' He refers to the philosophy and standard of disclosure discussed as long ago as 1934 in *In re Dorman, Long and Co.* where Maugham J noted: 'It is perhaps not unfair to say that in nearly every big case not more than five percent of the interest involved are present in person at the meeting.  It is for this reason that the Court takes the view that it is essential to see explanatory circulars sent out by the board of the company are perfectly fair and, <u>as far as possible, give all information reasonably necessary to enable the recipients to determine how to vote</u>.' What is true for a board circular is equally applicable to a dissident information circular. Shareholders must have all the information they need in order to make an informed decision about voting.
> …
> [16]    In essence, then, an information circular must contain <u>full, fair and plain disclosure, that has sufficient information concerning the pertinent matters set out 'in sufficient detail to permit shareholders to form a reasoned judgment concerning the matter</u>.'" (Underlining supplied)"

---

[2] [2006] CanLII 41292.

[18]    I consider the reasoning of Mesbur J in **Kluwac** to be sound, logical and persuasive.  It stands for the unobjectionable principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them.  In the instant case, it is not in dispute that: (1) the company has about 3,300 shareholders located in various parts of the world; (2) the board of directors had been re-elected, unopposed, at every AGM for many years and there had never been alternative candidates proposed; (3) shareholders typically voted online and by proxy in advance of the AGM; those who voted online or by proxy card in advance of the AGM would only have known of the Incumbent Directors, there being no indication of alternate candidates; and (5) a number of shareholders did not vote at all.  Based on those facts, it is a reasonable inference that shareholders who voted in advance of the AGM, or those who chose not to vote, had no reason to think that anything would be different at the 2017 AGM.  If they knew that an alternate slate was to be proposed, that might have determined whether and how some shareholders voted at the AGM.  In these circumstances, can it be said that the shareholders had full, fair and plain disclosure on the important matter of the election of the board of directors of a valuable international company to permit them to make an informed decision?

[19]    Mr. Houseman relied on **Betts & Co Limited v Macnaughten**.[3]  In that case, the notice of the annual general meeting of a company stated that its purpose was the passing of certain resolutions, one of which was the appointment of three named individuals as directors. At the meeting, an amendment was carried that, in addition to those three, two additional named directors should be appointed.  The company's articles of association provided that the notice of an ordinary general meeting, at which special business was to be transacted, should specify the general nature of such special business.  It also provided that the number of directors should be no more than seven or less than three.

---

[3] [1910] 1 Ch. 430.

[20]    Eve J, in concluding that the business transacted at the meeting was within the scope of the special business indicated in the notice, stated:

> "Ought I to hold that the amendment which purported to reappoint the three gentlemen named in the notice as directors for the ensuing twelve months and to add two other gentlemen as additional directors was an amendment so inconsistent with the object of the meeting as stated in the notice and so irregular as to be beyond the power of the meeting? Was it, in short, such an amendment as no reasonable man would have regarded as competent to be put forward at a meeting so convened? … <u>I think I must assume that the shareholders who received this notice were alive to this possible contingency,</u> <u>and, further, were aware that in the matter of electing directors the only restriction on the power of the company is to be found in the article which limits the maximum number to seven</u>.  With these facts present in his mind <u>I think a reasonable man reading this notice must have appreciated that those present at the meeting would regard themselves as empowered to make such appointments to the board for the ensuing year as they thought fit so long as they did not do anything contrary to the company's regulations</u>. No one could have thought that the meeting was convened to appoint the three named individuals without the power to substitute other qualified persons for all or any of such individuals, and there is nothing in the notice to indicate that the company will not, if they fit so to do, exercise their power of increasing the number of directors under …<u>The special business indicated in the notice being the election of directors for the ensuing year, I think a recipient of the notice must be taken to have known that the company in general meeting might make any appointments within the limit imposed by their regulations</u>…" (Underlining supplied)

[21]    Extrapolating the **Betts** principle to the instant case, Mr. Houseman argues that the shareholders, reading the notice of the AGM that there would be an election, were alive to the possibility that an amendment could be proposed resulting in the election of a different board of directors than the one proposed.  Indeed, there appears to be nothing in the IBCA, the IBCA Regulations, the bye-laws of the Company or its articles of association that prohibit or restrict the proposing of amendments to resolutions or motions at an AGM.  I think, however, that the instant case is materially distinguishable from **Betts** for the following reasons:

(1) In **Betts**, two additional directors were nominated in addition to the three proposed for nomination while, in the instant case, the proposed amendment was for the replacement of the proposed nominees, except for one;

16

(2) In **Betts**, the proposed amendment for two additional nominees to the board was within the articles of association which limited the board to a maximum of seven.  In the instant case, the Dissenting Shareholders proposed a cap on the number of elected directors that was below the fifteen member limit prescribed in the articles of association.

(3) **Betts**, a 1910 case, was in a different era.  The internet had not yet been invented and so the concept and possibility of voting online, in advance of the AGM, did not exist.  The instant case involves a company (with multi-national investors, incorporated in Antigua, doing business in China, listed on Nasdaq and regulated by US securities law) whose shareholders routinely voted online in advance of an AGM and therefore had no notion that an entirely different slate from that on which they voted would have materialized at the AGM.

[22]   I accept, in principle, that shareholders who receive notice of an AGM for the election of directors must be alive to the possibility that an amendment to the motion can be proposed, resulting in a different board of directors.  But the globally accepted, modern practice of voting online in advance of an election introduces a new dimension to the hitherto conventional practice of proposing amendments to motions on the floor of the AGM.  That practice might be unobjectionable where the shareholders of a company are all situated in the same jurisdiction and attend AGMs in person.  In today's world, however, where technology allows for internet voting and thousands of shareholders of a company are spread across the globe, physical attendance at meetings is an effete convention.  This Court therefore finds itself at the intersection of two corporate cultures.  One the one hand, there is the practice of moving amendments to motions on the floor of the AGM. On the other hand, there is the modern practice of shareholders voting online in advance of an AGM and not physically attending, which closes them off from what transpires at the AGM.

[23]   Where the company's articles of association and the governing law are silent as to how one might reconcile online voting in advance of an AGM with the right to

17

move an amendment to a motion at an AGM, the best that the Court can do is to insist on a minimum standard of basic fairness. Those shareholders who voted online in advance of the AGM were following a routine practice, voting for one slate that had been re-elected for many years, had no reason or warning to expect anything different and certainly had no idea that a different slate of candidates would have been proposed at the convention. They, as well as those who chose not to vote, did not have an opportunity to make an informed decision. The Dissenting Shareholders, as will be seen later in this judgment, had been planning in secret to propose an alternate slate and therefore had no good reason for not giving advance notice of their intended amendment. This undermines basic fairness to which the shareholders, as a whole, were entitled.

[24]    Returning to the language of section 71, I accept that it does not state that notice must be given to directors (or shareholders) where it is proposed to elect another person to the office of director. However, in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is to be contested ought to be given some kind of notice. If a director receives no notice, he cannot submit the written statement referred to in section 71(2), in which case the Company cannot send a copy of such statement to the shareholders as required by section 71(3). The shareholders would therefore not have received full and fair disclosure to make an informed decision on an important company matter. Shareholders in a valuable, publicly traded company surely would be interested in reading what an incumbent director, whose position is challenged, might have to say about the qualifications and experience of a proposed nominee for his seat on the board of directors. As stated above, there was no good reason for failing to give effect to the spirit and intent of section 71 (2) and (3).

[25]    In my view, the spirit and intent of section 71 was breached and while the section is silent as to the effect, if any, of non-compliance on the election or the AGM, it is certainly a factor for this Court to weigh in deciding whether or not to grant relief.

18

**Validity of Amended Motion, Ballots & Proxy Forms**

[26]    As the transcript of the proceedings of the AGM shows, the Dissenting Shareholders voted to amend the Company ballot paper to include the option of voting against the Incumbent Directors.  Their votes were therefore cast on an amended version of the Company's ballot paper.  The Company submits that their ballot was not validly amended because, firstly, the Dissenting Shareholders did not allow any review or consideration of the written terms of the proposed ballot by Weidong Yin, the Chairman of the AGM, or Guang Yang as inspector of the AGM.  Secondly, the Company ballot (setting out the motions in the AGM notice) had already been distributed, therefore the shareholders present at the AGM had two contradictory ballots with no clarity as to how many should be completed and in which order, resulting in procedural confusion.  Those shareholders who voted by proxy never got to see the alternative ballot at all.  Thirdly, the Dissenting Shareholders did not allow any opportunity for debate on why the number of directors that could be voted for was limited to five when the articles of association allowed for fifteen, or on the identity and qualifications of the proposed new slate.  Fourthly, the first two matters proposed at the AGM by the Dissenting Shareholders (to amend the Company ballot and to propose a vote for not more than five of nine nominees including the alternative) were not validly proposed or voted on.  Fifthly, the proxy form used by the Dissenting Shareholders at the AGM did not comply with the requirements of section 15 of the IBCA Regulations, rendering those votes invalid.  In these circumstances, the Company submits, the claimant is not entitled to the declaratory relief sought.

[27]    There is nothing in either the IBCA or the IBCA Regulations that prohibits an amendment to an ordinary resolution being proposed by shareholders attending an AGM.  Section 109 of the IBCA, read together with section 370, suggests that the business of election of directors is an ordinary motion or resolution carried by a simple majority of the votes cast by shareholders voting on that resolution:

> "108 (1) Notice of the time and place of a meeting of shareholders must be sent not less than twenty-one days nor more that fifty days before the meeting…

19

…
109 (1) All business transacted at a special meeting of shareholders and all business transacted at an annual meeting of shareholders is special business, except
    (a)  the consideration of the financial statements,
    (b)  the auditor's report,
    (c)  the election of directors, and
    (d)  the re-appointment of the incumbent auditor
….
370(l)   "ordinary resolution" means a resolution passed by a majority of the votes cast by the shareholders who voted in respect of that resolution."

[28]    Section 7.4 of the Company's bye-laws is to the same effect as section 109 (1) of the IBCA.  It is therefore clear that the election of directors at the AGM was not special business; it was an ordinary resolution that could have been passed by a majority of the votes cast by the shareholders who voted in respect of that resolution.  It does not appear that there were any technical breaches, if I might put it like that, of Antiguan law in proposing the amendments to the motion at the AGM.   The matter cannot, however, be analyzed in isolation from the Court's earlier finding that the shareholders as a whole were entitled to full and fair disclosure.  Amending the company's motion to include an alternate slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the Court to consider in deciding whether or not to grant relief under section 122.

[29]    I now turn to the question of the validity of the proxy form used by the Dissenting Shareholders.  The claimant complains that it would be procedurally unfair to permit the defendant to rely on this point because the defendant only gave notice, on Friday, 30th November 2018, that it intended to take this point at the trial on Monday, 1st December 2018.  I do not think the claimant is prejudiced for two reasons.  Firstly, as pointed out by the defendant, it was the claimant which first referred to sections 13-15 of the IBCA Regulations in its written submissions.  Having done so, it could not now complain if the defendant introduced an argument based on section 15.  Secondly, at the claimant's request, the Court

20

consented to the filing of post-hearing submissions on this point to allow the claimant time to research and submit a full response on this issue. The claimant filed eight pages of written submissions on this issue. There can therefore be no serious allegation of procedural unfairness.

[30] On the matter of proxies, the IBCA Regulations provide as follows:

> "14. A form of proxy may confer discretionary authority in respect of amendments to matters that properly come before the meeting and that were not identified in the notice of meeting.
> 15. A form of proxy must not confer authority to vote in respect of an auditor or the election of a director unless a bona fide proposed nominee for the appointment or election is named in the form of proxy."

[31] The Company argues that the proxy forms conferring authority upon representatives of the Dissenting Shareholders at the AGM failed to comply with regulation 15 and, consequently, the votes cast pursuant to those proxies should be ignored or rendered invalid. The claimant submitted that regulation 15 applies only to proxy forms issued by or on behalf of the company when it gives notice of the AGM, namely, the so-called 'proxy card'. The Company says that it applies to all proxy forms used to enable shareholders to cast their vote.

[32] I am of the view that the object and intent of regulation 15 is clear and unmistakable: it is to ensure that, on important matters such as the appointment of an auditor and the election of directors, the will of the shareholder (the proxy-giver) is effected and that all shareholders have been provided with full information concerning the election of directors. Such a requirement has greater relevance and consequences for a publicly traded company with thousands of shareholders who vote online and through brokers, than, for example, a small family-run company. On the evidence of Mr. Pengfei Li, given on behalf of the claimant, neither the claimant as beneficial shareholder nor TD Ameritrade Clearing Inc. as registered shareholder, knew that the alternative slate was to be put forward at the AGM at the time the registered shareholder granted the proxy to Mr. Li. Mr. Li,

21

who was himself nominated to the board by the Dissenting Shareholders, said he had no idea that he was going to be nominated.  This is not full, fair and plain disclosure.  It appears to be an ambush.

[33]  The claimant says that the company waived any procedural defect in the Dissenting Shareholders' proxy forms by counting them at the AGM for the purposes of declaring a quorum and then by counting them in favour of the amended motion.  It is clear, however, from the transcript of the proceedings at the AGM, that Guang Yang was at pains to point out that, while she would <u>collect</u> the ballots, she could not pronounce on the validity of the ballots that had been amended by the Dissenting Shareholders until the matter had been reviewed by Antiguan counsel.  Guang Yang did not say anything about the proxy forms at the AGM, but her reserving any declaration on the result of the election meant that it was open to the Company's Antigua counsel to review the validity of the process.  I am therefore of the view that the defect in the proxy forms was not waived by the Company.

[34]  Both sides relied on **Ambassador Industries Ltd v Camfrey Resources Ltd.**[4] In this case, the dissident shareholder's proxy form was upheld by the Court because both rival information circulars sent to all the shareholders had a full list of all the proposed director candidates.  Each information circular listed out the rival candidates for appointment and explained the rival positions. The court therefore had no difficulty upholding the form of proxy in that case.  The court in **Ambassador** stated:

> "These [rival circulars] make very clear to all concerned who is running and whether that candidate is part of the management slate or the dissident slate.  I also bear in mind that the petitioner's information circulars expressly refer to the circulars being sent out by Camfrey management.
> I find that in deciding whether or not this proxy is valid, the test I have to apply is whether under the circumstances of the information circulars sent out by the petitioner referring, as they do, to the circulars sent out by

---

[4] [1991] CanLii 593 (BC SC)

> Camfrey, it can be said that there is sufficient information to conclude that a shareholders is in a position to come to an intelligent decision as to whether he should vote for or against the directors on their respective slates."

[35]    I am of the view that **Ambassador** is persuasive authority for the proposition that, where a proxy form is called into question, the Court is concerned to examine the position of all the shareholders, not just those who signed the proxy in question.  In the instant case, none of the Dissenting Shareholders provided any advance notice to the Company or the shareholders, as a whole, prior to the AGM, of a proposal to replace the board or of the identity of their nominees for election, nor did their proxy form name any nominee for election.

[36]    The Court, in the final analysis, must weigh the right of the shareholders to full information to be able to come to an intelligent decision against the right of shareholders who voted not to be unfairly disenfranchised.  For this reason, I will not make any ruling on the validity of the proxy form but consider it as a factor, in the round, when exercising the Court's discretion under section 122.

### Conduct of the Claimant

[37]    The Company invites this Court to conclude that the claimant and the Dissenting Shareholders colluded and orchestrated a secret plan to elect a new board, without notice to the Incumbent Directors or the shareholders as whole.  As evidence of this, the Company relies on the following:

(1)  The year-end personal work summary of Tao Fuwu dated 12th January 2017;

(2)  A draft Amended and Restated Consortium Agreement;

(3)  The transcript of teleconference held on 8th January 2018;

(4)  An open letter from Sinobioway to all shareholders of Sinovac Biotech Limited; and

(5)  An email from "one shareholder Tang".

*Personal Work Summary of Tao Fuwu*

[38]    In this document, authored by Mr. Tao Fuwu, on the letterhead of Peking University V-Ming (Shanghai) Investment Holdings Co. Ltd, he set out his role as "one of the supervisors" in the matter of the privatization of the defendant and summarized his main work in 2017 to include:

> "…prepare to hold Sinovac special shareholders' conference and demonstration (including without limitation, repeated discussion and persuasion of 1G, especially assistance in analysis of poison pill plan, meeting order, analysis of the barriers and plans, shareholder proxies handling, and hiring of intermediary agent) preparation and opining on Sinovac's annual shareholders conference participation and change of the board of directors (repeatedly opine of plan risks, discuss rivals' obstructionism and opine on an appropriate response, opine on procedures, coordination among shareholders and documentation of authorized agent); the related media public relations work.
> …
> worked with 1G to achieve substantial progress and signed cooperation agreement and framework agreement…We are fundamentally prepared for changing the board of directors of Sinovac at the shareholders' conference."

[39]    Mr. Pengfei Li was the only witness of fact for the claimant.  During cross-examination, he stated that he was delegated by the claimant to manage its investment risk regarding the Company when the Company started being privatized.  He described his role as being to understand the situation, the processes and the risks involved in the privatization.  He stated, repeatedly, that the claimant entrusted him with full authority so he did not have to report to anyone there, even though the claimant had over a million shares in the defendant valued at between US $50-60 million dollars. He was free, he said, to make any decision, in consultation with the claimant's United States lawyers since the Company was listed in the United States.  He stated that most of the strategic advice in relation to the Company came from him and he did not need advice from anyone at the claimant.  He flatly denied, however, knowing anything about what was contained in the work summary and said he was puzzled by it.  He questioned whether, in fact, Mr. Tao Fuwu had really written it. He stated that competing groups in the privatization process would say anything to gain support but that the claimant had

24

remained neutral and had not sided with the Sinobioway Consortium as alleged by the defendant.

*Draft Amended and Restated Consortium Agreement*

[40]    This is a draft consortium agreement which lists 1 Globe Capital LLC and PKU-Ming (Shanghai) Investment Holdings Co. Ltd, among others, as parties to it.  This document suggests that the claimant was part of the Sinobioway Consortium to attempt to purchase the Company.  Under cross-examination, Mr. Pengfei Li said he was really surprised to see this document and had never seen it before.  He expressed doubt as to its authenticity since any communication would have to have been through him as the claimant's designated representative in this matter.  He said he believed that that so-called consortium agreement might be forged or fabricated, but declined Mr. Alford's invitation to say who might have forged it.  He said he had his suspicions about the placing of that document before this Court.

*Transcript of Teleconference*

[41]    This document is under the heading "Peking University V-MING (Shanghai) Investment Holdings Co. Ltd." and is a teleconference among Tao Fuwu, James Chang (called "Attorney Zhang"), "Attorney Chen" and "Attorney Bao" in which, among other things, the AGM is discussed and the eventuality of changing the board of directors. These plans included a rehearsal to prepare shareholder representatives for potential issues which the Dissenting Shareholders might face at the AGM and a media strategy to turn shareholders against the Incumbent Directors in the days before the AGM.

[42]    Mr. Pengfei Li, during cross-examination, denied that he knew anything about that teleconference and said that it was the first time he was seeing this document.  He stated that each group seeking to purchase the Company would say that it had the claimant's support, but the claimant had remained neutral throughout.

25

*Open Letter from Sinobioway*

[43]    In this document dated 31st January 2018, it is alleged that Mr. Weidong Yin, chairman and CEO of the defendant, bribed a senior official of the China Food and Drug Administration and was not qualified to serve as a director of the defendant; the defendant is accused of incompetence, not acting in the best interest of shareholders and infringing the voting rights of shareholders through the voting card prepared for the AGM.  It ended by recommending that shareholders attend the AGM and oppose the re-election of the current board.  Mr. Pengfei Li, again, denied any knowledge of involvement in this document.

*Email from Tang*

[44]    In this email to the defendant, the sender, describing himself as "one shareholder Tang", points out that the voting card prepared by the Company provided no option to vote "against" the re-election of the Incumbent Directors and requested the inclusion of the option to vote "against" on the voting card.  The sender's email address was 2300721606@qq.com.  On 8th February, a press release was sent out from Shandong Sinobioway Biomedicine Co. Ltd announcing the defeat of the Incumbent Directors and the election of the New Directors at the AGM. The release was sent from the email address 2300721606@qq.com.   Under cross-examination, Mr. Li admitted that Tang, whose real name was Joyce, was a younger colleague of his who worked at the claimant.  He admitted that the email was written, at his request, by Joyce but did not know why she used the name "Tang" instead of her real name.  He speculated that maybe if Guang Yang knew whom it was she would not have answered the email.  He was perplexed as to why the email of Joyce matched that of Sinobioway.

[45]    Mr. Pengfei Li maintained under cross-examination that he never knew James Chang, even though it was Mr. Chang who nominated him to be a director on the Company's board. He said he was surprised to have been nominated and did not know the other three individuals who were nominated to replace the Incumbent Directors.  He had remained silent throughout the AGM.  The next day he chaired

26

a meeting of the Company despite the fact that Guang Yang clearly had not declared the results of the election. I find it difficult to believe that Mr. Li did not know that he was going to be nominated. I find it equally difficult to believe that he did not need the claimant's approval to accept the nomination and did not need to consult the claimant on anything having to do with the Company. He was at a loss to explain why the email address from which his junior colleague sent an anonymous email to the Company matched the email address of Sinobioway which, on the evidence, had been involved in planning to oust the Incumbent Directors and spreading negative publicity about them. The haste with which he took charge of the Company, even before an official election result was declared, suggests that he knew of the plan to oust the Incumbent Directors. He said that Weidong Yin had called him to urge him to attend the meeting yet, instead of raising concerns with Mr. Yin, he instructed his junior colleague to send an email under a fictitious name. Taken in the round, I do not find the evidence of Mr. Pengfei Li to be at all credible. I am convinced, on a balance of probabilities, that there was a secret plan to take control of the Company and that the claimant, through Mr. Li, knew of and acquiesced in this plan.

[46]    When I consider the scale and detail of the secret plan, the absence of full and fair information which deprived shareholders of the opportunity to make an informed and intelligent decision and the defective proxy forms, I am obliged to conclude that this was not conduct that should be rewarded with relief under section 122. The claimant says that the defendant is not blameless and that the Incumbent Directors ran the Company in an undemocratic fashion by not preparing ballots that allowed for shareholders to vote "against" them. While there was no option of voting "against" on the ballot, shareholders had the option of "withholding" their votes. If the majority of votes were withheld from the Incumbent Directors, they could not have been deemed elected and therefore a fresh election would have to be called. In any event, a complaint about the Company's ballot was not good reason to keep secret an intention to propose an alternate slate.

[47]     In **Dumont v Manitoba Metis Federation**[5], the Court of Appeal of Manitoba, in considering section 139 of the **Corporations Act** (the equivalent of section 122 of the IBCA), stated that the court is free to exercise a discretion to make the order it thinks fit.  The Court, at paragraph 56 of its judgment, stated that evidence of wrongdoing and the essential fairness of the electoral process are factors that might influence the exercise of judicial discretion.  I therefore conclude that the claimant's knowledge of the secret plan, and the unfairness to other shareholders of the execution of that plan at the AGM, is enough for this Court to refuse the relief sought by the claimant.  While that conclusion is sufficient to fully dispose of this claim, I will go on to consider the validity of the Rights Agreement since both sides considered that this Court's declaration will be of practical utility to the parties in other proceedings.

### Validity of Rights Agreement

[48]     It is common ground between the parties that: (1) the Company entered into a Rights Agreement governed by Delaware law designed to "guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain control of the Company"; (2) the Rights Agreement provides that certain conduct of shareholders of the Company can trigger the dilution of their shareholding; (3) the question of whether the conduct of the claimant and others prior to the AGM constituted a "triggering event" entitling the Company to dilute their shareholding is currently pending before a Delaware court; (4) the Delaware court is the proper court to determine whether there was a "trigger event" under the Rights Agreement and whether that trigger event operated to dilute the Dissenting Shareholders' shareholding; (5) the Delaware Court has stated that it would benefit from a judgment of the Antiguan Court regarding the validity of the Rights Agreement as a matter of Antiguan law; and (6) this Court should indeed make a declaration on the validity of the Rights Agreement under Antiguan law.

---

[5] [2004] MBCA 149.

[49] The claimant argues, firstly, that Antigua, which applies English law, does not allow defensive shareholder rights plans without stockholder consent (and there was no such consent).  Secondly, the Rights Agreement was not validly adopted under Antigua law because the provisions of the IBCA were not complied with.  The defendant, in reply, relies on the Bermuda case of **Stena Finance BV v Sea Containers**[6] which upheld the validity of a rights plan, and contends that the Rights Agreement in the instant case was validly adopted under Antigua law.

[50] In **Stena**, Astwood CJ held that the distribution of rights to existing shareholders in anticipation of a possible hostile takeover bid is not unlawful, provided that the directors have the requisite powers under the company's bye-laws to issue such rights, that they exercise those powers bona fide (i.e. not for the purpose of entrenching the existing management of the company) and fairly as between shareholder.  Astwood CJ stated:

> "The directors stated the purpose for adopting the plan in the letter of 9 May 1988.  On review, their purpose appears to be legitimate and I have no reason to differ from them. The principles expounded by the Privy Council in *Howard Smith Ltd. v Ampol Petroleum* [1974] AC 821, have not, in my opinion, been breached. The plan seems to be favourable to all shareholders of record at the date of adoption of the plan, and those who became shareholders after that date did so knowing what the terms of the plan were. Therefore, they cannot now be heard to say that the plan is unfavorable to their aspirations in making a bid to take over the company.
>
> On a review of the plan, I tend to agree with Mr. Steinfeld that the plan did not do any of the following things: (a) it did not in any way alter or purport to alter (pending the exercise of the rights) the existing share capital of the company or the votes attached to the common shares; and (b) it, without in any way intending to penalize any existing shareholders (that would indeed have been expropriatory and improper), operated quite indiscriminately between all existing shareholders."

[51] I agree with Mr. Alford that, in the instant case, there is no allegation of any *mala fides* on the part of the Company's board or any suggestion that it entered into the Rights Agreement other than in accordance with its fiduciary duties.  There is in evidence minutes of the board meeting approving the Rights Agreement which

---

[6] (1989) 39 WIR 83.

record the board's belief that it would "contribute to the preservation of the Company's long-term value."

[52]    Corporate hostile takeovers are not a usual feature in the company law landscape of the Eastern Caribbean.  Several jurisdictions within the Eastern Caribbean (like the British Virgin Islands, Anguilla, Saint Christopher and Nevis and Antigua and Barbuda) have, however, introduced international business company legislation, resulting in the incorporation of some large companies with multi-national shareholders. These companies, as in the instant case, cannot carry on business in the jurisdiction of incorporation but are domiciled there to take advantage of tax advantages and other benefits and features available under the legislation.  It seems to me that, if Antigua wishes to attract international business to companies to incorporate in the jurisdiction, it has to recognize that defensive shareholder rights plans are part of that corporate landscape.  I would therefore adopt the approach taken by Chief Justice Astwood in **Stena** and say that, provided the Rights Agreement is not contrary to the IBCA or the Company's articles and bye-laws, and provided it was not entered into to entrench the Incumbent Directors, it should be considered as valid.   I would add that it should perhaps not be contrary to Antiguan laws or public policy.

[53]    I must therefore examine both the IBCA as well as the articles of association of the Company to see whether the company could lawfully enter into the Rights Agreement.

[54]    The articles of association of the Company provides as follows:

> **"ARTICLE III. CAPITAL**
> 1. The Corporation is authorized to issue 100,000,000 bearer or registered shares of US$0.0001 each par value common stock which shall be designated "Common Shares" and 50,000,000 Preferred shares of US$0.0001 par value which shall be designated "Preferred Shares".
> 2. No pre-emptive rights shall attach to the shares to be issued in respect of any class.

30

3. Both classes of shares may be issued in series and <u>the directors shall have the authority to fix the number of shares in, or to determine the designation of, and the rights, privileges, restrictions and conditions attaching to the shares of each series. (Underlining supplied)</u>

4. The Corporation shall have the power to increase or reduce said capital, and to issue any part of its capital, original or increased, with or without any preference, priority, or special privilege, or subject to any postponement of rights, or to any conditions or restrictions, and so that, unless the conditions of issue shall otherwise expressly declare, every issue of shares, whether declared to be preference or otherwise shall be subject to the power herein contained.

### ARTICLE IV. BOARD OF DIRECTORS

<u>The powers of the Corporation shall be exercised by the Board of Directors of the Corporation</u> which shall be empowered to name one or more officers as President and Vice-President of the Corporation, subject to any restrictions in the appointing resolution an act of a President shall bind the Corporation as if the said act had been approved by the Board of Directors. The Corporation shall have a minimum of one and a maximum of fifteen directors. (Underlining supplied)

### ARTICLE V. CORPORATE PURPOSE

The objects for which the Company is established are:

1. To conduct any and all business activities permitted by the laws of the State of Antigua and Barbuda as an International Business Corporation.

2. To acquire and deal with any property, real or personal, to erect any buildings, and generally to do all acts and things which, in the opinion of the Company or the Directors, may be conveniently, or profitably, or usefully, acquired and dealt with, carried on, erected or done by the Company in connection with said property.

3. To generally have and exercise all powers, rights and privileges necessary and incident to carrying out properly the objects herein under the International Business Corporation Act.

The Company shall not engage in International banking, Trust, Insurance, Betting and Bookmarking or any other activity which requires a License under the International Business Corporation Act.

The Company shall be primarily engaged in research, development and commercialization of human vaccines for infectious diseases."

[55]   Paragraph 8.9 of the bye-laws of the Company provides that the Board may exercise all such powers of the Corporation as are not by the Act or by the bye-laws required to be exercised by the corporation in an AGM.  It would therefore

31

appear to me that the power to make distributions, as contemplated by the Rights Agreement, is not reserved to the members and is therefore exercisable by the Board. I note as well that, under section 35 of the IBCA, the power of the Company to grant conversion privileges, options or rights to acquire shares of the corporation is exercisable by the board and not its members.

[56] Mr. Houseman relies on sections 161 and 163 of the IBCA to support his contention that Rights Agreement could not be adopted without amending the Company's articles of association. Those sections are as follows:

"(1) Subject to sections 162 and 163, the articles of a corporation may, by special resolution, be amended -
    (a) to change its name;
    (b) to add, change or remove any restriction upon the business that the corporation can carry on;
    (c) to change any maximum number of shares that the corporation is authorised to issue;
    (d) to create new classes of shares;
    (e) <u>to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued; (underlining supplied)</u>
    (f) to change the shares of any class or series, whether issued or unissued, into a different number of shares of the same class or series or into the same or a different number of shares of other classes or series;"

[57] Section 163 provides as follows:

"(1) The holders of shares of a class or, subject to subsection (2), of a series are, unless the articles otherwise provide in the case of an amendment described in paragraph (a) or (b), entitled to vote separately, as a class or series, upon a resolution to amend the articles -
    …
    (c)
    (iv) to add, remove or change prejudicially conversion privileges, options, voting, transfer or pre-emptive rights, or rights to acquire shares or debentures of a corporation, or sinking fund provisions."

32

[58]    I do not view the distribution of shares, triggered by the Rights Agreement, resulting in a dilution of a shareholders' shareholding, as changing the designation of or removing any rights or privileges attaching to or in respect of any shares. Neither do I see the applicability of section 163 of the IBCA.  I therefore conclude that the Rights Agreement is valid under Antigua law.

[59]    Finally, it is accepted between the parties that the question of whether the claimant acted in breach of US securities laws is a matter for the United States Courts; consequently, I will make no findings on this matter.

[60]    I therefore make the following orders:

     (1)  The Claimant's claim is dismissed.

     (2)  It is declared that the Rights Agreement was validly adopted as a matter of Antigua law.

**Godfrey P. Smith**
**High Court Judge**

**By the Court**

**Registrar**

33