# Exhibit 2

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE COURT OF APPEAL**

**ANTIGUA AND BARBUDA**

**ANUHCVAP2019/0005**

**BETWEEN:**

**1GLOBE CAPITAL LLC**

Appellant

**and**

**SINOVAC BIOTECH LTD.**

Respondent

**Before:**

| | |
|---|---|
| The Hon. Mr. Davidson Kelvin Baptiste | Justice of Appeal |
| The Hon. Mde. Louise Esther Blenman | Justice of Appeal |
| The Hon. Mde. Gertel Thom | Justice of Appeal |

**Appearances:**
Mr. Stephen Houseman QC, with him Mr. Lenworth Johnson for the Appellant
Mr. Stuart Alford QC, with him Mr. Rushaine Cunningham for the Respondent
Mr. Craig Jacas holding a watching brief

---

2019:  September 18
2021:  December 9.

---

*Civil appeal – Validity and effect of vote to determine company's directors at shareholders' annual general meeting - Power of court to determine any controversy surrounding an election or appointment of directors - Section 122 of the International Business Corporations Act – Whether the learned judge's refusal to grant relief under section 122 plainly wrong - Whether specific notice required to directors whose re-election is contested at forthcoming annual general meeting - Section 71 of the International Business Corporations Act – Shareholders' right to full and fair information - Whether court may insist on a basic standard of fairness being afforded to shareholders to reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting – Whether learned judge erred in his interpretation of regulation 15 of the International Business Corporation Regulations 1985 – Regulation 15 of the International Business Corporation Regulations 1985 - Whether the learned judge erred in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders – Conduct of party seeking section 122 relief - Whether the learned judge erred*

1

*by considering 1Globe's knowledge of the secret plan to oust the incumbent directors of Sinovac in refusing to grant relief under section 122 – Whether the learned judge erred in finding that the rights agreement between 1Globe and Sinovac was valid under Antiguan law*

1Globe Capital LLC ("1Globe") is a shareholder in Sinovac Biotech Ltd. ("Sinovac"), a China based company registered in Antigua and Barbuda under the International Business Corporations Act ("the IBCA"). On 28th December 2017, Sinovac issued formal notice of an annual general meeting to be held on 6th February 2018 ("the AGM"). Among the items of business listed for the meeting was the re-election of the existing board of directors. In advance of the AGM, shareholders who sought to oust the existing board ("the dissenting shareholders") formed a secret plan to take control of Sinovac. 1Globe knew of and acquiesced in this plan. Neither the board nor the other shareholders knew of the secret plan. At the AGM, without prior warning, the dissenting shareholders proposed alternative resolutions in order to secure the election of their own slate of directors. 1Globe contended that the new directors were validly elected whereas Sinovac maintained that the incumbent directors remained in control of Sinovac. As a result of the contested election, 1Globe applied under section 122 of the IBCA for the court to determine the controversy surrounding the validity of the election of the new directors. 1Globe sought, inter alia, a declaration that the new directors were validly elected at the AGM and an order that they be installed as Sinovac's new directors. Sinovac resisted the claim.

The learned judge dismissed 1Globe's claim and refused to grant relief under section 122. He found that there was a secret plan by the dissenting shareholders to oust the incumbent directors which 1Globe knew of and acquiesced in. The incumbent directors and other shareholders were given no notice of this secret plan and shareholders were effectively deprived of the opportunity to make an informed and intelligent decision on an important matter affecting Sinovac. The learned judge considered these factors, as well as the defective proxy forms and 1Globe's conduct, in coming to his decision to refuse to grant relief under section 122.

1Globe, being dissatisfied with the learned judge's decision, appealed. 1Globe argued, inter alia, that the learned judge (i) erred in his interpretation of section 71 of the IBCA, (ii) erred in finding that the principle permitting amendments to motions at shareholders' meetings, as laid down in Betts & Co. Ltd. v Macnaghten, was inapplicable to a modern corporate context, (iii) erred in finding that the proxy forms used by the dissenting shareholders were non-compliant with regulation 15 of the International Business Corporation Regulations 1985 ("the IBC Regulations"), (iv) erred in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders, by counting such votes as present for the purposes of declaring a quorum at the AGM (v) erred in considering 1Globe's conduct and knowledge of the secret plan to refuse to grant relief under section 122, (vi) erred in finding that the rights agreement between 1Globe and Sinovac was valid under Antiguan law and (vii) erred in the interpretation and exercise of his discretion under section 122 of the IBCA.

2

**Held:** dismissing the appeal; affirming the order of the learned judge and awarding prescribed costs to the respondent in the court below and costs in the appeal in the sum of 2/3 of the prescribed costs in the court below, that:

1. Absent local authority and case law on the interpretation of a particular section in legislation, authorities from another jurisdiction on corresponding legislative provisions are instructive. The learned judge found that the IBCA was modelled on corresponding Canadian legislation and section 71 mirrored section 110 of the Canada Business Corporations Act. Whilst section 71 of the IBCA had never been considered by the Eastern Caribbean Supreme Court, the corresponding legislative provisions had been the subject of judicial decision in Canada. Consequently, the learned judge did not err when he relied on and sought guidance from Canadian authorities dealing with similar provisions.

2. In construing legislation, the court's task is to give effect to Parliament's purpose. Provisions should be read in light of the statute as a whole, which, in turn, should be read in light of its historical context. The IBCA was modelled on Canadian legislation and Canadian authorities showed that the appropriate model was for full and fair disclosure of information to all shareholders. Thus, where shareholders are called to vote on important company matters, they are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. Whilst section 71 of the IBCA did not make it mandatory to give notice to the incumbent directors that there was a proposal by the dissenting shareholders to elect other persons in their place, in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is contested must be given some kind of notice. If no notice is given, then he would not be able to submit a written statement of his objections as per section 71(2) and the company would not be able to send that statement to the shareholders as per section 71(3). Consequently, shareholders would not have received full and fair disclosure to make an informed decision on an important company matter. The learned judge therefore did not err in his interpretation of section 71 in holding that the spirit and intention of the section had been breached by the dissenting shareholders' failure to give notice of the proposal to elect the new directors.

   Section 71 of the **International Business Corporations Act** Cap. 222, Revised Laws of Antigua and Barbuda 1992 applied; **Kluwak v Pasternak** 2006 CanLII 41292 (ON SC) applied; **Regina (Quintavalle) v Secretary of State for Health** [2003] UKHL 13 applied.

3. Where a company's articles of association and the governing law are silent as to how one may reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting, the court will insist on a minimum standard of basic fairness being afforded to all shareholders. Whilst there was nothing in the IBCA, the IBC Regulations or Sinovac's articles of association prohibiting an amendment to an ordinary resolution being proposed by the dissenting shareholders attending the AGM, by amending

3

the company's motion to include their alternative slate without notice to the other shareholders and after so many had voted in advance of the AGM, this undermined the basic fairness to which the shareholders, as a whole, were entitled. It would generally be in the company's best interests for shareholders to make fully informed decisions regarding the election of directors. The learned judge therefore did not err when he distinguished the case of Betts & Co. Ltd. v Macnaghten from the present facts since that was a 1910 case, before the internet had been invented and the possibility of voting online and in advance of the annual general meeting did not exist.

**Betts & Co. Ltd. v Macnaghten** [1910] 1 Ch. 430 distinguished.

4. Where a proxy form is called into question the court is concerned with examining the position of all shareholders and not just those who signed the proxy in question. A plain reading of regulation 15 of the IBC Regulations reveals that it applies to all proxies and that its object is to ensure that on important matters such as the election of directors, the will of the proxy giver, the shareholder, is effected and that all shareholders have been provided with full information concerning the election of directors. The learned judge therefore did not err in his interpretation of regulation 15. Furthermore, contrary to 1Globe's assertion, the learned judge expressly declined to make a ruling on the validity of the proxy forms. Instead, he considered the defective proxy forms as a factor to be considered when exercising the court's discretion under section 122.

Regulation 15 of the **International Business Corporation Regulations 1985** S.I. No. 43 of 1985 applied; **Ambassador Industries Ltd. v Camfrey Resources Ltd.** [1991] CanLII 593 (BC SC) applied.

5. Waiver refers to a voluntary, informed and unequivocal election by a party not to claim a right or raise an objection which it is open to that party to raise or claim. The words voluntary, informed, and unequivocal capture the essence of what is needed for a waiver of any kind to be valid. The learned judge found that at the AGM, the inspector of the election said nothing about the proxy forms and reserved a declaration as to result of the election. The inspector's evidence as well as the fact that the dissenting shareholders had a secret plan which neither the other shareholders nor the incumbent directors knew of, meant that the criteria for a valid waiver were not met. Consequently, Sinovac did not waive any technical deficiency in the proxy forms used by the dissenting shareholders by counting such votes as present for the purposes of declaring a quorum at the AGM.

**Millar v Dickson** [2002] 1 WLR 1615 applied; **McGowan v B** [2011] UKSC 54 applied.

6. An appellate court is constrained in interfering with findings of fact by a trial judge and must not interfere with such findings unless compelled to do so. This applies not only to findings of primary facts but also to the evaluations of those facts and to inferences to be drawn from them. Appellate interference requires a finding that

4

there was no evidence to support the challenged factual finding or that the finding was one which no reasonable trial judge could have made. Further, an appellate court is rarely justified in overturning findings of fact made by a trial judge which turn on the credibility of a witness. On the facts, the trial judge listed the items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan, and the documents were put to 1Globe's sole witness. The trial judge set out the witness' evidence in relation to each item and concluded that on the facts, the witness was not credible and there was a secret plan to take control of Sinovac which 1Globe knew of and acquiesced in. Such findings were open to the learned judge based on the evidence. Further, the court's exercise of its discretion under section 122 involves consideration of the facts and circumstances of the case at hand, with the conduct of the parties being one of the factors relevant to the exercise of the court's discretion.

**Fage UK Ltd. and another v Chobani UK Ltd. and another** [2014] EWCA Civ. 5 applied; **Mutual Holdings (Bermuda) Limited and others v Diane Hendricks and others** [2013] UKPC 13 applied.

7. For a rights agreement to have been validly entered into, it ought not be contrary to the governing law or the company's constitution. In coming to his decision that the rights agreement was valid under Antiguan law, the learned judge found that the rights agreement was not contrary to the IBCA or Sinovac's articles of association and bye-laws and that it was not entered into to entrench the incumbent directors. The learned judge did not err is his decision and the agreement was validly entered into since it was within the powers afforded to the directors under Sinovac's constitution and the IBCA.

**Stena Finance BV and Another v Sea Containers Ltd. and Others** (1989) 39 WIR 83 applied.

8. An appellate court will not interfere with the exercise of a discretion entrusted to a trial judge unless the judge has misdirected himself in law, taken account of irrelevant matters, failed to take account of relevant matters, or has made a decision which has exceeded the generous ambit within which reasonable disagreement is possible. Section 122 of the IBCA confers a very broad discretion in determining any controversy and on its plain wording, the court has a broad remedial discretion to make any order it sees fit. The exercise of the court's discretion in granting relief under section 122 and the form of that relief are inextricably linked to the facts of the particular case. Such facts necessarily include equitable principles such as the conduct of the party seeking relief. In refusing to grant relief under section 122, the learned judge considered the relevant factual context including 1Globe's conduct, the scale and detail of the secret plan and the absence of full and fair information to shareholders. Consequently, the learned judge did not err in his interpretation and exercise of discretion under section 122 in refusing to grant the section 122 relief.

**Dumont v Manitoba Metis Federation** [2004] MBCA 149 applied.

**JUDGMENT**

[1]    **BAPTISTE JA**:  This appeal stems from Smith J's dismissal of a claim brought by 1Globe Capital LLC ("1Globe") against Sinovac Biotech Ltd. ("Sinovac") under the remedial provision, section 122 of the **International Business Corporations Act**[1] ("**IBCA**"). The claim emanated from a dispute between 1Globe and Sinovac concerning a contested annual general meeting of Sinovac held in Beijing on 6th February 2018 ("the AGM"). 1Globe is a Delaware limited liability company and a shareholder in Sinovac, a China based company registered under the **IBCA**. Smith J described the case before him as a fight to control the board of directors of Sinovac, a company with about 3,300 shareholders, a market capitalization of US$447.3 million and listed on the Nasdaq stock exchange.

**Background**

[2]    The primary focus of the section 122 claim and the appeal concerned the validity and effect of the vote at the AGM whereby a vote was taken to remove the former directors of Sinovac ("the incumbent directors") and replace them with a new board of directors ("the new directors"). 1Globe contends that the new directors were duly elected as directors of Sinovac. Sinovac disputes this and posits that the incumbent directors, who had remained in control of Sinovac following the disputed election, are the valid directors of Sinovac.

[3]    In the court below, 1Globe sought a declaration that the new directors were validly elected at the AGM, an order that the new directors be installed as Sinovac's board of directors, a declaration that the incumbent directors are no longer Sinovac's directors, and an order that any action taken on behalf of Sinovac at their direction after the AGM are null and void.

[4]    Sinovac resisted the claim, contending that the votes cast by those shareholders in favour of the new directors ("the dissenting shareholders") were not valid because:

---

[1] Cap.222, Revised Laws of Antigua and Barbuda 1992.

(1) Their method of nominating individuals to Sinovac's board of directors, the proxy form used and the ballots they voted on did not conform to Antigua and Barbuda law ("Antiguan law").

(2) There was no full, fair, and plain disclosure to the shareholders in breach of section 71(2) of the **IBCA**, to enable them to make a fully informed decision regarding the election of Sinovac's board of directors.

(3) A right's agreement governed by Delaware law, was triggered by the conduct of the dissenting shareholders prior to, during and after the AGM, which affected the vote at the AGM by dilution of the shareholding of a significant proportion, if not all, of the dissenting shareholders who voted to elect the new directors.

(4) 1Globe and other shareholders, breached United States' securities laws by failing to make appropriate filings and, as a result, the business purportedly conducted at the AGM and/or the votes cast by those shareholders have been invalidated.

[5]   The issues before Smith J were:

(1) Was section 71(2) of the **IBCA** complied with in relation to the notices of the AGM? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace the incumbent directors?

(2) Was the vote to remove and replace the incumbent directors in conformity with Antiguan law? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace them?

(3) Is the rights agreement valid and effective as a matter of Antiguan law? If so, could the rights agreement, if triggered, affect the vote at the AGM?

(4) Was there a breach of section 13 of the United States **Securities Exchange Act of 1934**[2], by 1Globe? If so, what is the relevance, if any, to the outcome of the vote at the AGM?

[6]   Sinovac issued formal notice of the AGM on 28th December 2017, indicating three items of business, namely (1) the re-election of the existing board of directors, (2) approval of the audited consolidated financial statements of the company for 2017 and (3) the appointment of an independent auditor. This form of notice had been

---

[2] 15 U.S.C. 78a.

used by Sinovac and the relevant resolutions passed at the annual general meetings during the previous four years.

[7]    The court found that, in advance of the AGM, the dissenting shareholders formed a secret plan to take control of Sinovac by ousting the incumbent board. This plan involved ambushing the AGM on the day and attempting to secure the election, without notification to other shareholders or the board, of their own slate of directors, in place of the incumbent board. Smith J found that 1Globe had known of and acquiesced in the plan.

[8]    Shareholders holding shares constituting 82.5% of the issued share capital were present either in person or by proxy at the AGM. Almost half of those had voted in advance of the AGM by proxy or electronic voting. Critically, 17.4% of the issued shares were not voted. Both the advance proxy votes and those who had not voted were unaware of the proposal to elect the alternate slate of directors.

[9]    At the AGM, 1Globe and other dissenting shareholders, without prior warning, proposed resolutions to amend the ballot paper provided by Sinovac, impose a cap on the number of director candidates that shareholders could vote in favour of, and add four new candidates ("the alternative slate"), no information in respect of which had been provided to Sinovac or the other shareholders.

[10]   Smith J recognised that much turned on what transpired at the AGM and made the following factual findings from the transcript of the meeting:

> (1) No one at the AGM disputed the validity of the notice issued for the convening of the AGM.
>
> (2) A quorum was declared by Guang Yang, the scrutinizer/inspector of the election at the AGM.
>
> (3) A motion to (a) amend the ballot to include the option of voting against the incumbent directors and (b) to nominate four directors to the board, was moved and seconded.

8

(4) The dissenting shareholders cast their vote on an amended version of the ballots provided by Sinovac.

(5) Guang Yang collected the dissenting shareholders' ballots but repeatedly stated that she had to confirm the validity of those ballots with Sinovac's Antiguan attorneys.

(6) There was a tabulation of the votes cast which showed that the new directors had obtained the majority of votes, but there was no declaration of the results of the election. Guang Yang repeatedly stated that she needed to confirm the validity of the votes cast with the Antiguan counsel.

[11]    Smith J stated that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. In Smith J's view, the spirit and intent of section 71 of the **IBCA** was breached and while the section is silent as to the effect, if any, of non-compliance on the election or the AGM, it is certainly a factor for the court to weigh in deciding whether or not to grant relief.

[12]    The learned judge recognised that there was nothing in the **IBCA** or the **International Business Corporation Regulations 1985**[3] ("**the IBC Regulations**") prohibiting an amendment to an ordinary resolution being proposed by shareholders attending an annual general meeting, and that, it did not appear that there were any technical breaches of Antiguan law in proposing the amendments to the motion at the AGM. However, he reasoned that the matter could not be analyzed in isolation from the court's earlier finding that the shareholders, as a whole, were entitled to full and fair disclosure. Smith J further reasoned that amending the company's motion to include an alternative slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the court to consider in deciding whether or not to grant relief under section 122.

---

[3] S.I. No. 43 of 1985.

[13]     While Smith J did not make any ruling on the validity of the proxy form, he considered it as a factor, in the round, when exercising the court's discretion under section 122. He also considered Sinovac's invitation to conclude that 1Globe, and the dissenting shareholders colluded and orchestrated a secret plan to elect a new board without notice to the incumbent directors or the shareholders as a whole. After reviewing the evidence, Smith J found that there was a secret plan to take control of Sinovac and that 1Globe through Mr. Pengfei Li, 1Globe's only witness of fact and who the judge did not find to be credible, knew of and acquiesced in the plan.

[14]     Smith J concluded at paragraph 46 of his judgment that:

> "When I consider the scale and detail of the secret plan, the absence of full and fair information which deprived shareholders of the opportunity to make an informed and intelligent decision and the defective proxy forms, I am obliged to conclude that this was not conduct that should be rewarded with relief under section 122."

He dismissed the claim and declared that the rights agreement was validly adopted as a matter of Antiguan law.

**The appeal**

[15]     Being aggrieved by the judge's order and declaration, 1Globe filed nine grounds of appeal contending, among other things, that Smith J made numerous and material errors of fact and law. From a general level, 1Globe submits that the AGM vote claim/appeal is predominantly, if not entirely, a legal question governed by Antiguan law as the corporate seat. There was little, if any, factual dispute that is material to the determination of this central issue, yet the trial judge made factual findings which have no legal relevance to the proper determination of the pure legal issues underpinning the AGM vote analysis.

[16]     1Globe argues that an obvious and fundamental legal error vitiating the judgment is the judge's invocation of the discretionary remedial functions of section 122 of the **IBCA** to obfuscate pure questions of law and/or influence his determination of the section 122 claim by reference to extraneous findings of fact as to 1Globe's

10

knowledge of a "secret plan" to hijack the AGM. 1Globe further contends that the error of analysis by reference to the literal wording of section 122 appears to have allowed the learned judge to run distinct legal issues together into some kind of 'mix' rather than disposing of them on their own terms. 1Globe invites this Court to conduct the legal analysis afresh by reference to the discrete issues of company law involved.

[17]   For its part, Sinovac contends that the appeal is misconceived and lacks merit. In that regard, it asserts that 1Globe seeks to ignore factual findings based on Smith J's assessment of witnesses, notably, his rejection of 1Globe's sole witness, Mr. Li, as not "at all credible". Further, 1Globe seeks to ignore the fact that the judge's refusal to grant relief under section 122 of the **IBCA** involved the exercise of discretion and there is no basis for finding that the court exceeded the generous ambit of that discretion. Additionally, in circumstances where all the relevant Antiguan statutory provisions are derived from Canadian legislation, which differs significantly from English legislation in relation to the election of directors, it was entirely appropriate that Smith J had regard to Canadian authorities. Extensive Canadian case law shows that the appropriate model is for full disclosure by dissenting shareholders to allow all shareholders to make fully informed decisions. Sinovac also submits that the plain wording of section 122 confers a judicial discretion whether to grant relief and in what form. It gives the court a power to "determine any controversy …" and to "make any order it thinks fit …". The court has a broad discretion to make a just order under the circumstances in determining "any controversy".

**Ground 1**

[18]   I now consider the grounds of appeal. Ground one alleges that the learned judge erred in law in interpreting the words "make any order it thinks fit" in section 122 of the **IBCA** to confer upon the court a broad or general discretion as to the proper legal analysis of the validity of a vote taken at a meeting of shareholders including an annual general meeting. Section 122 provides that:

"(1) A corporation or a shareholder or director thereof may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.

(2) Upon an application made under this section, the court may make any order it thinks fit including, without limiting the generality of the foregoing,

   (a) an order restraining a director or auditor whose election or appointment is challenged from acting pending determination of the dispute;

   (b) an order declaring the result of the disputed election or appointment;

   (c) an order requiring a new election or appointment and including in the order directions for the management of the business and affairs of the corporation until a new election is held or appointment made; and

   (d) an order determining the voting rights of shareholders and of persons claiming to own shares."

[19]   Sinovac submits that on the plain wording of section 122 of the **IBCA** there is a clear judicial discretion whether to grant relief and in what form. It gives the court the power to "determine any controversy …" and to "make any order it thinks fit …". Sinovac posits that it is self-evident that such an exercise of discretion involves a consideration of the facts and circumstances of the case, and points to the heavy burden cast upon 1Globe in seeking to disturb the exercise of the judge's discretion. 1Globe must show that Smith J exceeded the generous ambit within which reasonable disagreement is possible. Sinovac submits that there is no basis for interfering with the exercise of Smith J's discretion.

[20]   It would be prudent to defer further consideration of this ground to later in the judgment.

**Ground 2**

[21]   Ground 2 alleges that the judge erred in law in concluding that (a) section 71 of the **IBCA** contains a specific obligation to notify directors that their re-election is to be

12

contested at a forthcoming meeting and (b) the "spirit and intent" of section 71 was breached in the present case and (c) notions of "basic fairness" to shareholders entitled to vote at meetings should inform or condition the proper meaning and effect of section 71, concerning notice to directors.

[22]    Section 71 states:

> "(1) A director of a corporation is entitled to receive notice of, and to attend and be heard at every meeting of shareholders.
>
> (2) A director
>> (a) who resigns,
>>
>> (b) who receives a notice or otherwise learns of a meeting of shareholders called for the purpose of moving him from office, or
>>
>> (c) who receives a notice or otherwise learns of a meeting of directors or shareholders at which another person is to be appointed or elected to fill the office of director, whether because of his resignation or removal or because his term of office has expired or is about to expire,
>
> may submit to the corporation a written statement giving the reasons for his resignation or the reasons why he opposes any proposed action or resolution.
>
> (3) The corporation shall forthwith send a copy of the statement referred to in subsection (2) to the Director and to every shareholder entitled to receive notice of any meeting referred to in subsection (1).
>
> (4) No corporation or person acting on its behalf incurs any liability by reason only of circulating a director's statement in compliance with subsection (3)."

[23]    1Globe asserts that Smith J erred in law in his interpretation of section 71 of the **IBCA** and argues that the proper meaning and effect of section 71 is a pure question of law, that is, statutory construction, and there is no room for factual circumstances to influence the answer. Section 71 is concerned with protecting a director's legitimate expectations in advance of a meeting where his tenure of office may be brought to an end. Further, section 71 did not impose a specific obligation upon Sinovac to give advance notice to the incumbent directors of any specific contest

13

for their re-election, and that the statutory requirement for notice was complied with in the AGM notice. 1Globe further submits that the learned judge erred in law by augmenting the statutory language under the influence of his own erroneous and extraneous factual findings and/or broad propositions of company law that have no bearing on the distinct point of statutory interpretation.

[24]     Further, 1Globe argues that Smith J erred in construing section 71 by reference to his own adopted concept of "full and fair disclosure" gleaned from Canadian case law, and what he called the "spirit and intent" of the provision. 1Globe submits that in so far as this amounts to the imposition by implication of a specific obligation of notification to a director of a meeting "called for the purpose of removing him from office", at which another person is to be appointed or elected to fill the office of director, then such construction is illegitimate as it contradicts the language and scheme of the provision which is unjustified. 1Globe invites this Court to construe section 71 properly and find that it was not breached, and further, even if breached, that it would not vitiate the outcome of the vote held at the AGM, it would, at most, give the incumbent directors a potential claim against Sinovac for damages for breach of statutory duty.

[25]     Sinovac posits that section 71 provides a right in favour of an existing director, where it is sought to elect a person in his place, to have a written statement circulated to all shareholders in advance of the meeting giving reasons why he opposes that proposal. Sinovac noted that while section 71 of the **IBCA** has not been considered by the Eastern Caribbean Supreme Court, it has been the subject of judicial consideration in Canada. Sinovac referred to the case of **Kaiser v Borillia Holdings Inc.**[4] Sinovac submits that Smith J's conclusion that, in order to give meaningful effect to section 71 of the **IBCA**, the director must be given advanced notice of a proposal to elect another person in his place, is consistent with the section and its legislative purpose.

---

[4] [2007] CanLII 18144 (ON SC).

14

[26]  Sinovac contends that 1Globe's failure to explain why the dissenting shareholders gave no notice of their intention to seek the election of the alternative slate spoke volumes, particularly given that:

(a) Smith J found that the dissenting shareholders had been taking covert steps to seek the replacement of the incumbent board with the alternative slate for many weeks prior to the AGM; and

(b) Sinobioway, acting in conjunction with the dissenting shareholders, had published an open letter by newswire targeted at Sinovac's shareholders, calling on them to vote against the re-election of the incumbent board at the upcoming AGM, though, significantly, not indicating that they would be seeking the election of the alternative slate, or anyone would be seeking the election of any alternative directors.

[27]  Sinovac asserts that the dissenting shareholders did not give notice of their intention to seek the election of the alternative slate precisely because they did not want the shareholders or the directors to know what they were up to. In addition, this meant that the incumbent board was deprived of the opportunity to provide a written statement to all shareholders, and to make the decision on whether to attend the AGM because of the proposed motion. In advance of the meeting, shareholders had no idea that alternative candidates were being proposed, let alone any information about the alternative slate proposed on the day of the AGM.

[28]  Smith J considered the parties' competing submissions on section 71 of the **IBCA**. He noted 1Globe's position that on a proper construction of the language of section 71, the only notice required is the notice of the annual general meeting to be given to directors which, in the instant case, had been provided. Each of the incumbent directors was given notice of and permitted to attend the AGM. 1Globe argued that it is difficult to see how the incumbent directors were entitled to any additional or

15

specific notification of their proposed removal at the AGM, other than notice under section 71.

[29]    Also considered was Sinovac's contention that section 71 must be construed against the contextual framework that shareholders should receive full, fair, and plain disclosure to have a reasonable opportunity to express their will on company matters. The shareholders were deprived of this opportunity. Smith J also noted Sinovac's submission that at the AGM, 1Globe and the dissenting shareholders, without prior warning, proposed a motion to amend the ballot paper, impose a cap on the number of director candidates that members could vote in favour of, and add four new candidates. Shareholders who did not attend the AGM had no advanced notice of any of these proposals and so were unable to consider, let alone, vote on them.

[30]    Smith J approached section 71 of the **IBCA** against the backdrop that the Eastern Caribbean Supreme Court had not previously considered its interpretation and that the **IBCA** was based on what he termed "the Canadian model". The learned judge noted that section 71(2) of the **IBCA** mirrors section 110(2)[5] of the **Canada Business Corporations Act**[6] ("**the Canadian Act**") and section 122 of the **IBCA** mirrors section 145 of **the Canadian Act**. In this regard, he considered Canadian authorities dealing with similar sections to be helpful.

[31]    There is nothing in my view that is exceptional about considering the relevant Canadian authorities. Absent local authority on the interpretation of section 71, Canadian authorities on corresponding legislative provisions are undoubtedly instructive. In the circumstances, Smith J's reliance on those authorities cannot be faulted. It was certainly permissible for him to rely on or seek guidance from them.

---

[5] In the judgment of Smith J, it was stated erroneously that section 71(2) of the IBCA mirrored section 123 of the Canadian Act.
[6] R.S.C., 1985, c. C-44.

[32]    Smith J properly accepted the reasoning in **Kluwak v Pasternak**,[7] a case relied on by Mr. Alford QC, for Sinovac, as authority for the principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them.

[33]    In **Kluwak**, there was a proxy fight for the control of the board of directors of the Griffin Corporation. Kluwak spearheaded the dissident shareholders in the fight. The respondent, Pasternak chaired the annual general meeting at which he disallowed the dissident proxies on the basis of what he viewed as material misrepresentations in the dissident proxy circular. As a result, he declared the management's slate of directors elected. Kluwak sought relief under sections 107 and 248 of the **Ontario Business Corporations Act**[8] ("**OBCA**") wishing the court to declare the board proposed by the dissident shareholders elected instead. Sub-sections (1) and (2) of section 107 of the **OBCA** are in terms identical to section 122 of the **IBCA** of Antigua and Barbuda. The court determined that section 107 gives the court an extremely broad discretion in determining any controversy regarding an election.

[34]    At paragraph 14 of **Kluwak**, Mesbur J stated:

> "The author of *Shareholder remedies in Canada* makes the comment that "case law requires that all information be disclosed that a reasonable investor would consider important in deciding whether to vote". He refers to the philosophy and standard of disclosure discussed as long ago as 1934 in *In re Dorman, Long and Co. [Ltd.]* where Maugham J noted: "It is perhaps not unfair to say that in every nearly big case not more than five percent of the interests involved are present in person at the meeting. It is for this reason that the Court takes the view that it is essential to see that explanatory circulars sent out by the board of the company are perfectly fair and, as far as possible, give all information reasonably necessary to enable the recipients to determine how to vote." What is true for a board circular is equally applicable to a dissident information circular. Shareholders must have all the information they need in order to make an informed decision about voting."

---

[7] 2006 CanLII 41292 (ON SC).
[8] R.S.O. 1990, c. B.16.

Mesbur J continued at paragraph 16:

"In essence, then, an information circular must contain full, fair and plain disclosure, that has sufficient information concerning the pertinent matters set out "in sufficient detail to permit shareholders to form a reasoned judgment concerning the matter"."

At paragraph 31 Mesbur J found:

"When looking generally at the best interests of the company, it must be that it is in the company's interests for shareholders to make a fully informed decision regarding the election of directors."

[35]    Smith J described the reasoning of Mesbur J as sound, logical and persuasive, stating that it stands for the unobjectionable principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. I agree. There is no basis to differ from that position.

[36]    Smith J found that (1) Sinovac has about 3,300 shareholders located in various parts of the world, (2) the board of directors had been re-elected un-opposed, at every annual general meeting for many years and there had never been alternative candidates proposed, (3) shareholders typically voted online and by proxy in advance of the annual general meeting, (4) those who voted by proxy in advance of the AGM would only have known of the incumbent directors, there being no indication of alternate candidates, and (5) a number of shareholders did not vote at all. Those facts led Smith J to draw the reasonable inference that shareholders who voted in advance of the AGM, or those who chose not to vote, had no reason to think that anything would be different at the 2018 AGM. In these circumstances, Smith J posed the question, ".... can it be said that the shareholders had full, fair, and plain disclosure on the important matter of the election of the board of directors of a valuable international company to permit them to make an informed decision?"

[37]    Smith J accepted that section 71 does not say that notice must be given to directors where it is proposed to elect another person to the office of director. He however

18

reasoned that in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is to be contested ought to be given some kind of notice. If a director receives no notice, he cannot submit the written statement referred to in section 71(2), in which case the company cannot send a copy of such statement to the shareholders as required by section 71(3). The shareholders would therefore not have received full and fair disclosure to make an informed decision on an important company matter. Smith J opined that a shareholder in a valuable, publicly traded company would be interested in reading what an incumbent director, whose position is challenged, might have to say about the qualifications and experience of a proposed nominee for his seat on the board of directors. He found that there was no good reason for failing to give effect to the spirit and intent of sections 71(2) and (3).

[38]    In my judgment, Smith J clearly reasoned how he arrived at his conclusion, and it cannot be said that he was wrong. The learned judge found that the spirit and intent of section 71 was breached and while the section is silent as to the effect of any non-compliance on the election or the AGM, it is certainly a factor for the court to weigh, in deciding whether or not to grant relief. I agree. Although 1Globe criticizes Smith J's interpretation and effect of section 71, I am of the view that such criticism is not merited. As stated by Lord Bingham of Cornhill in **Regina (Quintavalle) v Secretary of State for Health**[9] at paragraph 8:

> "The court's task, within the permissible bounds of interpretation, is to give effect to Parliament's purpose. So, the controversial provisions should be read in the context of the statute as a whole, and the statute as a whole should be read in the historical context of the situation which led to its enactment."

In my judgment, Smith J's interpretation of section 71 was consistent with that position.

[39]    Smith J was cognizant of the absence of authorities from the Eastern Caribbean Supreme Court and noting that the **IBCA** was modelled on corresponding Canadian

---

[9] [2003] UKHL 13.

19

legislation, quite properly considered and applied the relevant Canadian authorities. It was quite legitimate for him to so do. Further, Smith J was alive to the historical context, the legislative purpose, and the philosophy and standard of disclosure discussed as long ago as 1934, as referred to by Mesbur J in **Kluwak**.

[40]    I agree with Sinovac that Smith J's approach entailed an entirely orthodox application of the overarching legal principles governing the Antiguan court's supervision of company meetings, which is also consistent with Canadian law. Canadian case law shows that the appropriate model is for full disclosure by dissenting shareholders to allow all shareholders to make fully informed decisions. The overarching requirements are that shareholders be provided with full and fair information so as to allow them to determine whether to attend a meeting in person, by voting in advance, or by proxy, and how to vote. Shareholders who are called to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision is provided to them.

[41]     For the reasons advanced, ground 2 accordingly fails.

### Grounds 3, 4 and 5

[42]    Ground 3 asserts that the judge erred in law in finding that the common law principle permitting amendments to motions at shareholders meetings, as exemplified in **Betts & Co. Ltd. v Macnaghten**,[10] was inapplicable and inappropriate in a modern corporate context or was otherwise distinguishable from the present case.

[43]    Smith J stated that there was nothing in the **IBCA** or the **IBC Regulations** prohibiting an amendment to an ordinary resolution being proposed by shareholders attending an annual general meeting and it does not appear that there were any technical breaches of Antiguan law in proposing the amendments to the motion at the AGM. He however reasoned that the matter could not be analyzed in isolation

---

[10] [1910] 1 Ch. 430.

from the court's earlier finding that the shareholders as a whole were entitled to full and fair disclosure. Amending the company's motion to include an alternative slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the court to consider in deciding whether or not to grant relief under section 122.

[44]    1Globe submits that there are no applicable statutory or corporate constitutional provisions governing the process of amendments to motions at shareholders' meetings. In the absence of specific provisions in a company's bye-laws or articles, the common law position regulates amendments to motions at shareholders' meetings, including motions to re-elect directors. 1Globe's position is that a motion at a shareholders' meeting may be amended by a proposal made from the floor of the meeting itself so long as the amendment falls within the subject matter of the original motion. 1Globe asserts that it cannot be disputed that the amended motion, calling for the election of four new directors and the re-election of one existing director, fell comfortably within the parameters of the original motion as notified to shareholders in the AGM notice.

[45]    1Globe argues that Smith J sought to distinguish **Betts** on spurious or immaterial factual grounds and erroneously described **Betts** as "in a different era" and invoked notions of "corporate cultures" in order to depart from such well-established common law principles. 1Globe submits that there is no basis for distinguishing **Betts** on the facts. The fact that the amendment to the motion in **Betts** increased the number of directors from three to five, is immaterial.

[46]    1Globe posits that notice given to shareholders of a meeting, such as an annual general meeting at which the re-election of incumbent directors is a matter of business, necessarily informs or warns shareholders that something may change in the meantime or at the meeting which means that "some or all of" those incumbent directors are not re-elected. That change or risk may come about because, pursuant to common law principles as exemplified in the **Betts** decision, amendments are

21

proposed to such motion which create a contest for election to the board of directors. Armed with this information/warning at the outset, a shareholder can mitigate the risk by voting in advance in favour of re-election of the incumbent board. There is no prejudice.

[47]   Smith J referred to 1Globe's reliance on **Betts**. In **Betts**, the notice of the annual general meeting of a company stated that the purpose was the passing of certain resolutions, including the appointment of three named individuals as directors. At the meeting, an amendment was carried that, in addition to those three, two additional named directors should be appointed. The company's articles of association provided that the notice of an ordinary general meeting, at which special business was to be transacted, should specify the general nature of such special business. It also provided that the number of directors should be no more than seven or less than three. Eve J concluded that the business transacted at the meeting was within the scope of the special business indicated in the notice.

[48]   Eve J posed the questions:

> "Ought I to hold that the amendment which purported to reappoint the three gentlemen named in the notice as directors for the ensuing twelve months and to add two other gentlemen as additional directors was an amendment so inconsistent with the object of the meeting as stated in the notice and so irregular as to be beyond the power of the meeting? Was it in short, such an amendment as no reasonable man would have regarded as competent to be put forward at a meeting so convened.?.....I think I must assume that the shareholders who received this notice were alive to this possible contingency, and, further, were aware that in the matter of electing directors the only restriction on the power of the company is to be found in the article which limits the maximum number to seven. With these facts present in mind I think a reasonable man reading this notice must have appreciated that those present at the meeting would regard themselves as empowered to make such appointments to the board for the ensuing year as they thought fit so long as they did not do anything contrary to the company's regulations. No one could have thought that the meeting was convened to appoint the three named individuals without the power to substitute other qualified persons for all or any of such individuals, and there is nothing in the notice to indicate that the company will not, if they see fit so to do, exercise their power of increasing the number of directors under article 83. The special business indicated in the notice being the election of directors

22

for the ensuing year, I think a recipient of the notice must be taken to have known that the company in general meeting might make any appointment within the limit imposed by their regulations…."

[49]   Smith J noted that 1Globe extrapolated the **Betts** principle to the present case and its argument that the shareholders, reading the notice of the AGM that there would be an election, were alive to the possibility that an amendment could be proposed, resulting in the election of a different board of directors than the one proposed. He however found that the instant case was materially distinguishable from **Betts** for the following reasons:

(1)   In **Betts**, two additional directors were nominated in addition to the three proposed for nomination while, in the present case, the proposed amendment was for the replacement of the proposed nominees, except for one.

(2)   The proposed amendment in **Betts** for two additional nominees to the board was within the articles of association which limited the board to a maximum of seven. In the instant case, the dissenting shareholders proposed a cap on the number of elected directors that was below the fifteen-member limit prescribed in the articles of association.

(3) **Betts**, a 1910 case, was in a different era. The internet had not yet been invented and so the concept and possibility of voting online, in advance of the annual general meeting, did not exist. The instant case involves a company, with multi-national investors, incorporated in Antigua, doing business in China, listed on Nasdaq and regulated by US securities law, whose shareholders routinely voted online in advance of an annual general meeting and therefore had no notion that an entirely different slate from that on which they voted would have materialized at the AGM.

[50]   Smith J accepted in principle, that shareholders who received notice of an annual general meeting for the election of directors must be alive to the possibility that an

23

amendment to the motion can be proposed, resulting in a different board of directors. He however stated that the globally accepted modern practice of voting online in advance of an election, introduces a new dimension to the hitherto conventional practice of proposing amendments to motions on the floor of the annual general meeting. That practice might be unobjectionable where the shareholders of a company are all situated in the same jurisdiction, and they attend annual general meetings in person. In today's world, however, where technology allows for internet voting and thousands of shareholders of a company are spread across the globe, physical attendance at meetings is an effete convention. The court therefore finds itself at the intersection of two corporate cultures. On the one hand, there is the practice of moving amendments to motions on the floor of the annual general meeting. On the other hand, there is the modern practice of shareholders voting online in advance of an annual general meeting and not physically attending, which closes them off from what transpires at the annual general meeting.

[51]    Smith J reasoned that where the company's articles of association and the governing law are silent as to how one might reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting, the best that the court can do is to insist on a minimum standard of basic fairness. He found that those shareholders who voted online in advance of the AGM were following a routine practice, voting for one slate that had been re-elected for many years, had no reason or warning to expect anything different and certainly had no idea that a different slate of candidates would have been proposed at the convention. They, as well as those who chose not to vote, did not have an opportunity to make an informed decision. The dissenting shareholders had been planning in secret to propose an alternative slate and therefore had no good reason for failing to give advanced notice of their intended amendment. This undermines basic fairness to which the shareholders, as a whole, were entitled.

[52]    In my judgment, Smith J properly explained the bases on which he distinguished the instant case from **Betts**. He did so in clear and easily understandable terms.

24

Looking at the matter in the round, the reasons advanced for distinguishing the case, cannot be properly described as spurious. Further, having regard to the reasoning which led Smith J to his conclusion as a whole, I am not of the view that Smith J applied an incorrect legal test. His insistence on a minimum standard of basic fairness is consistent with the relevant Canadian authorities.

[53]    Ground 4 asserts that Smith J erred in law by imposing a novel test of "good reason" for shareholders in a publicly traded company to justify not giving advanced notice of an intention to propose amendments to a motion, concerning the re-election of directors at a meeting such as an annual general meeting. I am not of the view that Smith J was imposing a test of "good reason." The context in which Smith J made his statement does not admit such a test being laid down by him. Essentially, Smith J was addressing the issue of basic fairness to which shareholders as a whole were entitled, in the circumstances of the case.

[54]    Ground 5 alleges that Smith J misdirected himself in law in finding that the reasoning of Mesbur J in **Kluwak** was "sound, logical and persuasive" relative to the instant proceedings. In my view, this ground cannot be sustained. Mesbur J recognised that when looking generally at the best interests of the company, it must be that it is the company's interests for shareholders to make a fully informed decision regarding the election of directors. To my mind, that proposition is unassailable and there is no basis to differ.

[55]    For the reasons indicated, grounds 3, 4 and 5 fail.

**Ground 6**

[56]    Ground 6 asserts that the judge erred in law in finding that the proxy forms used by the dissenting shareholders to vote their shares at the AGM on 6th February were non-compliant with Antiguan law, specifically regulation 15 of the **IBC Regulations**. Sinovac points out, and I agree, that Smith J made no such finding. In fact, he

25

expressly declined to make a ruling on the validity of the proxy form. Thus, at paragraph 36, Smith J specifically stated:

> "….I will not make any ruling on the validity of the proxy form but consider it as a factor, in the round, when exercising the Court's discretion under section 122."

[57]    Regulation14 provides that:

> "A form of proxy may confer discretionary authority in respect of amendments to matters that properly come before the meeting and that were not identified in the notice of meeting."

Regulation 15 states:

> "A form of proxy must not confer authority to vote in respect of an auditor or the election of a director unless a bona fide proposed nominee for the appointment is named in the form of proxy."

[58]    At the trial, Smith J considered 1Globe's submission that regulation 15 applies only to proxy forms issued by or on behalf of Sinovac itself when it gives notice of the annual general meeting, namely, the so-called 'proxy card', while Sinovac's position was that it applied to all proxy forms used to enable shareholders to cast their vote. In support of its position Sinovac relies on Canadian authorities, which it states indicates that the equivalent Canadian rule applies to all proxies and not just those issued on behalf of the company or existing management. Sinovac also contends that its position is also consistent with the plain wording of regulation 15 which is stated to apply to "a form of proxy" and is not limited to "a form of proxy issued by the company itself, or by third parties acting under instructions from the company". I agree with Sinovac's position.

[59]    Smith J noted that both sides relied on the Canadian authority of **Ambassador Industries Ltd. v Camfrey Resources Ltd.**[11] He held that **Ambassador** is persuasive authority for the proposition that where a proxy form is called into question, the court is concerned to examine the position of all shareholders, not just those who signed the proxy in question. The learned judge noted that none of the

---

[11] [1991] CanLII 593 (BC SC).

26

dissenting shareholders provided any advanced notice to Sinovac or the shareholders, as a whole, prior to the AGM, of a proposal to replace the board or of the identity of their nominees for election, nor did their proxy form name any nominee for election.

[60]   Smith J held that the object and intent of regulation 15 is clear and unmistakable. It is to ensure that, on important matters such as the appointment of an auditor and the election of directors, the will of the shareholder, the proxy giver, is effected and that all shareholders are provided with full information concerning the election of directors. Such a requirement has greater relevance and consequences for a publicly traded company with thousands of shareholders who vote online and through brokers, than, for example, a small family-run company.

[61]   Sinovac submits and I agree, that in view of the authorities and the plain wording of regulation 15, and the scheme of the **IBCA** generally, including section 71, Smith J's conclusion regarding the object and intent of regulation 15 was entirely appropriate.

[62]   Smith J concluded that in the final analysis, the court must weigh the right of the shareholders to full information to be able to come to an intelligent decision against the right of shareholders who voted not to be unfairly disenfranchised. For this reason, Smith J made no ruling on the validity of the proxy form but regarded it as a factor in the round, in the exercise of his discretion under section 122.

[63]   I also agree with Sinovac that 1Globe's suggestion, that Smith J's conclusion as to the object and intent of regulation 15 renders the regulation ultra vires the enabling provision, section 351 of the **IBCA**, is also wrong. The power to make regulations under section 351 is provided "for the better administration of this Act" and the relevant sub paragraphs are expressly stated to be "without limiting the generality of the foregoing".

27

[64]  1Globe complains that regulation 15 is inconsistent with the common law position relating to amendments to ordinary resolutions, that is, **Betts**. Sinovac, rejects this complaint and submits that regulation 15 is consistent with Canadian case law, and in any event, it is a creature of statute, modelled on well-established Canadian provisions in respect of which there is a body of supportive case law. I agree.

[65]  For the reasons given, ground 6 also fails.

**Ground 7**

[66]  Ground 7 deals with waiver. It asserts that Smith J erred in fact and in law in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders at the AGM, in particular, after having counted their shares, on the basis of such proxy forms, as present for the purposes of declaring quorum at the AGM.

[67]  Smith J dealt with the issue at paragraph 33 of his judgment. He recited 1Globe's complaint that Sinovac waived any procedural defect in the dissenting shareholders' proxy forms by counting them at the AGM for the purposes of declaring a quorum and then counting them in favour of the amended motion. Smith J reasoned that it was clear from the transcript of the proceedings at the AGM, that Guang Yang was at pains to point out that, while she would collect the ballots, she could not pronounce on the validity of the ballots that had been amended by the dissenting shareholders until the matter had been reviewed by Antiguan counsel. Smith J also observed that Guang Yang did not say anything about the proxy forms at the AGM. He however concluded that Guang Yang, in reserving any declaration on the result of the election, meant that it was open to Sinovac's Antiguan counsel to review the validity of the process. In the circumstances, the learned judge found that the defect in the proxy forms was not waived by Sinovac. In my view, it was a conclusion that was properly open to him.

28

[68]   1Globe, however, posits that Smith J only dealt with the point about Sinovac's reliance upon or acceptance of the relevant proxy forms at the AGM for the purpose of counting of the vote. It argues that Smith J did not consider the real thrust of the waiver case, that is, that by counting and accepting the votes of the relevant shareholders, attending by proxies, for the purpose of establishing quorum at the AGM, Sinovac thereby waived any formal legal defect in the relevant proxy forms.

[69]   Sinovac submits that 1Globe's argument regarding the waiver of defects in the dissenting shareholders' proxy forms is moot in circumstances where Smith J, expressly declined to make any findings regarding the validity, or otherwise, of these proxy forms. There is, accordingly, no issue in relation to the quorum of the AGM. Further, Sinovac submits that even if there were an issue, this would not assist 1Globe. In that regard, Sinovac refers to regulation 8 of its bye-laws which provides that:

> "… Each director shall hold office unless removed as provided in these presents, until the next Annual Shareholders' meeting and until his successor shall have been elected."

Sinovac also utilizes section 67(4) of the **IBCA** which states that:

> "Notwithstanding subsection (2) of section 65 or subsections (1) and (3) of this section, if directors are not elected at a meeting of shareholders, the incumbent directors continue in office until their successors are elected."

[70]   Sinovac also submits that if the AGM had been inquorate, neither slate of directors could have been elected with the result that, pursuant to regulation 8.1 and section 67 of the **IBCA**, the incumbent board remained in office.

[71]   In considering the arguments of the parties, it is instructive to point out that in most litigious situations the expression 'waiver' is used to describe a voluntary, informed and unequivocal election by a party not to claim a right or raise an objection which

29

it is open to that party to raise or claim as per Lord Bingham of Cornhill in **Millar v Dickson**.[12] As noted in **McGowan v B**[13] at paragraph 17:

> "The words "voluntary, informed and unequivocal" captures the essence of what is needed for a waiver of any kind to be valid."

[72]    Given that the essence of a valid waiver and Smith J's conclusion with respect to the evidence of Guang Yang, I am not of the view that the criteria for a valid waiver were met. In the circumstances, Sinovac did not waive any technical deficiency in the relevant proxy forms, inter alia, by counting such votes as present for the purposes of declaring quorum at the AGM. This ground accordingly fails.

### Ground 8

[73]    Ground 8 alleges that the learned judge erred in fact and in law in concluding that (a) 1Globe had knowledge of a "secret plan" in advance of the AGM and (b) such knowledge and/or consequent "unfairness to other shareholders" constituted a sufficient reason for the court to refuse its power under section 122 of the **IBCA**.

[74]    1Globe contends that the key point in this context is the extent to which the learned judge allowed his views as to the motives of 1Globe or other shareholders to influence his determination of distinct questions of law throughout the judgment.

[75]    At paragraph 37 of his judgment, Smith J dealt with Sinovac's invitation to conclude that 1Globe and the dissenting shareholders colluded and orchestrated a secret plan to elect a new board, without notice to the incumbent directors or the shareholders as a whole. Smith J listed the five items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan to elect a new board. These were:

> (1) The year-end personal work summary of Tao Fuwu dated 12th January 2017.

---

[12] [2002] 1 WLR 1615.
[13] [2011] UKSC 54.

(2)  A draft amendment and restated consortium agreement.

(3) The transcript of a teleconference held on 8th January 2018.

(4) An open later from Sinobioway to all shareholders of Sinovac; and

(5) An email from "one shareholder Tang".

[76]    Each document was put to 1Globe's witness, Mr. Li, in cross-examination. Smith J set out Mr. Li's evidence in relation to each. Having done that Smith J set out his conclusion, regarding that on the evidence, there had indeed been a plan and that Mr. Li's evidence was not credible.

[77]    The personal work summary was authored by Tao Fuwu, who set out his role as "one of the supervisors" in the matter of the privatisation of Sinovac and summarised his main work in 2017 to include:

> " … prepare to hold Sinovac special shareholders' conference and demonstration  (including without limitation, repeated discussions and persuasion of 1G[lobe], especially assistance in analysis of poison pill plan, meeting order, analysis of the barriers and plans, shareholder proxies handling, and hiring of intermediary agent) preparation and opining on Sinovac's annual shareholders conference  participation and change of the board of directors (repeatedly opine of plan risks, discuss rivals' obstructionism, opine on an appropriate response, opine on procedures, coordination among shareholders and documentation of authorized agent); the related media public relations work…...worked with 1G[lobe] to achieve substantial progress and signed cooperation agreement and framework agreement.….We are fundamentally prepared for changing the board of directors of Sinovac at the shareholders' conference."

[78]    Smith J referred to Mr. Li's evidence in cross-examination that he was delegated by 1Globe to manage its investment risk when it started being privatised. He was entrusted with full authority and he was free to make any decision in consultation with 1Globe's United States lawyer. Most of the strategic advice in relation to 1Globe came from him and he did not need advice from anyone at 1Globe. He flatly denied, however, knowing anything about what was contained in the work summary and

31

said he was puzzled by it and questioned whether in fact Mr. Fuwu had really written it.

[79]    The draft consortium agreement suggests that 1Globe was part of the Sinobioway Consortium to attempt to purchase Sinovac. Under cross–examination, Mr. Li expressed surprise at the document and said that he had never seen it before, expressing doubt as to its authenticity, since any communication would have to come through him as 1Globe's designated representative in the matter. He stated that the consortium agreement might be forged or fabricated but declined to say who might have forged it.

[80]    With respect to the transcript of the teleconference, the AGM was discussed and the eventuality of changing the board of directors. These plans included a rehearsal to prepare shareholder representatives for potential issues which the dissenting shareholders might face at the AGM and a media strategy to turn shareholders against the incumbent directors in the days before the AGM. Smith J noted that during cross-examination, Mr. Li denied knowing anything about that teleconference and said that it was the first time he was seeing the document.

[81]    The open letter from Sinobioway dated 31st January 2018, alleged that the chairman and CEO of Sinovac, bribed a senior official of the China Food and Drug Administration and was not qualified to serve as a director of Sinovac. Sinovac was accused of incompetence, not acting in the best interests of shareholders and infringing the voting rights of shareholders through the voting card prepared for the AGM. It ended by recommending that shareholders attend the AGM and oppose the re-election of the current board. Smith J noted that Mr. Li again denied any knowledge of involvement in this document.

[82]    Lastly, Smith J referred to the email to Sinovac from a sender named Tang, who described himself as "one shareholder Tang". The email points out that the voting card prepared provided no option to vote "against" the re-election of the incumbent

directors and requested the inclusion of the option to vote "against" on the voting card. Under cross-examination Mr. Li admitted that Tang, whose real name was Joyce, was a younger colleague of his who worked at 1Globe and admitted that the email was written at his request by "Joyce" but did not know why she used the name "Tang" instead of her real name.

[83]    Smith J stated that Mr. Li maintained under cross-examination that he never knew James Chang, even though it was Chang who nominated him to be a director on Sinovac's board. He said he was surprised to have been nominated and did not know the other three individuals who were nominated to replace the incumbent directors. He had remained silent throughout the AGM.

[84]    Smith J found it difficult to believe that Mr. Li did not know that he was going to be nominated and found it equally difficult to believe that he did not need 1Globe's approval to accept the nomination and did not need to consult 1Globe on anything having to do with Sinovac. Smith J found that Mr. Li was at a loss to explain why the email address from which his junior colleague sent an anonymous email to Sinovac matched the email address of Sinobioway which, on the evidence, had been involved in planning to oust the incumbent directors and spreading negative publicity about them. The haste with which he took charge of Sinovac even before the official election result was declared, suggests that he knew of a plan to oust the incumbent directors. Smith J concluded:

> "Taken in the round, I do not find the evidence of Mr. Pengfei Li to be at all credible. I am convinced, on a balance of probabilities, that there was a secret plan to take control of the Company [Sinovac] and that the claimant [1Globe], through Mr. Li, knew of and acquiesced in this plan."

[85]    An appellate court is constrained in interfering with findings of fact by a trial judge and must not interfere with such findings unless compelled to do so. This applies not only to findings of primary facts but also to the evaluations of those facts and to inferences to be drawn from them as had been noted in **Fage UK Ltd. and another**

33

**v Chobani UK Ltd. and another**.[14] Appellate interference requires a finding that there was no evidence to support the challenged factual finding or that the finding was one which no reasonable trial judge could have made. On the issue of credibility, an appellate court is rarely justified in overturning a finding of fact by a trial judge which turns on the credibility of a witness as had been noted at paragraph 28 in **Mutual Holdings (Bermuda) Limited and others v Diane Hendricks and others**.[15]

[86]    As indicated, Smith J listed the items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan to elect a new board. The documents were put to Mr. Li, 1Globe's witness, in cross-examination and the learned judge set out his evidence in relation to each item. He then set out his conclusion that there was a secret plan to take control of Sinovac and that 1Globe, through Mr. Li, knew of and acquiesced in the plan. Smith J had also found that Mr. Li was not credible. It cannot be said that there was no evidence to support the factual findings, or that the findings were ones which no reasonable judge could have reached. The findings were clearly open to him on the evidence. 1Globe has not met the high threshold for appellate interference in the judge's factual findings. This ground of appeal accordingly fails.

[87]    1Globe asserts, incorrectly, in my view, that these findings of fact have no proper bearing on the determination of the legal issues impacting the determination of the section 122 claim and should not have been allowed to otherwise influence its outcome. Sinovac submits correctly, in my judgment, that the court's exercise of its discretion involves consideration of the facts and circumstances of the case at hand. This is supported by Canadian case law dealing with the equivalent to section 122 of the **IBCA**, which demonstrates that the conduct of the parties is one of the factors relevant to the exercise of the court's discretion.

---

[14] [2014] EWCA Civ. 5.
[15] [2013] UKPC 13.

**Ground 9**

[88]    The subject of Ground 9, a discrete ground of appeal, is the validity of the rights agreement between 1Globe and Sinovac. 1Globe asserts that the learned judge erred in law in finding that the rights agreement is valid as a matter of Antiguan Law.

[89]    The rights agreement was entered into to "guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain control of the company [Sinovac]". It provides that certain conduct of shareholders of Sinovac can trigger the dilution of their shareholding.

[90]    1Globe disputes the validity of the rights agreement on two bases. First, Antiguan law does not allow defensive shareholder rights plans absent stockholder consent and there was no such consent. Secondly, the rights agreement was not validly adopted under Antiguan law because the provisions of the **IBCA**, sections 161 and 163, were not complied with in respect thereof. Sinovac relies on the Bermuda case of **Stena Finance BV and Another v Sea Containers Ltd. and Others**,[16] which upheld the validity of a rights plan, and contends that the rights agreement was validly adopted under Antiguan law.

[91]    Smith J considered and rejected 1Globe's both arguments for disputing the validity of the rights agreement. He also noted Sinovac's reliance, in reply, on **Stena**, which upheld the validity of a rights plan and its contention that the rights agreement was validly adopted under Antiguan Law.

[92]    In **Stena**, Astwood CJ held that the distribution of rights to existing shareholders in anticipation of a possible hostile takeover bid is not unlawful, provided that the directors have the requisite powers under the company's bye-laws to issue such rights, that they exercise those powers bona fide (that is, not for the purpose of entrenching the existing management of the company) and fairly as between shareholders. Astwood CJ stated:

---

[16] (1989) 39 WIR 83.

"The directors stated the purpose for adopting the plan in the letter of 9[th] May 1988. On review, their purpose appears to be legitimate, and I have no reason to differ from them. The principles expounded by the Privy Council in *Howard Smith Ltd. v Ampol Petroleum* Limited [1974] AC 821, have not, in my opinion, been breached. The plan seems to be favourable to all shareholders of record at the date of adoption of the plan, and those persons who became shareholders after that date did so knowing what the terms of the plan were. Therefore, they cannot now be heard to say that the plan is unfavourable to their aspirations in making a bid to take over the company.

On a review of the plan, I tend to agree … that the plan did not do any of the following things: (a) it did not in any way alter or purport to alter (pending the exercise of the rights) the existing share capital of the company or the votes attached to the common shares; and (b) it, without in any way intending to penalize any existing shareholders (that would indeed have been expropriatory and improper), operated quite indiscriminately between all existing shareholders."

[93]    Smith J agreed with Sinovac that there was no allegation of any mala fides on the part of its board or any suggestion that it had entered into the rights agreement other than in accordance with its fiduciary duties. There is, in evidence, minutes of the board meeting approving the rights agreement which record the board's belief that it would "contribute to the preservation of the company's long-term value".

[94]    Smith J proceeded to say that:

"….if Antigua wishes to attract international business…..to incorporate in the jurisdiction, it has to recognize that defensive shareholder rights plans are part of that corporate landscape."

Smith J adopted the approach taken in **Stena** and stated that:

"….provided the Rights Agreement is not contrary to the **IBCA** or the Company's articles and bye-laws, and provided it was not entered into to entrench the Incumbent Directors, it should be considered as valid."

His Lordship went on to examine both the **IBCA** as well as Sinovac's articles of association to see whether Sinovac could lawfully enter into the rights agreement.

36

[95]     1Globe submits that Smith J erred in adopting and applying the reasoning of Astwood CJ in **Stena**, as the rights plan in that case dealt with a different corporate scenario, that is, hostile takeover bids, and fell to be construed against a different statutory regime than applicable in Antigua and Barbuda. Further, Smith J erroneously assumed that permitting defensive shareholder agreements was an intrinsically desirable thing "if Antigua wishes to attract international business … to incorporate in the jurisdiction".

[96]     1Globe asserts that the factual premise for Smith J's analysis was the assumption, in favour of Sinovac, that the rights agreement was adopted by the former directors in March 2016 in the "best interests of the shareholders as a whole". 1Globe described this as dubious. A further complaint was that Smith J made no attempt to analyze section 163 of the **IBCA**, but simply stated "[n]either do I see the applicability of section 163 of the **IBCA**", in reaching his conclusion as to the non-applicability of sections 161 and 163 to the rights agreement. Further, in reaching his conclusion as to the non-applicability of sections 161 and 163 to the rights agreement, Smith J made a fundamental misapprehension as to the legal effect of a 'trigger event' upon the legal rights attaching to shares held by 'acquiring persons', that is, the relevant shareholders, which involves the removal of voting rights and/or acquisition rights attaching to shares in Sinovac. It is difficult, 1Globe argues, to see how neither section 161 nor 163(1)(c)(iv) could be engaged.

[97]     As indicated, 1Globe criticized Smith J's reliance on **Stena**. In my judgment, Smith J was right in adopting and applying the reasoning in **Stena**. Although 1Globe sought to distinguish **Stena** on the ground that it dealt with a different corporate scenario, I agree with Sinovac's contention that there is no meaningful difference between the two cases. The rights plan in **Stena** was adopted in the context of competing takeover bids, while the rights agreement in the present case was adopted in the context of competing going private proposals. A distinction without a difference. Further, 1Globe's assertion that the rights plan in **Stena** fell to be

37

construed against a different statutory regime, is devoid of details as to the differences.

[98]    1Globe's attack on the bona fides of Sinovac's board in entering into the rights agreement is not justified. There was no pleaded allegation of mala fides on the part of Sinovac's board. Also, that was not a ground of appeal. I also note that there is no challenge to Smith J's finding that "there is no allegation of any mala fides on the part of the company's [Sinovac] board or any suggestion that it entered into the rights agreement other than in accordance with its fiduciary duties".

[99]    Smith J examined both the **IBCA** and the articles of association in considering whether Sinovac could lawfully enter into the rights agreement. He took cognizance of the class of shares Sinovac was allowed to issue, the directors' authority to fix the number of shares or to determine the designation of, and the rights privileges, restrictions and conditions attaching to the shares of each series, and that the powers of the corporation shall be exercised by its board of directors. Smith J also referred to paragraph 8.9 of the bye-laws which provides that the board may exercise all such powers of the corporation as are not by the **IBCA** or bye-laws required to be exercised by the corporation in an annual general meeting. He opined that the power to make distributions, as contemplated by the rights agreement, is not reserved to the members and is therefore exercisable by the board.

[100]   Smith J noted 1Globe's reliance on sections 161 and 163 of the **IBCA** to support the contention that the rights agreement could not be adopted without amending the Sinovac's articles of association. Section 161 states:

> "Subject to sections 162 and 163, the articles of a corporation may, by special resolution, be amended -
>> (a)  to change its name;
>>
>> (b)  to add, change or remove any restriction upon the business that the corporation can carry on;
>>
>> (c)  to change any maximum number of shares that the corporation is authorized to issue;

38

> (d) to create new classes of shares;
>
> (e) to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued;
>
> (f) to change the shares of any class or series, whether issued or unissued, into a different number of shares of the same class or series or into the same or a different number of shares of other classes or series;"

Section163(1)(c)(iv) provides:

> "(1) The holders of shares of a class or, subject to subsection (2), of a series are, unless the articles otherwise provide in the case of an amendment described in paragraph (a) or (b), entitled to vote separately, as a class or series, upon a resolution to amend the articles:
>> (c) to add, change or remove the rights, privileges, restrictions or conditions attached to the shares of that class and, in particular, without limiting the generality of the foregoing,
>>> (iv) to add, remove or change prejudicially conversion privileges, options, voting, transfer or pre-emptive rights, or rights to acquire shares or debentures of a corporation, or sinking fund provisions."

[101] Smith J did not view the distribution of shares, triggered by the rights agreement, resulting in a dilution of a shareholders' shareholding, as changing the designation of/or removing any rights or privileges attaching to, or in respect of any shares. Neither did he see the applicability of section 163 of the **IBCA**. He therefore declared that the rights agreement was valid under Antiguan law.

[102] 1Globe submits that in determining the applicability of sections 161 and 163 of the **IBCA,** Smith J made a "fundamental misapprehension" in failing to appreciate that the rights agreement involved "the removal of voting rights and/or the acquisition rights attaching to shares in the company". I do not accept that submission. I am persuaded by Sinovac's position, that the rights agreement is similar to that in **Stena**, where the court found that entering into a rights plan was within the directors' powers. Further, as in **Stena**, the rights agreement did not involve (a) the alteration

of the rights attaching to the company's common stock rather, it involved the distribution of a right to acquire shares, that is, an option, to all holders of the company's common stock, (b) the removal of voting rights rather, it is an acquiring person's rights, not its voting rights in its existing shares, which, under the original terms of the rights agreement, are avoided upon the happening of a trigger event.

[103]    As in **Stena**, in the present case, neither the adoption nor the implementation of the rights agreement involved or required an amendment to the articles of association, nor any other step requiring shareholder consent. In that regard:

> (a) article iii (3) of the articles of association permits Sinovac to issue shares in series and the directors are authorized to fix the number of shares in, and to determine the designation of, and the rights, privileges, restrictions and conditions attaching to shares of each series;

> (b) article iv provides that the powers of Sinovac are exercised by the board;

> (c) by virtue of bye–law 8.9 the board may exercise all such powers of Sinovac as are not by the **IBCA** or by the bye-laws required to be exercised by Sinovac in an annual general meeting;

> (d) the power to make distributions is not reserved to the members and is therefore exercisable by the board;

> (e) likewise, the power granted to Sinovac pursuant to section 35 of the **IBCA** to grant conversion privileges, options or rights, to acquire shares of the corporation is also not reserved to the members and is therefore exercisable by the board.

[104]    In the premises, the board was empowered to grant options or rights to acquire shares, and to fix the rights, privileges, restrictions and conditions attaching to shares, and also to make distributions. The rights agreement was validly entered into. It was within the powers afforded to the directors under Sinovac's constitution and the **IBCA**. This ground of appeal accordingly fails.

40

[105]   I return to the issue of the court's discretion under section 122 of the **IBCA**, which provides for a corporation, shareholder or director thereof to apply to the court with respect to any controversy with respect to the election of a director. Section 122 gives the court a very broad discretion in determining any controversy. On its plain wording, the section confers on the court, a broad remedial discretion to make any order it thinks fit and enumerates examples of permissible orders. The exercise of the discretion whether or not to grant relief and in what form, is inextricably linked to the facts of the particular case. In **Dumont v Manitoba Metis Federation**,[17] the court noted that the power to grant declaratory relief (under the equivalent section to section 122) entitled it to take account of equitable principles such as the conduct of the party seeking the relief.

[106]   1Globe's contention that the conduct of the parties "lack[s] any legal relevance" to the section 122 claim is unmeritorious and wrong in law. The court cannot exercise its discretion in a vacuum. The factual context is important. The reasons for the judge's exercise of discretion in refusing relief under section 122 of the **IBCA** are clearly set out in his judgment. Included therein are breach of the spirit and intent of section 71, amending the Sinovac's motion to include an alternative slate without notice to shareholders and after many had voted online in advance of the AGM, the right of the shareholders to full information and the absence of full and fair information depriving the shareholders of the opportunity to make an informed and intelligent decision, the conduct of 1Globe and the scale and detail of the secret plan to take control of Sinovac which 1Globe knew of and acquiesced in.

[107]   Smith J stated that in **Dumont**, the court stated that the evidence of wrongdoing and essential unfairness of the electoral process are factors that might influence the exercise of discretion. He therefore concluded that 1Globe's knowledge of the secret plan and the unfairness to other shareholders of the execution of the plan at the AGM, is enough for the court to refuse the relief sought by 1Globe.

---

[17] [2004] MBCA 149.

41

[108]    Is there a proper basis for disturbing the judge's exercise of discretion? There are well established principles governing appellate interference with the exercise of a judicial discretion. An appellant has a high hurdle to surmount when challenging the exercise of a judicial discretion. This court will not interfere with the exercise of a discretion entrusted to a trial judge unless the judge has misdirected himself in law, taken into account irrelevant matters, failed to take account of relevant matters or has made a decision which has exceeded the generous ambit within which reasonable disagreement is possible. Even if an appeal court would have preferred a different answer, unless the decision was plainly wrong, it will be left undisturbed.

[109]    Given the law regarding appellate interference with the exercise of the discretion of a judge, I am satisfied that there is no proper basis warranting such interference. It cannot be said that the learned judge's decision refusing relief to 1Globe under section 122 of the **IBCA** exceeded the generous ambit within which reasonable disagreement is possible or was plainly wrong.

42

**Order**

[110]    It is ordered that:

(1)  The appeal is dismissed.

(2)  The order of Smith J dismissing 1Globe's claim is thus affirmed, so also is the declaration that the rights agreement was validly adopted as a matter of Antiguan law.

(3)  The respondent, Sinovac, having succeeded in the court below and also in resisting the appeal, is entitled to prescribed costs in the court below and costs on the appeal being, 2/3 of the prescribed costs in the court below.

I concur.
**Louise Esther Blenman**
Justice of Appeal

I concur.
**Gertel Thom**
Justice of Appeal

**By the Court**

**Chief Registrar**

43