# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MW GESTION, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>1GLOBE CAPITAL LLC, JIAQIANG LI, CHIANG LI FAMILY, JEFF Li, and LINDA LI<br><br>Defendants. | Case No.: 1:22-cv-11315-NMG<br><br>CLASS ACTION<br><br>**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 7

III.   PARTIES ............................................................................................................ 8

IV.    SUBSTANTIVE ALLEGATIONS .................................................................... 9

       A.    The Ongoing Battle for Control of Sinovac.......................................... 11

       B.    Defendants Triggered the Rights Agreement by May 2016 ................. 12

       C.    Defendants Violated Their Disclosure Obligations under Section 13 of the
             Exchange Act ....................................................................................... 16

             1.    Li Acquired Additional Sinovac Stock in His Relatives' Accounts Starting
                   in May 2016 .................................................................................. 18

             2.    Defendants' Section 13 Violations ............................................... 19

       D.    Defendants Had a Duty to Disclose, and Made Materially False and Misleading
             Statements Concerning, Li's Holdings of Sinovac Stock ..................... 24

             1.    Defendants Violated Their Disclosure Duties Under Section 13(d) and
                   Rule 13d ....................................................................................... 24

             2.    Defendants Made Materially False and Misleading Statements Concerning
                   Their Sinovac Stock Holdings ....................................................... 25

             3.    Defendants' Section 13(d) Violations and Misrepresentations Delayed
                   Sinovac's Exchange Under the Rights Agreement .......................... 27

       E.    Defendants' Other Deceptive Tactics in the Battle for Control of Sinovac Confirm
             That They Engaged in a Fraudulent Scheme and Intentionally Misrepresented
             Their Sinovac Holdings ....................................................................... 29

       F.    Defendants Caused Trading in Sinovac Shares to Be Halted ............... 42

V.     NO SAFE HARBOR ........................................................................................ 49

VI.    ADDITIONAL SCIENTER ALLEGATIONS ................................................. 50

VII.   LOSS CAUSATION UNDER THE EXCHANGE ACT ................................. 54

VIII.  CLASS ACTION ALLEGATIONS ................................................................. 55

i

IX.      APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE-MARKET PRESUMPTIONS ........................................................... 57

X.       COUNT I  (Tortious Interference With Business Relations Against All Defendants)..... 58

XI.      COUNT II  (Tortious Interference With Business Expectancy Against All Defendants) 60

XII.     COUNT III  (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated  Thereunder Against All Defendants).......................................................... 62

XIII.    COUNT IV  (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated  Thereunder Against All Defendants).......................................................... 64

XIV.     COUNT V  (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants).................................................................................................................... 66

XV.      PRAYER FOR RELIEF ................................................................................................ 67

XVI.     DEMAND FOR TRIAL BY JURY ................................................................................ 68

Lead Plaintiff MW Gestion ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, United States Securities and Exchange Commission ("SEC") filings, and other information regarding Defendants' involvement with 1Globe Capital LLC and Sinovac Biotech Ltd. ("Sinovac" or the "Company"), and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>INTRODUCTION</u>

1.    This class action bringing common law and federal securities claims arises out of Defendants' fraud and misconduct in connection with their battle for control of Sinovac, a biopharmaceutical company that focuses on the research, development, manufacturing, and commercialization of vaccines.

2.    Starting in January 2016, competing sets of shareholders were vying for control of Sinovac. Defendants are individuals and entities associated with 1Globe Capital LLC ("1Globe"), a family investment office that is owned and controlled by Defendant Jiaqiang Li. Li was Sinovac's largest shareholder when Sinovac's CEO made an offer in January 2016 to buy Sinovac for approximately $350 million. Li supported a competing group that sought to buy Sinovac for a higher price. Rather than provide this support in an open and transparent manner, Li and 1Globe used deceptive practices to advance their position. After Sinovac adopted a rights agreement on March 28, 2016 containing a "poison pill" that limited the amount of Sinovac stock that a shareholder could acquire (the "Rights Agreement"), Defendants made many intentionally false

1

and misleading statements and schemed to secretly purchase a large stake in Sinovac that reached nearly one-third of the Company's stock, in violation of their statutory disclosure obligations under Section 13(d) of the Securities Exchange Act of 1934 ("Section 13(d)" of the "Exchange Act") and in order to conceal the extent and purpose of Li's and 1Globe's ownership of Sinovac stock.

3.     The details of Defendants' deceptive tactics are laid out in a Cease-and-Desist Order that the Securities and Exchange Commission issued on May 13, 2020 against Li and 1Globe (the "SEC Order"). The SEC determined that Li's and 1Globe's deceptive actions "depriv[ed] existing and potential shareholders"—such as Plaintiff and the Class—"of information necessary to make fully informed investment decisions." Moreover, the SEC imposed $290,000 in penalties on Li and 1Globe for their violations of their disclosure requirements under Section 13(d).

4.     For example, in early April 2016, right after the Rights Agreement was adopted, 1Globe and Li separately disclosed 16.4% and 6.19% positions in Sinovac stock, respectively. They misrepresented that these shares were held by separate parties, when in reality, they shared beneficial ownership in this combined 22.5% stake in Sinovac stock. Li sought to obscure his ownership position even further by making his separate disclosure under the name the "Chiang Li Family." The SEC found that the Chiang Li Family is merely an "assumed name" that Li sometimes uses to disclose his ownership of Sinovac stock.

5.     Defendants also falsely represented Li's stake in Sinovac by failing to update their disclosure forms and filing additional false forms that omitted substantial amounts of stock that Li directed family members to purchase in separate accounts beginning in May 2016. By the end of 2017, Li had acquired a 31% stake in Sinovac, and then 32.6% by May 2018, but still disclosed only his and 1Globe's 16.4% and 6.19% positions.

6.      Li and 1Globe acquired this stake through a deceptive scheme that they orchestrated in which they coordinated the purchase of Sinovac stock in separate accounts, including of family members such as Defendant Jeff Li, in order to deliberately, and unlawfully, avoid the disclosure requirements of Section 13(d).

7.      In addition to misrepresenting the amount of Sinovac stock that Li and 1Globe owned, Defendants misrepresented their secret plan to act in concert with other shareholders to try to take control of the Company. While Sinovac knew that Li and 1Globe were acting in concert based on the Company's private communications with them during the battle for control of the Company, this information was not known to public shareholders.

8.      Plaintiff and the Class are Sinovac securityholders that have been caught in the middle of this battle between Sinovac's management and 1Globe for control of the Company. While Plaintiff and the Class also seek to receive fair value if Sinovac is taken private, Defendants' behind-the-scenes scheming impeded this effort. Instead, Defendants have caused Plaintiff and the Class substantial harm because their misrepresentations and omissions concerning 1Globe's and Li's true ownership of Sinovac stock, and their deceptive actions in their efforts to take control of the Company, artificially suppressed the price of Sinovac securities from reaching the value that this information would have conferred and caused trading in Sinovac stock to be halted from February 22, 2019 through the present.

9.      The SEC Order explains that "Section 13(d) is a key regulatory provision that allows shareholders and potential investors to evaluate substantial shareholdings and the implications of such shareholdings for their own investment in the security." 1Globe's and Li's misrepresentations and failures to make the disclosures that they were required to make under

3

Section 13(d) deprived Plaintiff and the Class of being able to evaluate the implications for their investment decisions of such a large shareholder and potential acquiror.

10.    If it became known that shareholders triggered the poison pill in the Rights Agreement by acquiring 15% or more of Sinovac's stock, the rights of other securityholders, such as Plaintiff, to receive additional discounted shares of Sinovac stock became exercisable. This could take place either by shareholders exercising their Rights or through an Exchange that Sinovac's Board could conduct under the Rights Agreement. Rather than disclose the full amount of Sinovac stock that Li owned or his plans to influence Sinovac—as Defendants were required to do under Section 13(d)—Li hid his actions that triggered the Rights Agreement by orchestrating a complex scheme in which he directed relatives to secretly purchase substantial stakes in Sinovac stock in separate accounts.

11.    Even the purchase of a single share of Sinovac stock above the Rights Agreement's 15% threshold constituted a Trigger Event under the Rights Agreement. All of Li's and 1Globe's purchases of Sinovac stock that they made—or directed to be made on their behalf—after March 28, 2016, therefore triggered Sinovac's poison pill. The SEC Order makes clear that Li and 1Globe triggered the poison pill by May 2016, *at the latest*.

12.    Defendants' intentionally false statements and omissions concerning the true nature of Li's and 1Globe's ownership of Sinovac stock, as well as their deceptive scheme through which they acquired those shares, caused the Exchange under the Rights Agreement to be delayed by several years. If Li had fully disclosed his ownership of Sinovac stock, as he was required to do under Section 13(d), it would have been clear as day that the Rights Agreement was triggered by May 2016, at the latest. In addition, Defendants engaged in additional actions that constituted Trigger Events under the Rights Agreement that were not revealed until the SEC Order.

13.     By violating their disclosure obligations under Section 13(d), Defendants gave Sinovac cover to delay implementing the Rights Agreement until a time would be more beneficial for Sinovac's CEO and Chairman, Weidong Yin. Moreover, Defendants caused the value of Sinovac securities to be artificially depressed by preventing the public from accounting for the value of Defendants' stake in Sinovac and their efforts to take control of the Company.

14.     The purpose of the Rights Agreement is to protect against shareholders such as Li and 1Globe from acquiring a substantial stake in Sinovac in order to try to take control of the Company. The contentious dispute between Sinovac's management and 1Globe for control of the Company has taken a toll on other shareholders such as Plaintiff that were stuck watching this struggle unfold. Trading in Sinovac stock on the NASDAQ has been halted since February 22, 2019, while securityholders waited for a court to decide whether to side with Sinovac management or 1Globe. By misrepresenting their secret acquisitions of Sinovac stock, Li and 1Globe have caused Plaintiff and the Class to suffer the harm that has ensued from the fight for control of the Company.

15.     Defendants' deceptive actions caused 1Globe's battle for control of Sinovac to come to a head through 1Globe's ambush at Sinovac's Annual General Meeting that it held on February 6, 2018 (the "Annual Meeting"). Following that meeting, 1Globe and Sinovac's incumbent directors contested the results of that meeting, and whether Sinovac was permitted to conduct an Exchange under the Rights Agreement, for seven years. Sinovac's attempt to conduct an Exchange on February 22, 2019, while that dispute was pending, caused the NASDAQ stock exchange to halt trading in Sinovac shares since that time, for over six years.

16.     As the Court ruled, in connection with the prior complaint, Plaintiff sufficiently pled that Defendants acted "without justification" and "causation of [Plaintiff's] alleged injuries"

because "the suspension of trading by NASDAQ" was a "foreseeable result[]" of Defendants' wrongful conduct that entailed "defendants eschew[ing] their Section 13(d) obligations in order to avert implementation of the Rights Agreement and advance the particular interests of the Sinobioway Group." Defendants' Section 13(d) violations thus foreseeably led to 1Globe's protracted dispute with Sinovac that involved trading in Sinovac's shares being halted while Sinovac attempted to conduct an Exchange under the Rights Agreement.

17.    The struggle for control of the Company spawned lawsuits between Sinovac and 1Globe (as well as related parties) in Massachusetts, Delaware, and Antigua (where Sinovac is incorporated). Sinovac alleges that it obtained a recording of a secret meeting between 1Globe and other Sinovac shareholders where they conspired to advance an alternative slate of directors at the Annual Meeting, but warned to "do this smartly. Don't leave any evidence to [Sinovac], showing that our shareholders have formed a 13(d) [group]. This is important." While 1Globe and Li dispute this evidence in their ongoing litigation against Sinovac, and claim that they did not know before the Annual Meeting that they would be voting for an alternative slate of directors, the SEC Order revealed on May 13, 2020 that Li and 1Globe "participated in an activist plan to replace four of five incumbent directors through a shareholder vote at Sinovac's 2018 annual shareholder meeting."

18.    On January 16, 2025, the Judicial Committee of the Privy Council ("Privy Council"), the highest court for 1Globe's action in Antigua against Sinovac, reversed the two prior decisions by Antiguan courts and ruled that the Rights Agreement is not valid under Antigua law. The Privy Council, however, adopted the description by the lower courts of 1Globe's actions at the Annual Meeting as an "ambush" and did not alter the SEC's determination that 1Globe and Li engaged in extensive violations of Section 13(d). The Privy Council decision thus confirms that

6

although the Rights Agreement is not valid, Defendants wrongfully interfered with the business relationship between Sinovac and its shareholders, resulting in trading in Sinovac stock on the NASDAQ being halted since February 22, 2019.

19.     Plaintiff brings this action on behalf of all (1) holders of Sinovac securities other than Defendants since February 22, 2019, when trading in Sinovac stock was halted on the NASDAQ stock exchange and (2) Sinovac securityholders other than Defendants who sold their securities between April 11, 2016 (the earliest possible date on which their Rights could have become exercisable) and February 22, 2019, to redress the harm that Defendants' fraud and misconduct has caused them to suffer. *See infra* ¶ 186.

## II.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over the tortious interference claims in this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

21.     This Court has jurisdiction over the federal securities claims in this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act. Those claims arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).[1]

22.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial part of the conduct complained of herein occurred in this District, and because each Defendant resides, conducts business in, and maintains operations within this District.

23.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

---

[1] The Court previously dismissed Plaintiff's claims brought under the Exchange Act. Plaintiff includes them in this Complaint to preserve them for appeal. ECF No. 43.

7

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

24.    Plaintiff MW Gestion is an institutional asset manager based in France that manages investment assets through separate funds and is authorized to bring legal action on their behalves. Prior to filing this Complaint, Plaintiff obtained a valid assignment of the claims of its fund that holds the Sinovac securities that are the subject of this action. Plaintiff's Certification, attached to the initial complaint in this action and Plaintiff's motion to be appointed Lead Plaintiff (ECF Nos. 1-1, 1-2, 6-3), lists Plaintiff's transactions in Sinovac securities that are the subject of this action.

25.    Defendant 1Globe is a Delaware corporation with its principal place of business at One International Place, 44th Fl, Boston, Massachusetts. 1Globe's prior principal place of business was at 245 First Street, Riverview II, 18th Floor, Cambridge, Massachusetts.

26.    Defendant Jiaqiang "Chiang" Li ("Li") is a citizen of the People's Republic of China, who resides in Boston, Massachusetts. He is the sole owner of 1Globe, which is a family office that purchases stock listed on U.S. exchanges.[2]

27.    Defendant the Chiang Li Family resides at 8 Museum Way, Cambridge, Massachusetts. Defendant Li has sometimes used an assumed name, Chiang Li Family, to disclose his ownership of Sinovac shares in SEC filings.

28.    Defendant Linda Li is Vice President and Director of 1Globe and resides in Boston, Massachusetts. She is also Manager of Corporate Development & Strategy at 1Globe Health

---

[2] References in this Complaint to "Li" or "Defendant Li" refer to Defendant Jiaqiang Li rather than to his relatives that are also referenced in this Complaint.

Institute LLC ("GHI"). According to GHI's website, www.1globe-usa.com, GHI was founded in 2012 and is a "research organization" located at 333 Boston-Providence Turnpike, Norwood, MA 02062. GHI lists "Chiang J. Li" as one of its founders and the chairman of its board of directors. Linda Li is related to Defendant Li and has signed SEC filings on behalf of 1Globe purporting to disclose its holdings of Sinovac stock.

29.    Defendant Jeff Li is related to Defendant Jiaqiang "Chiang" Li. Jeff Li has signed SEC filings on behalf of 1Globe purporting to disclose its holdings of Sinovac stock, as a Managing Director of 1Globe. The SEC Order references Jeff Li as "Relative #1."[3]

30.    Defendant Jiaqiang Li, Linda Li, and Jeff Li, referenced in ¶¶ 26 and 28-29 above, are collectively referred to as the "Individual Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

31.    Sinovac is a biopharmaceutical company incorporated under the laws of Antigua and Barbuda, and based in Beijing, PRC. Sinovac focuses on the research, development, manufacturing and commercialization of vaccines that protect against human infectious diseases including, among other diseases, hepatitis A and B, hand foot and mouth disease caused by enterovirus 71, seasonal influenza, H5N1 and H1N1 pandemic influenza and mumps.

32.    Sinovac also developed a vaccine for COVID-19 called CoronaVac that is widely used around the world, including in China and South America. As of April 29, 2022, Sinovac provided over 2.8 billion doses of CoronaVac globally. Sinovac's total sales in 2021 increased from $510.6 million in 2020 to $19.4 billion in 2021, primarily as a result of sales of CoronaVac.

---

[3] The SEC Order states that Relative #1 signed 1Globe's May 5, 2013 Schedule 13G disclosing its 6.19% ownership of Sinovac common stock, using the title "Managing Director" of 1Globe. Defendant Jeff Li is the individual that signed this Schedule 13G on behalf of 1Globe.

In addition, the Company's total sales increased from $246.1 million in 2019 to $510.6 million in 2020, primarily as a result of sales of CoronaVac.

33.     On May 13, 2020, the SEC issued its cease-and-desist order that penalized 1Globe and Li $290,000 for their violations of Section 13(d) of the Securities Exchange Act and Rule 13d thereunder arising out of their improper disclosures related to their ownership of Sinovac stock. Li and 1Globe consented to the SEC Order and Li admitted to its findings for bankruptcy purposes.

34.     1Globe and Li agreed with the SEC that in any "Related Investor Action"—such as this one—"they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action."[4]

35.     Defendants' misrepresentations related to their holdings of Sinovac stock, their failure to meet their disclosure obligations under Section 13(d), and their scheme to avoid those obligations prevented Plaintiff and the Class from receiving the proper return on their Sinovac securities. Defendants caused the value of Sinovac securities to be artificially depressed by preventing the public from being able to account for the value of Defendants' stake in, and efforts to take control of, the Company.

36.     Plaintiff and the Class were further harmed because Defendants' actions prevented Plaintiff and the Class from being able to trade their Sinovac securities since February 22, 2019, when the NASDAQ halted trading in Sinovac securities upon Sinovac's announcement after the market closed of the Company's plan to conduct an Exchange under the Rights Agreement.[5]

---

[4] The SEC Order defines a "Related Investor Action" as "a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding."

[5] NASDAQ is headquartered in New York, at 151 West 42nd Street, Floors 26-28, New York, NY 10036.

A. **The Ongoing Battle for Control of Sinovac**

37.    Weidong Yin was Sinovac's President, CEO, and Chairman since 2003.[6] On January 30, 2016, Yin led a group of investors that submitted a proposal to the Company's Board of Directors to acquire all of Sinovac's shares for $6.18 in cash per share, valuing the company at approximately $350 million. This group of investors (the "Yin Group") owned 29.5% of Sinovac's shares, including 10.6% held by Yin and 18.94% held by an investment company called SAIF Partners IV.

38.    At the time of the Yin Group's offer, Sinovac had already produced successful vaccines and had several new lucrative products in the pipeline. For example, by January 2016, Sinovac had already received licenses from Chinese regulators for vaccines for hepatitis, flu, mumps, and foot-and-mouth disease. It also was in the midst of clinical trials for a Sabin-inactivated polio vaccine ("sIPV") and a varicella vaccine.

39.    Certain Sinovac shareholders unaffiliated with the Yin Group opposed Yin's offer as undervaluing Sinovac. On February 3, 2016, a competing consortium of investors led by Sinobioway, an investor in Sinovac's main operating subsidiary, submitted an offer to acquire all of Sinovac's shares for $7.00 in cash per share, substantially more than the Yin Group offered.

40.    1Globe and Li were Sinovac's largest shareholder at the time, holding approximately 22.5% of Sinovac's common stock by April 2016. They supported the Sinobioway Group's effort to purchase the Company for a higher price.

41.    Plaintiff agrees that if Sinovac is going to be sold, its shareholders should receive fair value for their shares. But Defendants' fraudulent plan that they undertook in response to the

---

[6] Yin was replaced as Chairman when Sinovac announced on February 28, 2025, following the Privy Council's decision, that its New Board consisted of 1Globe's chosen Directors that it voted for at the Annual Meeting, including Defendant Li as Chairman, along with Mr. Yuk Lam Lo, Dr. David Guowei Wang, Mr. Pengfei Li and Mr. Jianzeng Cao.

11

Yin Group's offer served only to further disenfranchise Plaintiff and the Class.

42.    On March 28, 2016, Sinovac adopted the Rights Agreement that contained a "poison pill" designed to prevent parties other than the Yin Group from taking control of Sinovac. On March 29, 2016, Sinovac announced that its Board of Directors adopted the Rights Agreement.

43.    The Rights Agreement granted rights through a dividend that the Board declared for each outstanding share of Sinovac common stock at the close of business on April 8, 2016. If the Rights Agreement was triggered, each Right allowed the holder, other than the investors that trigger the Rights agreement, to purchase discounted shares of Sinovac stock or to receive free shares if the Board conducts an "Exchange." The Rights Agreement thus discouraged outside parties from accumulating substantial portions of Sinovac stock by granting extra shares to Sinovac's other investors but not the potential acquirers.

44.    The Rights Agreement was amended several times to extend its expiration past its initial March 27, 2017 expiration date, including through when Sinovac attempted to conduct an Exchange on February 22, 2019.

45.    The SEC Order states that Li was opposed to the Rights Agreement because he thought that it would discourage rival bids for the Company. Li therefore attempted to evade the Rights Agreement by secretly accumulating a substantial portion of Sinovac's common stock so that he could influence the battle for control of the Company.

### B. Defendants Triggered the Rights Agreement by May 2016

46.    Li used several deceptive tactics to substantially increase his stake in Sinovac after the Rights Agreement was adopted. The SEC determined that Li is the sole owner of 1Globe, which is his family office that purchases stock listed on U.S. exchanges. In addition to acquiring Sinovac stock through 1Globe, Li "also purchases shares individually and has sometimes used an assumed name, Chiang Li Family, to disclose his ownership of such shares in SEC filings."

12

47.     In order to further conceal his total ownership stake in Sinovac stock, Li instructed multiple relatives, including Defendant Jeff Li, to purchase substantial stakes in the Company in separate accounts under their names. Li and 1Globe funded these purchases in order to increase their stake in Sinovac. These additional purchases were made at Li's direction, "using funds provided by 1Globe Capital and Li." 1Globe and Li therefore had beneficial ownership, including through voting and investment power, over all of these holdings in Sinovac stock across 1Globe's account, Li's account, the Chiang Li Family's account, and the accounts of relatives that purchased Sinovac stock at the direction of 1Globe and Li.

48.     Li and 1Globe triggered the Rights Agreement by acquiring additional shares of Sinovac stock by the beginning of May 2016, *at the latest*. The acquisition of beneficial ownership of 15% or more of Sinovac stock, as set out in Section 1.1 of the Rights Agreement, makes the acquiror an "Acquiring Person" under the Rights Agreement.

49.     In addition, Li and 1Globe further triggered the Rights Agreement through their agreement to act together in connection with the batter for control of Sinovac.

50.     Under the terms of the Rights Agreement, shares held as of the date that the Rights Agreement was executed are exempted, but if such "Existing Holders" acquire even a single additional share after that date that is over the Rights Agreement's 15% threshold, that additional acquisition triggers the Rights Agreement.[7] When a party becomes an "Acquiring Person" under the Rights Agreement, that constitutes a "Trigger Event." (Rights Agreement § 1.15.)

---

[7] Section 1.1 of the Rights Agreement explains this rule by stating that an Existing Holder becomes an Acquiring Person under the Rights Agreement if they "become the Beneficial Owner of one or more additional Common Shares" after the first public announcement of the Rights Agreement and those additional shares continue to make them "the Beneficial Owner of 15% or more of the Common Shares then issued and outstanding."

51.     A person is considered a "beneficial owner" under the Rights Agreement of shares that "such person, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise has or shares voting power" or of shares that "are Beneficially Owned, directly or indirectly, by any other Person with whom such Person . . . has an agreement, arrangement or understanding to act together for the purpose of  acquiring, holding, voting or disposing of any securities of the Company." (Rights Agreement § 1.3.3)

52.     When a "Trigger Event" occurs, the Acquiring Person's Rights become void. In addition, after the Trigger Event, Rightsholders other than the Acquiring Person have the right to acquire discounted shares of Sinovac common stock or the Board may conduct an "Exchange" of one new share of common stock for every Right not held by an Acquiring Person. (Rights Agreement §§ 11.1.2 and 27.) If shareholders choose to exercise their Rights, they may acquire shares of common stock having a market value of two times the then current Purchase Price of the Right.[8]

53.     The SEC Order makes clear that by May 2016, Li and 1Globe acquired additional shares above the Rights Agreement's 15% threshold beyond what they beneficially owned when the Rights Agreement went into effect on March 28, 2016:

> ***Beginning in May 2016***, using funds provided by 1Globe Capital and Li, Relative #1 began building on the Sinovac position in [Relative #2's account] account. From May 2016 through January 2017, an additional 4.2% of Sinovac's common stock was acquired in Relative #2's account, for a total 4.9% position. 1Globe Capital and Li funded substantially all of the purchases through ten separate wire transfers, totaling $13 million, during the second half of 2016. (Emphasis added).

54.     Defendants also triggered the Rights Agreement even before May 2016. The SEC found that "[a]s of April 30, 2016, Relative #2 held Sinovac common stock constituting

---

[8] The details of how Rights holders can exercise their Rights are described in Sections 7 and 11.1.2 of the Rights Agreement.

approximately 0.7% of Sinovac's outstanding shares in a Canadian brokerage account." The portion of these shares that were purchased between when the Rights Agreement went into effect on March 28, 2016, and the April 30, 2016 date that the SEC noted, constituted a Trigger Event because any purchases during that time added to Li's and 1Globe's stakes that were already over the 15% triggering threshold.

55.     In addition to all of these acquisitions of Sinovac stock, the SEC Order revealed that Li and 1Globe acquired additional shares of Sinovac stock in several acquisitions that took place through May 2018. (*See infra* ¶¶ 60-61, 78-79). Each of these additional acquisitions further triggered the Rights Agreement.

56.     The SEC Order explains that Li funded his relatives' purchases with cash transfers totaling at least $23 million and by transferring the shares of another stock that his relatives then liquidated to fund additional purchases of Sinovac stock.

57.     Li and 1Globe also triggered the Rights Agreement when they acquired beneficial ownership of additional shares by virtue of their forming an agreement, arrangement, or understanding to act together with other shareholders to vote their shares in favor of the Sinobioway Group's offer to buy the Company and in favor of an alternative slate of directors at Sinovac's Annual Meeting. (*See, e.g., infra* ¶¶ 74-77, 79(d), 115, 118).

58.     This size of Defendants' holdings of Sinovac stock was crucial because Yin's offer to purchase the Company needed to be "approved by a special resolution passed by not less at least two-thirds of the Shares present and voting in person or by proxy" at a meeting that would be held to vote on the Yin Group's agreement to buy the Company. The Yin Group required the support of a substantial number of other shareholders for the transaction to be approved because the group held only 29.5% of Sinovac stock.

### C.  **Defendants Violated Their Disclosure Obligations under Section 13 of the Exchange Act**

59.    The SEC Order found that Li and 1Globe violated their disclosure duties under Section 13(d) several times by making false statements, and failing to meet their disclosure obligations, in their disclosure forms that they filed with the SEC purporting to disclose 1Globe's and the Chiang Li Family's ownership of Sinovac stock.

60.    These false and misleading statements that Defendants made in connection with 1Globe's and Li's Section 13 filings concealed the fact that Defendants caused a Trigger Event soon after the Rights Agreement was adopted, and several times thereafter, including each of their purchases of Sinovac of stock leading up to Li's and 1Globe's having beneficial ownership of approximately 31% of Sinovac's stock by December 2017, and then 32.6% by May 2018.

61.    As the SEC Order explains:

By December 2017, 1Globe Capital and Li thus had beneficial ownership of approximately 31% of Sinovac's outstanding common stock, inclusive of a then-4.99% position in Relative #1's account4 and the 3.5% position in Relative #2's account. Yet, at the time, Respondents had disclosed only the 22.5% position held in 1Globe Capital and Li's accounts, improperly splitting the disclosure into two separate disclosure schedules and not including the shares in the relatives' accounts on either schedule.

62.    The SEC Order explains that Section 13(d)(1) and Rule 13d-1(a) "require any person, including a group, that has acquired, directly or indirectly, beneficial ownership of more than five percent of a class of a registered equity security to file a statement with the Commission disclosing the identity of its members and the purpose of its acquisition." These requirements are met by filing a Schedule 13D with the SEC within ten days after parties acquire the requisite beneficial ownership. The Schedule 13D form requires the filer to disclose several types of information related to their securities ownership, including any shared beneficial ownership, any agreements related to the securities of the issuer, and the purpose of the acquisition.

16

63.    In addition, "Section 13(d)(2) of the Exchange Act and Rule 13d-2(a) together require a filer to promptly amend the filer's Schedule 13D when there are material changes to the facts previously reported."

64.    On May 9, 2013, 1Globe filed an initial Schedule 13G disclosing beneficial ownership of 6.19% of Sinovac common stock. A Schedule 13G is a short-form filing that Exchange Act Rule 13d-1(c) allows passive investors to file to meet their Section 13(d) disclosure duties, if they own less than 20% of the class of securities at issue and can certify that the securities were not acquired or held with the "purpose, or with the effect, of changing or influencing the control of the issuer."

65.    This Schedule 13G was signed by Defendant Jeff Li, who identified himself as a Managing Director of 1Globe and who the SEC Order describes as "Relative #1," a relative of Jiaqiang Li. The SEC Order explains that Jeff Li "has sometimes used the title of 1Globe Capital 'Managing Director.'" Since at least 2013, Jiaqiang Li has granted Jeff Li access to 1Globe's and Jiaqiang Li's personal brokerage accounts "in order to engage in securities transactions at Li's general direction, for 1Globe Capital and Li's benefit."

66.    1Globe and Li proceeded to substantially increase their holdings of Sinovac securities after their initial Schedule 13G. On April 5, 2016, shortly after Sinovac entered into the Rights Agreement, 1Globe filed an amendment to its Schedule 13G, disclosing a 16.44% position in Sinovac common stock.  Defendant Linda Li signed this Schedule 13G on behalf of 1Globe, as a Director of the company.

67.    A few days later, on April 11, 2016, Jiaqiang Li filed an initial Schedule 13G, under the name Chiang Li Family, further disclosing a 6.08% position in Sinovac common stock. This Schedule 13G was dated March 31, 2016 and signed by the Chiang Li Family. The SEC Order

17

explains that in addition to purchasing Sinovac shares through 1Globe's account, Li "purchases shares individually and has sometimes used an assumed name, Chiang Li Family, to disclose his ownership of such shares in SEC filings."

68.    The SEC Order also explains that all of the shares referenced in 1Globe's and the Chiang Li Family's Schedule 13G filings were purchased by Jeff Li (who signed 1Globe's May 5, 2013 Schedule 13G). The SEC determined that "1Globe Capital and Li had voting and investment power over all of the shares reported on separate Schedule 13G filings submitted by 1Globe Capital and Chiang Li Family. Therefore, the entire cumulative 22.5% block of Sinovac stock was beneficially owned by both 1Globe Capital and Li. Having acquired a collective 20% or more of the class of Sinovac securities, they were thus ineligible to file a Schedule 13G as Passive Investors under Rule 13d-1(c)." They should have filed a Schedule 13D instead to disclose their full, substantial stake in Sinovac stock.

69.    The SEC Order also explained that "a 'grandfather clause' in the rights plan exempted 1Globe Capital and Li's pre-existing, collective 22.5% position in Sinovac shares from application of the poison pill. However, even a small increase in beneficial ownership, as determined under the rights plan, risked being deemed a 'trigger event' by Sinovac."

### 1.    <u>Li Acquired Additional Sinovac Stock in His Relatives' Accounts Starting in May 2016</u>

70.    After filing these Schedule 13G forms on behalf of 1Globe and the Chiang Li Family in early April 2016, Defendants proceeded to secretly increase 1Globe's and Li's holdings of Sinovac. Li directed a relative ("Relative #2") to purchase additional Sinovac stock in a separate account. As of April 30, 2016, this relative held approximately 0.7% of Sinovac's outstanding shares in a Canadian brokerage account. The SEC Order explains that "Relative #1 [*i.e.*, Jeff Li] had access to Relative #2's account and sometimes engaged in securities transactions in that

account. Beginning in May 2016, using funds provided by 1Globe Capital and Li, Relative #1 began building on the Sinovac position in this account."

71.     The SEC Order further explains that "[f]rom May 2016 through January 2017, an additional 4.2% of Sinovac's common stock was acquired in Relative #2's account, for a total 4.9% position. 1Globe Capital and Li funded substantially all of the purchases through ten separate wire transfers, totaling $13 million, during the second half of 2016."[9] Because 1Globe and Li had or shared voting and investment power over the Sinovac shares in Relative #2's account, 1Globe and Li were "beneficial owners" of the securities.

72.     Relative #2's holdings of 4.9% of Sinovac's stock fell just below the 5% disclosure threshold (although Defendants still violated Section 13's disclosure requirements because of Li's and 1Globe's shared beneficial ownership of all of their Sinovac stock). As the SEC found, Jeff Li therefore opened a new "Canadian brokerage account in his own name in late December 2016 and began purchasing Sinovac shares in the account after receiving" a total of $10 million in wire transfers from 1Globe and Li in February and March 2017. Jeff Li attained a 3.5% position in Sinovac shares in the new account from February through December 2017. The SEC determined that 1Globe and Li also had or shared voting and investment power over the Sinovac shares in this new account and were therefore "beneficial owners" of the securities.

### 2.  Defendants' Section 13 Violations

73.     As a result of these secret purchases by related parties, by December 2017, 1Globe and Li had beneficial ownership of approximately 31% of Sinovac's outstanding common stock. At this point however, Defendants still disclosed only the 22.5% position that they held in 1Globe

---

[9] These purchases were also funded through Li's transfer of "a large block of shares of another stock to Relative #2's Canadian account. The shares were then liquidated and the proceeds used toward the ongoing purchases of Sinovac shares in Relative #2's account."

and Li's accounts. This violated their disclosure requirements under Section 13 for several reasons, including because they did not disclose the total amount of Sinovac securities that they beneficially owned in Jeff Li's and Relative #2's accounts, they improperly split their disclosure into two separate 13G schedules (one for 1Globe and one for the Chiang Li Family) instead of filing a single Schedule 13D, and they misstated their purpose in purchasing their Sinovac securities.

74.     On July 7, 2017, 1Globe converted its amended Schedule 13G that it had filed in April 2016 disclosing a 16.44% stake in Sinovac stock, to a Schedule 13D. 1Globe stated in this new filing that it now held the shares of Sinovac stock with a "control purpose," in that it supported the Sinobioway Group's privatization proposal and to "express[] its willingness to vote its shares of Common Stock in favor of such acquisition and roll-over its shares of Common Stock in connection with the acquisition."

75.     This Schedule 13D still did not disclose any of the reportable, material increases in 1Globe's and Li's beneficial ownership that had occurred since 2016, their agreement with each other and other related parties with respect to these shares, or the purpose of any of the shares other than the 16.44% stake that was disclosed in this new filing.

76.     The SEC Order determined that Defendants also acted improperly in connection with Sinovac's Annual Meeting that it held on February 6, 2018. "By at least January 22, 2018, 1Globe Capital and Li had decided to participate in an activist plan, obtain proxies for the Sinovac shares held in their accounts, and instruct their representatives to attend the annual meeting and vote their shares for the Alternative Slate" of directors that the Sinobioway Group proposed at the Annual Meeting. Similarly, the SEC Order explains that "[b]y at least January 22, 2018, 1Globe Capital and Li had decided to participate in an activist plan, obtain proxies for the Sinovac shares held in their accounts, and instruct their representatives to attend the annual meeting and vote their

20

shares for the Alternative Slate. . . . [And were advised] to instruct their brokers to 'keep the whole thing strictly confidential from Sinovac.'" This alternative slate of directors included a relative of Defendant Li who has been employed under Li's general direction as an officer of 1Globe's Beijing research affiliate since at least 2016.

77.     1Globe then filed an amended Schedule 13D on March 26, 2018, only with respect to the 16.4% position that it held in its own account. This amended Schedule 13D misstated Defendants' intentions in connection with the Annual Meeting by claiming that 1Globe "did not have an intention to nominate or second the nomination of a slate of proposed directors that would change the composition of the board." This amended Schedule 13D also continued to misstate 1Globe's true total beneficial ownership of Sinovac stock, its purpose for acquiring or holding the stock, and its agreements with related parties in connection with Sinovac stock.

78.     Defendants' disclosure violations were made even worse by the fact that from January through May 2018, as the resolution of the Annual Meeting remained in limbo, Jeff Li continued to purchase more Sinovac stock in his account with 1Globe's and Li's funds. These purchases added a 1.6% position in Sinovac shares during this time period, raising 1Globe's and Li's beneficial ownership to approximately 32.6% of Sinovac's stock. None of these purchases were disclosed in updated Section 13 filings that 1Globe and Li were required to make for these purchases. Jeff Li stopped buying Sinovac shares in this account only because his broker placed limitations on further purchases after conducting a compliance inquiry.

79.     The SEC determined that 1Globe's and Li's actions violated Sections 13(d)(1) and 13(d)(2) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder. In particular:

      a.  No later than April 5, 2016, 1Globe and Jiaqiang Li violated Section 13(d)(1) and Rule 13d-1(f)(1) by failing to disclose their shared beneficial ownership of 20% or more of Sinovac common stock;

21

b.  From July 2017—when 1Globe converted its Schedule 13G disclosing a 16.44% stake in Sinovac stock to a Schedule 13D—through June 2018, 1Globe and Li violated Section 13(d)(2) and Rule 13d-2(a) because they failed to file a Schedule 13D amendment disclosing multiple additional material acquisitions of shared beneficial ownership of Sinovac common stock;

c.  1Globe's July 7, 2017, Schedule 13D violated Section 13(d)(1) and Rule 13d-1 because 1Globe and Jiaqiang Li failed to disclose 1Globe's full beneficial ownership of Sinovac common stock, 1Globe's "Item 4 plans or proposals with respect to additional acquisitions of Sinovac shares," and its "Item 6 arrangements, understandings or relationships with respect to Sinovac securities";

d.  No later than July 7, 2017, Li violated Section 13(d)(1) and Rules 13d-1(e)(1) and 13d-1(f)(1) by failing to file "a Schedule 13D disclosing, in connection with all of the Sinovac common stock shares of which he was a beneficial owner, his plans to support [the Sinobioway Group's] proposed Sinovac privatization";

e.  No later than January 22, 2018, 1Globe and Jiaqiang Li violated Section 13(d)(2) and Rule 13d-2 because they "failed to file a Schedule 13D amendment disclosing their participation in an effort to replace four of Sinovac's five incumbent directors through a shareholder vote at the Sinovac annual meeting"; and

f.  1Globe and Li violated Section 13(d)(2) and Rule 13d-2 because 1Globe's March 26, 2018 Schedule 13D/A:

    i.  failed to disclose 1Globe's full beneficial ownership of Sinovac common stock shares, inclusive of shared beneficial ownership in shares held in Li's account and Relative #1 and #2's accounts;

    ii.  made incomplete disclosure regarding 1Globe's actions in connection with the February 2018 annual shareholder meeting while omitting material facts concerning 1Globe's and Li's participation in the effort to replace four of Sinovac's five incumbent directors;

    iii.  failed to disclose 1Globe's Item 4 plans or proposals with respect to additional acquisitions of Sinovac shares, even as Relative #1 continued to undertake purchases substantially funded by 1Globe Capital and Li; and

    iv.  failed to disclose 1Globe's Item 6 arrangements, understandings or relationships with respect to Sinovac securities, even as Relatives #1 and #2 both held Sinovac shares in their accounts, the purchase of which had been substantially funded by 1Globe Capital and Li.

80.  The SEC Order makes clear how integral Defendant Jeff Li was to furthering Defendant Li and 1Globe's scheme. For example, *all* of the shares reflected in 1Globe's and Li's

22

separate Schedule 13G filings in April 2016 totaling 22.52% of Sinovac stock (16.44% for 1Globe and 6.08% for Li) were "purchased in trades effected by [Jeff Li], who had general authorization to trade in the brokerage accounts of 1Globe Capital and Li with funds from the two accounts." Then, starting in May 2016, Jeff Li "began building on the Sinovac position" in the account of another relative (who the SEC Order describes as Relative #2).

81.    The SEC Order further explains that "[a]s the Sinovac stock position held in Relative #2's Canadian brokerage account neared the 5% disclosure threshold, [Jeff Li] opened a Canadian brokerage account in his own name in late December 2016 and began purchasing Sinovac shares in the account after receiving a $5 million wire transfer from 1Globe Capital and Li in February 2017," followed by a "second $5 million wire [that] was sent from 1Globe Capital and Li the following month." Jeff Li used these funds to build "a 3.5% position in Sinovac shares in the new account, during the time period February through December 2017. These shares comprised approximately 90% of the total account value." In other words, Jeff Li—at the direction of Li and 1Globe—deliberately evaded Section 13's requirements by opening a new account to conceal his purchases passing the 5% threshold.

82.    Defendant Jeff Li then continued to purchase Sinovac stock in his Canadian account from January through May 2018, purchasing an additional 1.6% stake that was "substantially funded by 1Globe Capital and Li" through a third wire transfer, for $6 million. The SEC Order explains that Jeff Li did not stop buying Sinovac shares in this account until "after his broker conducted a compliance inquiry and placed limitations on further purchases."

83.    The SEC Order also makes clear that Defendants' Section 13(d) violations in connection with their Schedule 13D filings were based on their failure to disclose the full extent of 1Globe's beneficial ownership of Sinovac stock "even as" Jeff Li "continued" to purchase

23

Sinovac shares "substantially funded by 1Globe Capital and Li" and even as Jeff Li "continued to hold the aforementioned large positions in Sinovac common stock, substantially funded by 1Globe Capital and Li."

### D. Defendants Had a Duty to Disclose, and Made Materially False and Misleading Statements Concerning, Li's Holdings of Sinovac Stock

#### 1. Defendants Violated Their Disclosure Duties Under Section 13(d) and Rule 13d

84. Defendants repeatedly violated their duty under Section 13(d) and Rule 13d to disclose material information concerning Li's and 1Globe's holdings of Sinovac stock.

85. First, Defendants had a duty under Section 13(d) and Rule 13d to file a Schedule 13D disclosing the full extent of Li's and 1Globe's shared beneficial ownership of Sinovac stock across accounts held by 1Globe, Li, the Chiang Li Family, and Li's relatives who purchased Sinovac stock at the direction of Li.

86. Second, Defendants had a duty to update their prior Schedule 13 filings and to file a Schedule 13D amendment disclosing each material acquisition of additional shares of Sinovac stock.

87. Third, Defendants had a duty to disclose their plans in connection with all of their Sinovac holdings to support the Sinobioway Group's offer for the Company, to support the alternative slate of Directors at the Annual Meeting, and to acquire additional shares of Sinovac stock.

88. Fourth, Defendants had a duty to disclose the full extent of their relationships and agreements to act in concert with other Sinovac shareholders to advance those plans, including their agreements and relationships among each other and with the Sinobioway Group.

24

### 2. Defendants Made Materially False and Misleading Statements Concerning Their Sinovac Stock Holdings

89.     In addition to violating their duties to disclose under Section 13(d) and Rule 13d, Defendants made materially false and misleading statements in 1Globe's and Li's (as well the Chiang Li Family's) Schedule 13G and Schedule 13D filings.

90.     The amended **Schedule 13G that 1Globe filed on April 5, 2016**, signed by Defendant Linda Li, falsely disclosed a 16.44% stake in Sinovac stock, and falsely certified that the securities at issue "were not acquired and are not held for the purpose of and do not have the effect of changing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having such purpose or effect for the time being."

91.     These statements were materially false and misleading, and violated Section 13(d)(1) and Rule 13d-1(f)(1), because they misrepresented or failed to disclose (i) - 1Globe's and Li's shared beneficial ownership of 20% or more of Sinovac common stock; (ii) - Defendants' agreements and relationships with each other concerning their Sinovac stock; (iii) - their plans to purchase additional shares of Sinovac stock; and (iv) - their plans to support the Sinobioway Group's offer for the Company.

92.     The **Schedule 13G that Li filed as the Chiang Li Family on April 11, 2016** (and dated March 31, 2016), falsely disclosed a 6.08% stake in Sinovac stock, and falsely certified that the securities at issue "were not acquired and are not held for the purpose of and do not have the effect of changing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having such purpose or effect for the time being."

25

93.     These statements were false and misleading, and violated Section 13(d)(1) and Rule 13d-1(f)(1), because they misrepresented or failed to disclose (i) - 1Globe's and Li's shared beneficial ownership of 20% or more of Sinovac common stock; (ii) - Defendants' agreements and relationships with each other concerning their Sinovac stock; (iii) – their plans to purchase additional shares of Sinovac stock; and (iv) - their plans to support the Sinobioway Group's offer for the Company.

94.     The **Schedule 13D that 1Globe filed on July 7, 2017**, signed by Defendant Linda Li, continued to falsely disclose a 16.4% stake in Sinovac stock and falsely added:

> The purpose of the acquisition was investment. 1Globe Capital LLC supports the Sinobioway Consortium's proposal to acquire all of the Common Shares of Sinovac Biotech for the consideration of $8 per Common Share and has expressed its willingness to vote its shares of Common Stock in favor of such acquisition and roll-over its shares of Common Stock in connection with the transaction. Except as indicated above, 1Globe Capital LLC as of the date of this Statement does not have any plans or proposals which relate to or would result in additional acquisitions or dispositions of shares of Sinovac Biotech Ltd. Except as indicated above, 1Globe Capital LLC as of the date of this Statement does not have any plans or proposals which relate to or would result in changing the organizational structure, management, governance of Sinovac Biotech Ltd.

95.     These statements were false and misleading, and violated Section 13(d)(1) and Rule 13d-1, because they misrepresented or failed to disclose (i) - 1Globe's and Li's shared beneficial ownership of 20% or more of Sinovac common stock; (ii) - Defendants' agreements and relationships with each other concerning their Sinovac stock; (iii) - their plans to purchase additional shares of Sinovac stock; and (iv) – the full extent of their agreements and relationships with members of the Sinobioway Group with respect to their Sinovac stock.

96.     The **amended Schedule 13D that 1Globe filed on March 26, 2018** (dated March 23, 2018), signed by Defendant Linda Li, continued to falsely disclose a 16.4% stake in Sinovac stock and falsely added that Sinovac's allegations in the lawsuit that it filed in this District that

26

1Globe violated Section 13(d) "are wholly without merit for several reasons, including without limitation, that it has fully complied with its disclosure and filing obligations under Section 13(d)," that the director from the alternative slate that is affiliated with 1Globe "was nominated by an existing shareholder of the Issuer that is unaffiliated with" 1Globe, that prior to the Annual Meeting, 1Globe "did not have an intention to nominate or second the nomination of a slate of proposed directors that would change the composition of the Board," and that 1Globe " simply exercised their basic and legally-protected rights to vote on board of directors at the" Annual Meeting.

97.     These statements were materially false and misleading, and violated Section 13(d)(2) and Rule 13d-2, because they misrepresented or failed to disclose (i) - 1Globe's and Li's shared beneficial ownership of 20% or more of Sinovac common stock; (ii) - 1Globe's actions in connection with the Annual Meeting, including 1Globe's and Li's participation in the effort to replace four of Sinovac's five incumbent directors; (iii) - Defendants' agreements and relationships with each other concerning their Sinovac stock; and (iv) - their plans to purchase additional shares of Sinovac stock.

### 3.     Defendants' Section 13(d) Violations and Misrepresentations Delayed Sinovac's Exchange Under the Rights Agreement

98.     The Rights Agreement provided that Rights become exercisable on the "Distribution Date," which occurs on the close of business on the tenth Business Day after the "Share Acquisition Date." (Rights Agreement §§ 3.1, 7.1).

99.     The Share Acquisition Date, in turn, was "the first date of public announcement (which, for purposes of this definition, shall include, without limitation, *the filing of a report pursuant to Section 13(d) of the Exchange Act* or pursuant to a comparable successor statute) by the Company or an Acquiring Person that an Acquiring Person has become such or that discloses

27

information which reveals the existence of an Acquiring Person or such earlier date as a majority of the Board shall become aware of the existence of an Acquiring Person." (Rights Agreement § 1.13 (emphasis added)). An Acquiring Person is someone, or a group, that is the "Beneficial Owner of 15% or more of [Sinovac's] Common Shares then issued and outstanding." (Rights Agreement § 1.1).

100.    Until the "Distribution Date," "the Rights (and the right to receive certificates therefor) will be transferable only in connection with the transfer of the underlying Common Shares." Then, "[a]s of and after the Distribution Date, the Rights will be evidenced solely by" Right Certificates. At this point, the Rights no longer transfer "in connection with the transfer of the underlying Common Shares." Instead, "as of and after the Distribution Date, the Right Certificates are transferable only on the registry books of the Rights Agent if surrendered at the office of the Rights Agent designated for such purpose, duly endorsed or accompanied by a proper instrument of transfer with all required certifications completed." (Rights Agreement §§ 3.1 and 16(b)). [10]

101.    When a Trigger Event occurs, the Rights Agreement gave Rightsholders the ability to purchase discounted shares of Sinovac stock. Alternatively, Sinovac's Board could choose to conduct an "Exchange" under the Rights Agreement whereby Rightsholders exchange their Rights "at an exchange ratio of one Common Share per Right." But neither of these events may occur

---

[10] The Rights Agreement also provided that "[a]s soon as practicable after the Distribution Date, the Company will prepare and execute, the Rights Agent will countersign and the Company (or, if requested, the Rights Agent) will send" the Right Certificates "to each record holder of Common Shares as of the close of business on the Distribution Date (other than any Acquiring Person or any Related Person of an Acquiring Person), at the address of such holder shown in the register of members of the Company or the transfer agent or registrar for the Common Shares."

under the Rights Agreement until after the Distribution Date (which itself does not occur until ten business days after the Share Acquisition Date). (Rights Agreement §§ 7.1, 11.1.2 and 27).

102.    Defendants' material misstatements and omissions, as well as their fraudulent scheme, concerning their ownership of Sinovac stock caused a delay in certain bases for the Share Acquisition Date. If Defendants had disclosed the true extent and purpose of their beneficial ownership of Sinovac common stock, that would have constituted a Share Acquisition Date. The occurrence of the Share Acquisition Date then would have automatically made the Distribution Date occur ten business days later.

103.    Defendants' actions harmed Plaintiff and the Class because their misrepresentations concerning 1Globe's and Li's true ownership of Sinovac stock, and their efforts to take control of the Company, artificially suppressed the price of Sinovac securities from the time of Defendants' first Section 13(d) violation, preventing the securities from reaching the value that this information would have conferred, and led to the halt in trading of Sinovac shares since February 22, 2019.

**E.  Defendants' Other Deceptive Tactics in the Battle for Control of Sinovac Confirm That They Engaged in a Fraudulent Scheme and Intentionally Misrepresented Their Sinovac Holdings**

104.    After Sinovac adopted the Rights Agreement on March 28, 2016, the Yin Group and the Sinobioway Group continued to try to advance their competing bids for Sinovac. 1Globe and Li engaged in unscrupulous tactics in their effort to defeat Yin and Sinovac's incumbent Board that they viewed as beholden to Yin.

105.    The SEC Order found that during the struggle for control of the Company, 1Globe and Li, as large Sinovac shareholders, corresponded and met with representatives of the Yin Group, the Sinobioway Group, and Sinovac management. Li stated his disapproval of Sinovac's

29

poison pill because he believed that it could discourage rival bids.[11] During these meetings, Li also expressed his desire for 1Globe to be represented on Sinovac's Board of Directors, including during an August 2017 joint meeting between him and the two groups vying for control of Sinovac. Li acquired substantial shares of Sinovac stock in violation of the Rights Agreement in order to further these efforts.

106.    On June 26, 2017, Sinovac issued a press release announcing that it had entered into a definitive "Amalgamation Agreement" for the Yin Group to purchase Sinovac for $7.00 per share.

107.    The Sinobioway Group responded immediately by submitting a revised proposal to acquire Sinovac for $8.00 per share. Sinovac's Board told the Sinobioway Group in late October 2017 that it rejected the group's revised offer because of purported concerns with the group's funding. The Sinobioway Group viewed this explanation as a pretext for the Board to continue to support the Yin Group's proposal. Sinobioway wrote a letter to shareholders alleging several types of misconduct by Sinovac's management in the operation of the Company's business.

108.    A dispute then arose at Sinovac's February 6, 2018 Annual Meeting between the Company's management and 1Globe concerning the composition of Sinovac's Board. 1Globe joined with the Sinobioway Group to try to elect an alternative slate of Directors to Sinovac's Board in an attempt to take control of Sinovac's Board and thwart the Yin Group's efforts to buy the company. The alternative slate of directors received more votes at the Annual Meeting than the incumbent slate of directors. 1Globe then issued a press release after the Annual Meeting declaring that its nominees were successfully elected to the Board.

---

[11] The SEC Order does not state the specific date on which Li expressed this disapproval, but describes it in the course of discussing Defendants' actions in April 2016.

109.    But the incumbent Board and Sinovac's management took the position that Defendants' votes were not valid, including because they did not disclose before the Annual Meeting that they planned to nominate an alternative slate of directors or that they had formed a group to vote together at the meeting in an effort to take control of Sinovac. Sinovac issued a press release on March 5, 2018, stating that the incumbent Board was "re-elected by a majority of the votes validly cast. The Company determined, after consultation with its Antigua legal counsel, that a ballot proposed by the dissident group without prior notice at the AGM was invalid."

110.    The fallout from Sinovac's contested Annual Meeting is the subject of several lawsuits between Sinovac and 1Globe.[12]

111.    Sinovac brought an action in Delaware Chancery Court against 1Globe and the parties that voted with it at the Annual Meeting, seeking a declaration of a Trigger Event because 1Globe and the other related defendants "became Acquiring Persons under the Rights Agreement [thereby effectuating a Trigger Event] on or before February 6, 2018."[13]

112.    Sinovac brought this action rather than go ahead and declare that a Trigger Event occurred, because the Company "anticipates Defendants [including 1Globe and Li] will dispute that their actions caused a Trigger Event under the Rights Agreement."

---

[12] In addition, after these events, on July 3, 2018, Sinovac terminated the Amalgamation Agreement, stopping its agreement allowing the Yin Group to purchase Sinovac for $7.00 per share. But Sinovac also embarked on other efforts to aid Yin's improper attempts to take control of Sinovac. In this same July 3, 2018 announcement, Sinovac disclosed that it was issuing 11.8 million shares to two entities that were members of the Yin Group at a price of $7.35 per share—significantly below the Sinobioway Group's offer of $8 per share and Sinovac's share price of $8.66 per share as recently as June 8, 2018. This transaction had the effect of increasing the Yin Group's holdings of Sinovac stock from approximately 29% to approximately 41%.

[13] This action is captioned *Sinovac Biotech Ltd. v. 1Globe Capital, LLC*, et al., C.A. No. 2018-0143-JTL (Del. Ch.) (the "Delaware Action").

31

113.    That is exactly what happened. In addition to contesting Sinovac's claims in the Delaware action, 1Globe brought suit in Antigua seeking to have the court declare 1Globe's slate of directors as the properly elected Board.[14]

114.    Sinovac has also brought an action against 1Globe in this District seeking injunctive relief for 1Globe's Section 13(d) violations.[15]

115.    The evidence raised in these lawsuits demonstrates the extent to which 1Globe and Li secretly coordinated to rig the vote at the Annual Meeting and have blatantly lied about those efforts. This evidence includes a recording of what Sinovac describes as a secret meeting between 1Globe, its related parties, and the Sinobioway Group, where they agreed to secretly advance an alternative slate of directors at the Annual Meeting. Sinovac obtained this recording after Sinobioway's Chairman "and about 300 unnamed individuals in security uniforms forcibly entered Sinovac Beijing's Changping site [at 3:20 a.m. on May 19, 2018], in an attempt to steal data and take control of the manufacturing site."

116.    According to Sinovac, these intruders left behind two laptop computers and two thumb drives that contained minutes and the audio recording from a January 8, 2018 teleconference between 1Globe and the Sinobioway Group in which they discussed their secret plan to "replace the Board of Directors during the Annual General Meeting." 1Globe's counsel from DLA Piper cautioned at this meeting that the group needed to conceal that they were acting in concert. He stated: "The key is we will not only do this, but also do this smartly. Don't leave any evidence to [Sinovac], showing that our shareholders have formed a 13(d) [inaudible] group. This is

---

[14] This action is captioned *1 Globe Capital, LLC, Claimant, and Sinovac Biotech Ltd.*, Defendant, ANUHCV 2018/0120 (Eastern Caribbean Supreme Court, Antigua and Barbuda).

[15] This action is captioned *Sinovac Biotech Ltd. v. 1Globe Capital LLC and The Chiang Li Family*, No. 18-cv-10421-NMG (D. Mass) (the "Massachusetts Action").

important." The participants at this meeting also agreed to "conduct [an] internal rehearsal of the Annual General Meeting one or two weeks before February 6" in a manner to avoid detection as "conspirators."

117. On December 19, 2018, the High Court of Justice of Antigua and Barbuda dismissed 1Globe's claim because 1Globe's "secret plan to take control of" Sinovac led to an "ambush" at the Annual Meeting that "deprived shareholders of the opportunity to make an informed and intelligent decision." The court in Antigua also held that the Rights Agreement is valid under Antigua law.

118. The court in Antigua also determined that 1Globe's testimony that it was not aware of the proposed alternative slate before the Annual Meeting was not credible. For example, the court determined that Pengfei Li—the 1Globe employee that the Sinobioway Group nominated to the Board (and who is now on the Board following the Privy Council's decision)—must have been part of the group's plan because he would not otherwise have accepted the nomination on the spot without 1Globe's approval. Moreover, Pengfei Li "remained silent throughout the" Annual Meeting and then chaired a meeting of the Sinobioway Group's Board the next day even through Sinovac's management contested his election. The court determined that "[t]he haste with which he took charge of [Sinovac], even before an official election result was declared, suggests that he knew of the plan to oust the Incumbent Directors." Pengfei Li was also "at a loss to explain why the email address from which his junior colleague sent an anonymous email to [Sinovac] matched the email address of Sinobioway which, on the evidence, had been involved in planning to oust the Incumbent Directors and spreading negative publicity about them."

119. Moreover, the SEC Order makes clear that "[b]y the end of 2017, 1Globe Capital, Li, and related parties together held nearly one-third of the common stock of issuer Sinovac

33

Biotech Ltd. . . . and participated in an activist plan to replace four of five incumbent directors through a shareholder vote at Sinovac's 2018 annual shareholder meeting in Beijing, but failed to disclose material information that is required in a Schedule 13D." The SEC also determined that "[b]y at least January 22, 2018, 1Globe Capital and Li had decided to participate in an activist plan, obtain proxies for the Sinovac shares held in their accounts, and instruct their representatives to attend the annual meeting and vote their shares for the Alternative Slate" of directors. Li's and 1Globe's failure to disclose "their full beneficial ownership of Sinovac stock, inclusive of substantial shares held by related parties, and their participation in a plan, led by other investors, thereby depriving existing and potential shareholders of information necessary to make fully informed investment decisions."

120.    On February 22, 2019, Sinovac announced that "[b]ased upon the [Antiguan] Court's judgment and other facts, the Board determined [on February 18, 2019] that 1Globe Capital, LLC, Chiangjia Li, OrbiMed Advisors LLC and those additional shareholders who voted together with the foregoing at the AGM, together with their affiliates and associates . . . became Acquiring Persons on or prior to the AGM and their conduct resulted in a Trigger Event under the Rights Agreement." According to Sinovac's Board, these shareholders became Acquiring Persons under the Rights Agreement, thereby creating a Trigger Event, "prior to the Company's Annual General Meeting held on February 6, 2018."

121.    Sinovac's Board decided to conduct an Exchange under the Rights Agreement whereby each Right "that was valid and outstanding as of the close of trading in the United States on February 22, 2019" would be exchanged for 0.655 of the Company's common shares and 0.345 of the Company's newly created Series B Convertible Preferred Shares. Sinovac also explained

34

that each shareholder held one Right "for each Common Share they held as of" February 22, 2019, when the Board declared the Exchange.

122.   When Sinovac announced the Exchange in a Form 6-K that it filed with the SEC after the market closed on February 22, 2019, it stated that NASDAQ "has advised the Company that it expects to implement a halt in trading in the Common Shares until at least March 8, 2019 in order to facilitate the orderly distribution of the Exchange Shares." It was foreseeable that NASDAQ would halt trading while the Exchange was pending because Sinovac shares could not trade in an orderly manner while its share count was being increased by 42.4 million shares that were being exchanged for the Rights held by all of "the Company's shareholders other than the Collaborating Shareholders [*i.e.*, 1Globe and the rest of the Sinobioway Group]."[16] This trading halt was then extended indefinitely because the Exchange was halted at 1Globe's request.

123.   On March 6, 2019, the Delaware Chancery Court granted 1Globe's Motion for a *Status Quo* Order. This Order halted Sinovac from taking any action to Exchange the Rights under the Rights Agreement until the final disposition of the Delaware action. The Exchange, and trading of Sinovac securities, have been suspended since that time, pending resolution by the Delaware Chancery Court of whether the Rights Agreement was triggered.

124.   On March 8, 2019, Sinovac announced that because of the *Status Quo* Order, the Exchange would not happen until the court in the Delaware Action "has determined whether the conduct of 1Globe Capital, LLC, Chiangjia Li, OrbiMed Advisors LLC and those additional shareholders who voted with the foregoing at the annual general meeting held in February 2018 (the 'Collaborating Shareholders') triggered the Rights Agreement. The Exchange Shares remain

---

[16] Sinovac February 22, 2019 Press Release filed with the SEC.

35

issued and outstanding and holders of valid Rights may continue to submit certifications to verify that they are eligible for the Exchange."

125.    Similarly, on April 12, 2019, Sinovac announced that "[o]n April 4, 2019, the Eastern Caribbean Supreme Court, Court of Appeal issued an order that restrains the Company from taking further action under its Rights Agreement, including the distribution of the previously issued Exchange Shares to the holders of valid Rights, until the conclusion of 1Globe Capital, LLC's appeal of the December 19, 2018 Judgment of the High Court of Justice of Antigua and Barbuda." Sinovac therefore expects the Exchange Shares "to remain in the Shareholder 2019 Rights Exchange Trust in the name of Wilmington Trust, National Association, until, at least, the conclusion of the Antigua appeal and final disposition of the Delaware litigation or further order of the Delaware Chancery Court. The Exchange Shares remain issued and outstanding and holders of valid Rights may continue to submit certifications to verify that they are eligible for the Exchange."

126.    1Globe appealed the Antigua court's ruling in Sinovac's favor. On December 9, 2021, the Eastern Caribbean Supreme Court, Court of Appeal, dismissed 1Globe's appeal and upheld the lower court's ruling in Sinovac's favor. 1Globe applied for leave to appeal to the Privy Council. On February 24, 2022, the Court of Appeal granted 1Globe leave to appeal to the Privy Council.

127.    In January 2022, the Court of Appeal in the Antigua Action extended the order initially made on April 4, 2019, that restrains Sinovac from taking further action under its Rights Agreement, including the distribution of the previously issued Exchange Shares, until the conclusion of 1Globe's appeal to the Privy Council. Sinovac and 1Globe also agreed to the continuation of this injunction until the appeal process is complete.

128.     Sinovac disclosed in SEC filings that the Exchange Shares would not be distributed until the conclusion of both the appeal in the Antigua action and the conclusion of the Delaware action. The implementation of the Exchange under the Rights Agreement, as well as all trading of Sinovac shares on the NASDAQ, therefore remained halted while the Antigua and Delaware Actions have been pending.[17] Sinovac has disclosed in SEC filings that "[t]he Company is currently unable to estimate when trading will resume, or if Nasdaq will take any additional action in regards to trading of the Company's common shares."

129.     1Globe disputed, in all of its actions against Sinovac (including in Delaware, Antigua, and Massachusetts), that 1Globe triggered the Rights Agreement at all. For example, in an amendment to 1Globe's Schedule 13D that it filed with the SEC on March 19, 2019, it described Sinovac's actions against 1Globe as "frivolous lawsuits." 1Globe explained that although on February 18, 2019, Sinovac (which 1Globe calls the "Disputed Board") "purportedly determined that [1Globe] and all other shareholders that voted against the Disputed Directors at the 2018 AGM (representing about 50% of all shares outstanding) constituted 'Acquiring Persons' and therefore triggered the Poison Pill," Sinovac "did not establish a legitimate basis for such determination or explain why it made such determination over a year after the purported trigger event had occurred without waiting for the result of the Pending Delaware Case which the Issuer initiated.  The intent of the Disputed Board and Former Management is to greatly dilute all shareholders who voted against their re-election through the Poison Pill and to gain control of more than 50% of the Issuer shares in order to remove any resistance to their goal of acquiring the Issuer at a discount." While

---

[17] Sinovac explained in its 2021 Form 20-F (as well as prior SEC filings) that "NASDAQ implemented a halt in trading in Sinovac Antigua's [*i.e.*, Sinovac's] common shares in order to facilitate the orderly distribution of the Exchange Shares. In light of the ongoing litigation concerning the Rights Agreement, there can be no assurance when or if this halt will be lifted."

the Privy Council ended up ruling that the Rights Agreement was not valid, given that the agreement was in place at the time, it was foreseeable that 1Globe's deceptive tactics in its battle for control of Sinovac would cause Sinovac's incumbent Board to try to conduct an Exchange under the Rights Agreement. Protecting Sinovac from takeover attempts, such as 1Globe's, was the purpose of the agreement and what Defendants sought to evade through their Section 13(d) violations.

130.    1Globe's appeal took a tortured path to the Privy Council. On February 24, 2022, the Antigua Court of Appeal granted 1Globe's motion for leave to file an appeal with the Privy Council on certain of its requested grounds of appeal, but not on the issue of whether the Rights Agreement was valid under Antigua law. On April 19, 2022, 1Globe applied directly to the Privy Council for permission to appeal "whether the Rights Agreement is permitted under Antiguan law." On July 13, 2022, 1Globe filed its initial notice of appeal on issues for which it had already been granted leave to appeal.[18]

131.    Then, on September 16, 2022, 1Globe applied to the Privy Council to raise new issues in its appeal. On February 15, 2023, the Privy Council granted 1Globe's application to amend its Notice of Appeal, but "reserved, until the final substantive hearing, its decision on whether to grant permission to appeal on the other two grounds sought." The amendment that the Privy Council granted was simply 1Globe's request to consolidate several of the grounds that it had previously been granted permission to appeal, into a single ground. On all of the new grounds that 1Globe sought to appeal, the Privy Council reserved decision until the final hearing on whether 1Globe would even be permitted to appeal.[19]

---

[18] *See* Sinovac and 1Globe's joint letter in the Delaware Action, dated April 27, 2023.
[19] *Id.*

132.    Following this decision by the Privy Council on February 15, 2023, setting the scope of 1Globe's appeal, on April 27, 2023, 1Globe estimated in its joint letter with Sinovac in the Delaware Action, that the Privy Council "appeal will be decided in the next 12 to 18 months"—*i.e.*, as soon as April 2024. 1Globe, however, then delayed substantially in perfecting its appeal.

133.    As Sinovac explained when it disclosed its financial information for the first half of 2023, although 1Globe was initially granted permission to appeal on February 24, 2022, and the Privy Council finalized the scope of the appeal on February 15, 2023, as of August 15, 2023, "1Globe [was] still completing necessary procedural filings, and has not yet taken steps to list a substantive hearing before the Privy Council."

134.    Based on an inquiry made to the Registry at the Privy Council at the direction of the undersigned counsel, 1Globe did not file its Statement of Facts and Issues with the Privy Council until October 27, 2023. 1Globe was required to make that filing before the parties could notify the Privy Council that the appeal was ready to be listed for a hearing. It was not until April 29, 2024, that Sinovac stated in its Annual Report on Form 20-F, that the "final substantive hearing before the Privy Council is listed for July 10 to 11, 2024."[20]

135.    On January 16, 2025, when the Privy Council issued its decision, it did not allow 1Globe to appeal the issues that 1Globe sought to raise in its September 16, 2022 application related to the validity of the Rights Agreement, which 1Globe was raising for the first time on appeal.[21] The Privy Council explained that 1Globe's request to raise those issues came after there

---

[20] When 1Globe moved to stay this case at the end of 2023, its counsel stated at the hearing held on December 6, 2023, that 1Globe still did not have any update on when the Privy Council hearing would take place, expecting only that the appeal would "conclude in 2024" based on information from "counsel for 1Globe that is handling that matter."

[21] These new grounds for appeal included 1Globe's arguments that "the Rights Agreement was invalid because of bad faith, or breach of the fiduciary duty to exercise powers for proper purposes," and that the agreement entailed "an unlawful dividend." Privy Council Decision ¶ 30.

"ensued a change in 1Globe's legal team, following which a largely new case was advanced."[22] The Privy Council did not allow 1Globe to raise these issues because they were "not advanced in either of the courts below" and were "raised for the first time before" the Privy Council. The Privy Council thus did not have the benefit of the other side being given the opportunity to respond at trial, "the views of the local courts having first been obtained, after full argument before them," or "the necessary assistance of the views of the local courts."[23] The Privy Council was highly critical of 1Globe's litigation strategy, describing the posture of the case as the "perhaps unfortunate result of these choices by the parties," making the appeal turn "as much upon the way in which a complicated litigation game has been played as upon the application of all the available law to the relatively straightforward and uncontentious facts." [24] Similarly, the Privy Council repeatedly decried that it was "unwillingly" limited in its ruling "by the way in which the parties have chosen to identify and litigate the issues in the proceedings," even though "[s]omething quite different from that proposed by either party may be perfectly appropriate."[25] 1Globe's belated attempt, in its September 16, 2022 application, to change the basis of its appeal thus substantially delayed the Privy Council's decision setting the scope of the appeal until February 15, 2023.

---

[22] While the Privy Council considered 1Globe's new request as to the lower court judge's exercise of discretion, it did so only because that issue was "inexorably" tied to the "errors of law in [the lower court's] analysis of the AGM issues" that 1Globe appealed originally and therefore the lower court's "original discretion as to relief will have to be re-exercised in any event." Privy Council Decision ¶¶ 30, 32-33.

[23] Privy Council Decision ¶¶ 30-31, 76. While the Privy Council allowed 1Globe to appeal the issue of the validity of the Rights Agreement on one ground under Antigua law, 1Globe had applied for permission to appeal that issue on April 19, 2022, based on the rulings by the lower courts on it.

[24] Privy Council Decision ¶ 2.

[25] Privy Council Decision ¶¶ 87-88; *see also id.* ¶¶ 27, 29, 55, 65, 81.

136.    On the merits, the Privy Council ruled that the Rights Agreement is not valid as a matter of Antigua law. In particular, the court held that the Rights included in the Rights Agreement had to have been "conferred by amendment of [Sinovac's] Articles [of Incorporation] supported by a special resolution" of shareholders. Because Sinovac did not adopt the Rights Agreement that way, the Privy Council "conclude[d] that the Rights Agreement was invalid."

137.    This ruling by the Privy Council reversed the two earlier decisions by the Antiguan courts, the December 19, 2018 Judgment of the High Court of Justice for the Eastern Caribbean Supreme Court and the December 9, 2021 Judgment of Court of Appeal of the Eastern Caribbean Supreme Court. The Court of Appeal reasoned that Sinovac's "board was empowered to grant options or rights to acquire shares, and to fix the rights, privileges, restrictions and conditions attaching to shares, and also to make distributions. The rights agreement was validly entered into." The Court of Appeal therefore affirmed the trial court's "declaration that the rights agreement was validly adopted as a matter of Antiguan law."

138.    While the Privy Council reversed those two lower court rulings, and the Rights Agreement is no longer valid under Antigua law, Defendants' actions still interfered with Plaintiff's business relationship with Sinovac. As the Court in this action has already held, the trading halt that the NASDAQ implemented was a "foreseeable result[]" of Defendants' wrongful conduct that entailed "defendants eschew[ing] their Section 13(d) obligations in order to avert implementation of the Rights Agreement and advance the particular interests of the Sinobioway Group."

139.    In addition, the Privy Council did not contest the description of the lower courts in Antigua of 1Globe's actions at the Annual Meeting as an "ambush." While the Privy Council held that those actions did not render 1Globe's votes at the Annual Meeting invalid, "even by way of

41

ambush," that ruling merely resolved a dispute between Sinovac's incumbent directors and 1Globe. The Privy Council determined, however, that the better course of action as to Sinovac's minority shareholders would have been for Sinovac's shareholders to have had the opportunity to take consider 1Globe's surprise proposal. As the Privy Council explained, "[t]he real potential prejudice arising from there having been no adjournment of the AGM concerns those who, ignorant of what the dissenters proposed, decided not to attend, or at least did not attend, even if through general indifference." Moreover, all of Sinovac's shareholders were harmed by 1Globe's actions because they foreseeably led to Sinovac belatedly seeking to implement the Exchange under the Rights Agreement that caused trading in Sinovac stock to be halted.

## F.    Defendants Caused Trading in Sinovac Shares to Be Halted

140.    Defendants' false and misleading statements, and deceptive tactics at issue here, prevented the knowledge of 1Globe causing a Trigger Event and Share Acquisition Date from being revealed publicly. This allowed Sinovac to delay its implementation of the Rights Agreement in a way that serves Yin's self interest, by making it apply to shares held as of February 22, 2019, instead of when Sinovac actually learned of 1Globe's triggering of the Rights Agreement as early as 2016.

141.    If Defendants complied with their Section 13(d) obligations, and disclosed their true ownership and intentions for their Sinovac stock as required under Section 13(d), Sinovac would not have been able to delay its implementation of the Rights Agreement because 1Globe and Li's violation of the agreement would have been crystal clear to the general public and all of Sinovac's securityholders.

142.    Sinovac disclosed detailed information in its Proxy Statement that it filed with the SEC on January 5, 2018 (and amended on January 30, 2018) in connection with Yin's offer to buy

42

Sinovac, showing that the Sinovac's Board knew additional information starting in 2016 revealing that 1Globe triggered the Rights Agreement.

143.    For example, after Sinovac filed its initial Proxy Statement that repeatedly referred to 1Globe and the Chiang Li Family as shareholders that were acting together, the SEC asked for clarification as to the relationship between 1Globe and the Chiang Li Family "given that the Special Committee sought information regarding the Chiang Li Family from 1Globe." In response, Sinovac amended the Proxy Statement on January 30, 2018, to explain:

> In interactions in connection with the Proposed Transaction among the Special Committee, the Buyer Consortium and their respective advisors, on the one hand, and 1Globe and the Chiang Li Family, on the other hand, *the Chiang Li Family has appeared to follow 1Globe in considering whether to participate in the Proposed Transaction as a member of the Buyer Consortium* by rolling over its Shares. As a result, while the email received by Mr. Anderson [in response to his emailing 1Globe to ask about 1Globe's and the Chiang Li Family's collective position] referred only to 1Globe's position with respect to the Proposed Transaction, *the Company believes that the Chiang Li Family would take a similar position to that of 1Globe*, but is not able to confirm that this is the case. In light of the foregoing and the possible relationship between 1Globe and the Chiang Li Family, the dissenting Shares condition negotiated by the Special Committee in the Amalgamation Agreement refers to both 1Globe and the Chiang Li Family. (Emphasis added.)

144.    The Proxy Statement also references many other correspondence between the Special Committee, on the one hand, and 1Globe and the Chiang Li Family on the other, discussing 1Globe's and the Chiang Li Family's collective position.

145.    For example, on August 17, 2016, the Special Committee (which included three of Sinovac's five Board members) and Yin's counsel had a conference call in which they discussed the fact that "two of the Company's existing shareholders, 1Globe and the persons comprising the reporting person identified as 'Chiang Li Family' in the Schedule 13G relating to the Company filed by such reporting person with the SEC on April 11, 2016 (the 'Chiang Li Family'), which such shareholders collectively held approximately 22.5% of the Shares at such time, would be

43

willing to join the Buyer Consortium and participate in the Proposed Transaction as rollover shareholders."

146. The Yin Group and Sinovac continued to correspond with 1Globe under the assumption that it had agreed with the Chiang Li Family to act in concert in connection with their decision of whether to join the Yin Group. For example, on September 29, 2016, the Yin Group's counsel sent a "final bid package" that included "1Globe and the Chiang Li Family as two new rollover shareholders." That same day, Duff & Phelps, the Special Committee's financial advisor, "received an email from a representative of 1Globe indicating that the Chiang Li Family intended to join the" Yin Group.

147. Sinovac's Board therefore knew from this correspondence over the course of 2016 that 1Globe and the Chiang Li Family triggered the Rights Agreement through their beneficial ownership of each other's shares.

148. The Proxy Statement and 1Globe's disclosures also revealed that Sinovac's Board was aware by July 2017 that 1Globe had attained "beneficial ownership" under the Rights Agreement—either directly or through agreements to act together with other shareholders—of far more than the 22.5% of shares that 1Globe and the Chiang Li Family disclosed in their Schedule 13G filings in April 2016.

149. On July 7, 2017, 1Globe converted its amended Schedule 13G that it had filed in April 2016 disclosing a 16.44% stake in Sinovac stock, to a Schedule 13D. 1Globe stated in this new filing that it now held the shares of Sinovac stock with a "control purpose," in that it supported the Sinobioway Group's privatization proposal and to "express[] its willingness to vote its shares of Common Stock in favor of such acquisition and roll-over its shares of Common Stock in connection with the acquisition."

44

150.     Similarly, on July 24, 2017, the Sinobioway Group's counsel sent the Special Committee's counsel an email stating that "shareholders of the Company (including 1Globe) collectively representing 32% of the Shares had expressed a willingness to support, and roll over their Shares in connection with, the Revised Sinobioway Proposal and that it would need to engage in further discussions with shareholders of the Company."

151.     Then, on October 16, 2017, "the Special Committee received an email from 1Globe and its affiliates stating, among other things, that they held more than 30% of the Shares and that they would vote their Shares against any proposed transaction requiring shareholder approval that was not recognized by 1Globe."[26] Until that point, 1Globe and the Chiang Li Family had disclosed only that they owned 22.5% of Sinovac's stock.

152.     Sinovac's Board thus learned that the Rights Agreement was triggered yet another time, through the Sinobioway Group's and 1Globe's July 24, and October 16, 2017, emails to Sinovac's Special Committee—which included three of Sinovac's five Board Members—concerning the Sinobioway Group's and 1Globe's plans for shareholders representing at least 31% of Sinovac's common stock (including "affiliates" of 1Globe) to act together in connection with the competing offers for the Company.[27]

---

[26] Sinovac similarly stated in its Complaint against 1Globe in Massachusetts that "[o]n October 16, 2017, Sinovac's Special Committee (formed for the purpose of evaluating a strategic transaction) received an email from 1Globe, [stating] among other things, that it and its affiliates held more than 30% of the outstanding Sinovac shares and that they would vote their shares against any proposed transaction requiring shareholder approval that was not recognized by 1Globe."

[27] These July and October 2017 emails align with the SEC's determination that 1Globe is owned by Jiaqiang "Chiang" Li, who also owned the shares represented by the Chiang Li Family. The SEC also determined that starting in May 2016, through various relatives' accounts, 1Globe and Li began to acquire additional shares of Sinovac stock beyond their 22.5% stake, so that by December 2017, 1Globe and Li had beneficial ownership of approximately 31% of Sinovac's stock.

45

153.    Sinovac then learned additional information in connection with its Annual Meeting on February 6, 2018, showing that 1Globe and its group triggered the Rights Agreement.  Sinovac determined that 1Globe's, Li's, and the Sinobioway Group's actions at the Annual Meeting made them Acquiring Persons under the Rights Agreement by the meeting date on February 6, 2018. Sinovac filed the Delaware Action on March 5, 2018, because it determined that 1Globe, Li, and the Sinobioway Group "reached an agreement, arrangement or understanding to act together to vote in excess of 15% of the outstanding shares of common stock in favor of the alternative slate of nominees at the Annual Meeting." (Delaware Action Complaint ¶ 36).[28]

154.    After Sinovac filed the Delaware Action, it acquired even more evidence showing that 1Globe, Li, and the Sinobioway Group had an agreement to vote for the alternative slate at the Annual Meeting, as described above. On June 26, 2018, Sinovac filed a motion for summary judgment in the Delaware Action before discovery had been conducted because, Sinovac explained, "through a bizarre series of recent events, Sinovac has discovered *evidence that proves beyond all doubt that Defendants had an agreement to act together for purposes of voting their shares at the [Annual Meeting].*" (Emphasis added.)

155.    Moreover, on October 10, 2018, Sinovac filed a Form 6-K with the SEC, signed by Defendant Wang, that included a press release from the prior day describing an effort to replace

---

[28] Sinovac explained in the Delaware Action why 1Globe's, Li's, and the Sinobioway Group's actions at the Annual Meeting made it apparent that they had an agreement to vote as a group in favor of an alternative slate of Directors. Among other reasons, it was unusual that after a member of the Sinobioway Group proposed the alternative slate of directors, which included a representative of 1Globe, without any explanation or commentary in support of their appointment, "no stockholder representative raised any questions concerning the qualifications, or even the affiliations, of the alternative directors." 1Globe and the Sinobioway Group then voted for the alternative slate using pre-printed ballots that the Sinobioway Group member prepared instead of using Sinovac's ballot. These actions made it clear to Sinovac that 1Globe, Li, and the Sinobioway Group had formed an agreement in advance of the Annual Meeting to vote in favor of the alternative slate of directors.

the Board of Sinovac's Hong Kong subsidiary with "with nominees of the Sinobioway Consortium, led by Sinobioway Biomedicine Co., Ltd. ('Sinobioway'), a minority shareholder of Sinovac Beijing, and a group of Sinovac's shareholders led by 1Globe and OrbiMed (collectively, the 'Dissident Shareholders') *who have repeatedly attempted to take control of Sinovac Biotech Co. and its subsidiaries and affiliates*." (Emphasis added.)

156.    All of this evidence makes clear that Sinovac's Board knew long before February 2019, that the Defendants here (and the Sinobioway Group) triggered the Rights Agreement because they acquired additional Sinovac stock and were acting together in their opposition to Yin's attempt to buy the Company. But Defendants' actions described above gave Sinovac a pretext to improperly delay implementing the Rights Agreement.[29]

157.    Similarly, Sinovac explained in the Delaware Action that while "Defendants' actions in connection with the Annual Meeting may have caused them to become 'Acquiring Persons' under the terms of the Rights Agreement. . . . Plaintiff anticipates that Defendants will dispute that they are Acquiring Persons and that a Trigger Event has occurred." Sinovac also stated in its Annual Report that it filed with the SEC on May 11, 2018, that "[t]he Company cannot predict the outcome of the [Delaware] litigation, including whether our Rights Plan has been triggered and, if it has been, how the terms of our Rights Plan will be implemented."

158.    1Globe and Li have contested these issues in the various actions between them and Sinovac. In response to Sinovac's motion for summary judgment in the Delaware Action, 1Globe implausibly described Sinovac's assertion that 1Globe and other parties had an "agreement, arrangement, or understanding to elect an alternative slate of directors and Sinovac's annual

---

[29] Defendants also engaged in additional actions that constituted Trigger Events under the Rights Agreement that were not revealed until the SEC Order.

47

meeting" as "based on hearsay and conjecture, as to which 1Globe should have an opportunity to conduct discovery and test their veracity."

159.    Although the Privy Council ultimately ruled in 1Globe's favor as to the validity of the Rights Agreement and the outcome of the Annual Meeting, it still characterized 1Globe's actions at the Annual Meeting as an "ambush." *See supra* ¶ 139. Moreover, the Privy Council's decision does not alter the SEC findings of Defendants' many violations of their Section 13(d) disclosure obligations. As the Court in this action has already held, Defendants' wrongful conduct delayed Sinovac's implementation of the Rights Agreement and entailed "defendants eschew[ing] their Section 13(d) obligations in order to avert implementation of the Rights Agreement and advance the particular interests of the Sinobioway Group," the "foreseeable results" of which "allegedly caused plaintiff harm including, inter alia, the suspension of trading by NASDAQ."

160.    Furthermore, while the Rights Agreement is no longer valid, Defendants' misconduct still led to 1Globe's protracted dispute with Sinovac that caused the extended trading halt while that dispute was pending. Defendants' Section 13(d) violations were the basis of their scheme to take control of Sinovac, which led to the Company's extensive litigation against 1Globe. In addition to causing Sinovac to delay conducting an Exchange under the Rights Agreement, 1Globe's Section 13(d) violations substantially extended the duration of its dispute with Sinovac.

161.    By causing Sinovac to delay conducting an Exchange under the Rights Agreement, Defendants enabled 1Globe to be able to conduct its ambush at the Annual Meeting. Indeed, the whole purpose of Defendants' Section 13(d) violations was to further 1Globe's position in its

48

efforts to take over Sinovac.[30] For example, the SEC Order makes clear that 1Globe and Li engaged in their "activist plan to replace four of five incumbent directors through a shareholder vote at Sinovac's 2018 annual shareholder meeting in Beijing, but failed to disclose material information that is required in a Schedule 13D." *See supra* ¶ 119. The events at the Annual Meeting then led to the protracted litigation between Sinovac and 1Globe and resulted in Sinovac seeking to conduct an Exchange on February 22, 2019, followed by the trading halt while 1Globe's litigation against Sinovac was pending.[31] When the trading halt was initially announced, it was intended to last only two weeks. *See supra* ¶ 122. The trading halt was then extended over six years because of 1Globe's request that the Exchange be paused while its litigation against Sinovac was pending. *See supra* ¶¶ 122-28.

## V. NO SAFE HARBOR

162. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

---

[30] It is not necessary for Plaintiff to plead the counterfactual because based on the events that did occur, 1Globe's misconduct plainly led to its dispute with Sinovac that resulted in the trading halt. Even so, if Defendants had met their Section 13(d) obligations, 1Globe would not have been able to conduct its ambush because Sinovac would have been able to address 1Globe's growing position in Sinovac stock from soon after 1Globe increased its stake beyond 22.5% in 2016—long before 1Globe amassed over 32% of Sinovac stock—through 1Globe's preparations for its ambush at the Annual Meeting in 2018. The dispute arising out of 1Globe's actions in February 2018, which caused the trading halt while that dispute was pending, would not have occurred (or taken the seven years that it did) if Defendants complied with their Section 13(d) disclosure obligations since May 2016.

[31] 1Globe's actions at the Annual Meeting formed the core of the Antigua and Delaware Actions. *See supra* ¶¶ 153-54. Indeed, the vast majority of all three decisions in the Antigua Action—including the Privy Council's decision—focused on the propriety of 1Globe's actions at the Annual Meeting. The Privy Council dealt with the validity of the Rights Agreement in just 7 paragraphs of its 89-paragraph decision, focusing the remainder of its analysis on the Annual Meeting. *See* Privy Council Decision ¶¶ 70-76.

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

163.    Defendants each had scienter as to their false and misleading statements because they each knew or, at a minimum, recklessly disregarded the facts described above.

164.    Defendants' scienter is also established by their having signed 1Globe's SEC filings that falsely disclosed 1Globe and Li's stake in Sinovac.

165.    Defendant Li's scienter is further established by his *admitting* in the SEC Order that "the findings in this Order are true."

166.    Defendant's scienter is also established by their financial motive. The whole purpose of the scheme alleged in this complaint was for Defendants to purchase Sinovac shares without disclosing the full extent and nature of those purchases, as part of their attempt to take control of the Company.

167.    Defendants' scienter is also established by their knowledge of, or recklessness as to, their actions. The SEC Order—as well as the only plausible explanation of Defendants' actions—make clear that Defendants' Section 13(d) violations were the result of a deliberate plan

50

to conceal the full extent and true nature of 1Globe's and Li's holdings of Sinovac stock in order to avoid their disclosure obligations and evade the Rights Agreement.

168.    Li was aware of the Rights Agreement, as he expressed his disapproval of the agreement when he met with Sinovac and the other parties vying for control of the Company, because he believed that the poison pill could discourage rival bids for the Company. (*See supra* ¶ 105). Indeed, in their Answer to the prior complaint, Defendants "admit actual knowledge of the Rights Agreement, which was publicly disclosed by Sinovac as an exhibit to a Form 6-K current report filed with the SEC on March 29, 2016." ECF No. 46 ¶ 217; *see also id.* ¶ 161 (admitting as to Defendant Li).

169.    The SEC Order also makes clear that Li acquired substantial shares of Sinovac stock in violation of the terms of the Rights Agreement in order to further his efforts to take control of Sinovac. The steps that Defendants took to further this plan—including disclosing holdings under different names (the assumed name of the Chiang Li Family) and an intricate purchasing scheme in which multiple relatives acted at Li's direction and with his and 1Globe's funds to purchase Sinovac stock in separate accounts in order to evade disclosure requirements under Section 13(d)—evinces a patently clear knowledge of, and certainly recklessness as to, the fraudulent nature of Defendants' conduct.

170.    For example, the SEC Order describes how "[s]ince at least 2013, Li has granted [Defendant Jeff Li] access to 1Globe Capital and his brokerage accounts in order to engage in securities transactions at Li's general direction, for 1Globe Capital and Li's benefit."

171.    Similarly, the SEC Order describes how "1Globe Capital and Li funded substantially all of the purchases [of a different relative] through ten separate wire transfers, totaling $13 million, during the second half of 2016. During this same time period, Li's account

51

also transferred a large block of shares of another stock to Relative #2's Canadian account. The shares were then liquidated and the proceeds used toward the ongoing purchases of Sinovac shares in Relative #2's account."

172. Defendant Jeff Li also purchased Sinovac stock through another relative's account (who the SEC Order describes as Relative #2) "using funds provided by 1Globe Capital and Li, [Jeff Li] began building on the Sinovac position in this account."

173. The SEC Order also explains that "[a]s the Sinovac stock position held in Relative #2's Canadian brokerage account neared the 5% disclosure threshold, [Defendant Jeff Li] opened a Canadian brokerage account in his own name in late December 2016 and began purchasing Sinovac shares in the account after receiving a $5 million wire transfer from 1Globe Capital and Li in February 2017. . . . These [and subsequently purchased shares] comprised approximately 90% of the total account value."

174. Moreover, the SEC Order explains that Defendant Jeff Li continued purchasing Sinovac shares through May 2018, "substantially funded by 1Globe Capital and Li with a third wire transfer from them to [Jeff Li], in the amount of $6 million . . . giving 1Globe Capital and Li beneficial ownership of approximately 32.6% of Sinovac's common stock." Defendant Jeff Li "stopped buying Sinovac shares in the account after his broker conducted a compliance inquiry and placed limitations on further purchases."

175. Defendants' scienter is further established by the deliberate nature of their activist plan to take control of Sinovac at the Annual Meeting. As the SEC Order explains:

By the end of 2017, 1Globe Capital, Li, and related parties together held nearly one-third of the common stock of issuer Sinovac Biotech Ltd. ("Sinovac") and participated in an activist plan to replace four of five incumbent directors through a shareholder vote at Sinovac's 2018 annual shareholder meeting in Beijing, but failed to disclose material information that is required in a Schedule 13D. Specifically, 1Globe Capital and Li failed to disclose their full beneficial ownership of Sinovac stock, inclusive of substantial shares held by related parties,

52

and their participation in a plan, led by other investors, thereby depriving existing and potential shareholders of information necessary to make fully informed investment decisions.

176.    Similarly, the SEC Order explains that "[b]y at least January 22, 2018, 1Globe Capital and Li had decided to participate in an activist plan, obtain proxies for the Sinovac shares held in their accounts, and instruct their representatives to attend the annual meeting and vote their shares for the Alternative Slate. . . . [And were advised] to instruct their brokers to 'keep the whole thing strictly confidential from Sinovac.'"

177.    For example, as explained above, an audio recording from a January 8, 2018 teleconference between 1Globe and the Sinobioway Group reveals that they discussed their secret plan to "replace the Board of Directors during the Annual General Meeting." 1Globe's counsel from DLA Piper cautioned at this meeting that the group needed to conceal that they were acting in concert. He stated: "The key is we will not only do this, but also do this smartly. Don't leave any evidence to [Sinovac], showing that our shareholders have formed a 13(d) [inaudible] group. This is important." The participants at this meeting also agreed to "conduct [an] internal rehearsal of the Annual General Meeting one or two weeks before February 6" in a manner to avoid detection as "conspirators."

178.    The findings of the Antigua court also establish Defendants' scienter. As the High Court of Justice of Antigua and Barbuda concluded in its December 19, 2018 decision, which was upheld on appeal, dismissing 1Globe's claim, 1Globe had a "secret plan to take control of" Sinovac that led to an "ambush" at the Annual Meeting that "deprived shareholders of the opportunity to make an informed and intelligent decision." The court in Antigua also determined that 1Globe's testimony that it was not aware of the proposed alternative slate of Directors before the Annual Meeting was not credible, as explained further above. The Privy Council similarly described 1Globe's actions at the Annual Meeting as an "ambush."

53

179.    All of these acts leave no doubt that Defendants acted intentionally (and certainly recklessly) in their efforts to gain control of Sinovac.

180.    Defendants' scienter is also established because the alleged misstatements, omissions, and deceptive conduct at issue here concerned 1Globe's core operations. 1Globe is a private investment company owned solely by Defendant Li. By May 2018, 1Globe and Li had beneficial ownership of approximately 32.6% of Sinovac stock. Defendants, by virtue of their roles in senior management and involvement in 1Globe's core operations, would have had knowledge of the true nature of 1Globe's core businesses at all relevant times.  In addition, Defendants had access to reports and communications describing these operations.

181.    1Globe itself had scienter as to the false and misleading nature of the statements and omissions described above based on the knowledge of the other Defendants. In addition, because the false and misleading statements at issue here relate to 1Globe's central business, its scienter can be inferred because these statements would have been approved by corporate officials that knew they were false or misleading.

## VII.    <u>LOSS CAUSATION UNDER THE EXCHANGE ACT</u>

182.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Exchange Act Class (the "Class" for purposes of this Section on Loss Causation Under the Exchange Act).

183.    Throughout the Exchange Act Class Period, Defendants' actions have caused Plaintiff and the Class substantial harm. By misrepresenting their secret acquisitions of Sinovac stock and scheming to acquire those shares and to take control of Sinovac, Li and 1Globe have caused Plaintiff and the Class to suffer the harm that has ensued.

184.    Defendants' actions artificially suppressed the price of Sinovac securities from reaching the value that this information would have conferred. The SEC Order explains that

"Section 13(d) is a key regulatory provision that allows shareholders and potential investors to evaluate substantial shareholdings and the implications of such shareholdings for their own investment in the security." 1Globe and Li's actions deprived Plaintiff and the Class of being able to evaluate the implications for their investment decisions of such a large shareholder and potential acquiror.

185.    As a result of Defendants' wrongful acts and omissions, Plaintiff and other members of the Class have suffered significant losses and damages.

## VIII.    CLASS ACTION ALLEGATIONS

186.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3) on behalf of a Class, consisting of all those, other than Defendants, who (1) held Sinovac securities since February 22, 2019, when trading in Sinovac stock was halted on the NASDAQ stock exchange (the "Tortious Interference Class") and (2) sold their Sinovac securities between April 11, 2016 (the earliest possible date on which their Rights could have become exercisable) and February 22, 2019 (the "Exchange Act Class"), to redress the harm that Defendants' fraud and misconduct has caused them to suffer, and were damaged as a result of Defendants' conduct described herein. The Tortious Interference Class and the Exchange Act Class are referred to collectively as the "Class." The Class Period for Plaintiff's Exchange Act claims is April 11, 2016 to February 22, 2019 (the "Exchange Act Class Period"). The Class Period for Plaintiff's tortious interference claims is February 22, 2019 through when trading of Sinovac shares on the NASDAQ resumes (the "Tortious Interference Class Period").[32]

187.    Excluded from the Class are Defendants and their parents, subsidiaries, and affiliates, the officers and directors of 1Globe, at all relevant times, members of their immediate

---

[32] Trading in Sinovac stock remains halted as of the date of this Complaint.

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

188.    The members of the Class are so numerous that joinder of all members is impracticable. As of December 31, 2018 (the last year before trading was halted following Sinovac's attempted Exchange on February 22, 2019), there were over 71 million Sinovac shares outstanding. Throughout the Exchange Act Class Period, Sinovac securities were actively traded on the NASDAQ.[33] While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sinovac or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

189.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of law that is complained of herein.

190.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

191.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

---

[33] Sinovac has also disclosed that after accounting for the issuance of the approximately 42 million Exchange Shares, as of "December 31, 2023, 99,638,043 of common shares and 14,630,813 of Series B Preferred Shares were issued and outstanding."

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public misrepresented or omitted material facts about their transactions in, and intentions for, Sinovac securities;

- whether Defendants engaged in a fraudulent scheme or wrongful conduct concerning their position in Sinovac stock;

- whether the Individual Defendants caused 1Globe and the Chiang Li Family to issue false and misleading financial statements, and engage in a fraudulent scheme;

- whether the Court should enjoin Defendants' misconduct that continues to prevent Sinovac securities from being traded on the NASDAQ; and

- whether Defendants knew of Plaintiff's and the Class's business relationship (or prospective business relationship) with Sinovac;

- whether Defendants interfered with Plaintiff's and the Class's business relationship (or prospective business relationship) with Sinovac;

- whether the members of the Class have sustained damages as a result of Defendants' conduct and, if so, what is the proper measure of damages.

192.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE-MARKET PRESUMPTIONS

193.    Plaintiff and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United State*s, 406 U.S. 128 (1972), as Defendants omitted material information in their Exchange Act Class Period statements in violation of a duty to disclose such information, as detailed above.

57

Defendants omitted material information that they had a duty to disclose under Section 13(d) of the Exchange Act and the rules promulgated thereunder.

194.    Alternatively, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Exchange Act Class Period;

- the omissions and misrepresentations were material;

- Sinovac securities were traded in an efficient market during the Exchange Act Class Period;

- Sinovac's securities were liquid and traded with moderate to heavy volume during the Exchange Act Class Period;

- Sinovac's securities traded on the NASDAQ and were covered by multiple analysts;

- the misrepresentations, omissions, and fraudulent conduct alleged would tend to induce a reasonable investor to misjudge the value of Sinovac's securities; and

- Plaintiff and members of the Exchange Act Class purchased, acquired and/or sold Sinovac securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

195.    Based upon the foregoing, Plaintiff and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

## X.    COUNT I

### (Tortious Interference With Business Relations Against All Defendants)

196.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

197.    Defendants engaged in the wrongful acts described above that were designed to avoid disclosure of their full holdings of Sinovac stock or the extent of their agreements among

themselves and the Sinobioway Group to act together in connection with the battle for control of Sinovac.

198.    Plaintiff and the Tortious Interference Class were involved in a business relationship with Sinovac by virtue of Plaintiff's and the Tortious Interference Class's status as shareholders of the Company, including their ability to access their Sinovac shares.

199.    Defendants knew that Sinovac was a publicly traded company with many minority shareholders.

200.    Defendants knew that their wrongful actions interfered with Plaintiff's and the Tortious Interference Class's business relationship with Sinovac.

201.    Defendants' wrongful actions caused Sinovac to delay in conducting an Exchange under the Rights Agreement until February 22, 2019.

202.    Sinovac's actions were a direct and foreseeable consequence of Defendants' wrongful actions.

203.    Defendants did not have authority or justification to misrepresent their holdings of Sinovac stock or otherwise interfere with Plaintiff's and the Tortious Interference Class's business relationship with Sinovac. Rather, Defendants purposefully engaged in the acts described above to advance their particular interests in their efforts to take control of Sinovac.

204.    Defendants had a duty, including under Section 13(d) of the Exchange Act, to provide complete and accurate disclosures concerning their holdings of Sinovac stock and their agreements and plans in connection with those holdings.

205.    If Defendants had complied with their disclosure obligations under Section 13(d), Sinovac would not have been able to delay attempting to conduct an Exchange under the Rights Agreement until February 22, 2019, because 1Globe's holdings of Sinovac stock would have been

59

very clear to the public and all of Sinovac's securityholders. Furthermore, if Defendants had complied with their disclosure obligations under Section 13(d), 1Globe would not have had its protracted dispute with Sinovac arising out of 1Globe's ambush at the Annual Meeting.

206.    Defendants' actions caused all trading in Sinovac stock on the NASDAQ to be halted since Sinovac's belated attempt to conduct an Exchange under the Rights Agreement in February 2019.

207.    As a result of Defendants' misconduct, Plaintiff and the Tortious Interference Class have suffered damages in the form of the inability to trade Sinovac securities since February 2019.

## XI.        COUNT II

### (Tortious Interference With Business Expectancy Against All Defendants)

208.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209.    Defendants engaged in the acts described above that were designed to avoid disclosure of their full holdings of Sinovac stock or the extent of their agreements among themselves and the Sinobioway Group to act together in connection with the battle for control of Sinovac.

210.    Plaintiff and the Tortious Interference Class, by virtue of Plaintiff's and the Tortious Interference Class's status as shareholders of the Company, had a reasonable expectation of a future business relationship with Sinovac, including their expectation of their continued ability to access their Sinovac shares.

211.    Defendants knew that Sinovac was a publicly traded company with many minority shareholders.

212.    Defendants knew that their wrongful actions interfered with Plaintiff's and the Tortious Interference Class's expected business relationship with Sinovac.

213.    Defendants' wrongful actions caused Sinovac to delay in conducting an Exchange under the Rights Agreement until February 22, 2019.

214.    Sinovac's actions were a direct and foreseeable consequence of Defendants' wrongful actions.

215.    Defendants did not have authority or justification to misrepresent their holdings of Sinovac stock or otherwise interfere with Plaintiff's and the Tortious Interference Class's expected business relationship with Sinovac. Rather, Defendants purposefully engaged in the acts described above to advance their particular interests in their efforts to take control of Sinovac.

216.    Defendants had a duty, including under Section 13(d) of the Exchange Act, to provide complete and accurate disclosures concerning their holdings of Sinovac stock and their agreements and plans in connection with those holdings.

217.    If Defendants had complied with their disclosure obligations under Section 13(d), Sinovac would not have been able to delay attempting to conduct an Exchange under the Rights Agreement until February 22, 2019, because 1Globe's holdings of Sinovac stock would have been very clear to the public and all of Sinovac's securityholders. Furthermore, if Defendants had complied with their disclosure obligations under Section 13(d), 1Globe would not have had its protracted dispute with Sinovac arising out of 1Globe's ambush at the Annual Meeting.

218.    Defendants' actions caused all trading in Sinovac stock on the NASDAQ to be halted since Sinovac's belated attempt to conduct an Exchange under the Rights Agreement in February 2019.

219.    As a result of Defendants' misconduct, Plaintiff and the Tortious Interference Class have suffered damages in the form of the inability to trade Sinovac securities since February 2019.

61

## XII.    COUNT III[34]

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

220.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

221.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

222.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC.

223.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

224.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the other members of the Exchange Act Class who sold Sinovac securities.

225.    Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the Exchange Act Class; and (ii) cause Plaintiff and the Exchange Act Class to sell Sinovac securities.

---

[34] As noted above, while the Court previously dismissed Plaintiff's claims under the Exchange Act, Plaintiff includes them in this Complaint to preserve them for appeal. *See supra* ¶ 21 n.1.

226.    In addition, Defendants had a duty to disclose the true nature of their holdings in, and plans for, Sinovac securities under Section 13(d) of the Exchange Act and the rules promulgated thereunder.

227.    Defendants also were individually and collectively responsible for making the false and misleading statements and omissions alleged herein by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Defendants' holdings in, and plans for, their Sinovac securities.

228.    By virtue of their actions and positions at 1Globe and in the Chiang Li Family, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Exchange Act Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

229.    During the Exchange Act Class Period, Sinovac securities were traded on an active and efficient market. Plaintiff and the other members of the Exchange Act Class, relying upon the price of the Sinovac securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, sold Sinovac securities at artificially deflated prices and were

63

damaged thereby.  Had Plaintiff and the other members of the Exchange Act Class known the truth, they would not have sold said securities when they did.

230.    By selling their Sinovac securities at these artificially deflated prices, Plaintiff and the Exchange Act Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

231.    By virtue of the foregoing, Defendants are liable to Plaintiff and members of the proposed Exchange Act Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### XIII.        COUNT IV

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated  Thereunder Against All Defendants)

232.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege or prove in this Count that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs prior to Count III above as if fully set forth herein.

233.    During the Exchange Act Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Exchange Act Class; and (ii) cause Plaintiff and the Exchange Act Class to sell Sinovac securities.

234.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon

Plaintiff and the Exchange Act Class in connection with their sales of Sinovac securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

235.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included their many purchases of Sinovac stock in different accounts, under different names, in order to unlawfully evade the requirements of Section 13(d), as well as their plan to take control of Sinovac.

236.    During the Exchange Act Class Period, Sinovac securities were traded on an active and efficient market. Plaintiff and the other members of the Exchange Act Class, relying upon the price of the Sinovac securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, sold Sinovac securities at artificially deflated prices and were damaged thereby.  Had Plaintiff and the other members of the Exchange Act Class known the truth, they would not have sold said securities when they did.

237.    During the Exchange Act Class Period, Plaintiff and the Exchange Act Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Exchange Act Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have sold Sinovac securities, or if they had, would not have done so at the value at which they did.

238.    As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Exchange Act Class suffered damages in connection with their sales of Sinovac securities during the Exchange Act Class Period.

239.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiff and the Exchange

Act Class for damages suffered in connection with their sales of Sinovac securities during the Exchange Act Class Period.

## XIV.    COUNT V

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

240.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

241.    During the Exchange Act Class Period, the Individual Defendants participated in the operation and management of 1Globe and the Chiang Li Family, and conducted and participated, directly and indirectly, in the conduct of 1Globe's and the Chiang Li Family's business affairs.  Because of their senior positions, they knew the adverse non-public information about 1Globe's and the Chiang Li Family's misstatements.

242.    The Individual Defendants had a duty to disseminate accurate and truthful information with respect to 1Globe's and the Chiang Li Family's holdings in, and plans for, Sinovac securities, and to correct promptly any public statements issued by 1Globe and the Chiang Li Family that had become materially false or misleading.

243.    Because of their positions of control and authority as senior officers, owners, and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which 1Globe and the Chiang Li Family disseminated in the marketplace during the Exchange Act Class Period concerning 1Globe's and the Chiang Li Family's holdings in, and plans for, Sinovac securities. Throughout the Exchange Act Class Period, the Individual Defendants exercised their power and authority to cause 1Globe and the Chiang Li Family to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of 1Globe and the Chiang Li Family within the meaning of

Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein.

244.    Each of the Individual Defendants, therefore, acted as a controlling person of 1Globe and/or the Chiang Li Family.  By reason of their senior management positions and/or being owners or directors of 1Globe or the Chiang Li Family, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, 1Globe and the Chiang Li Family to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of 1Globe and the Chiang Li Family, and possessed the power to control the specific activities which comprise the primary violations of the Exchange Act about which Plaintiff and the other members of the Exchange Act Class complain.

245.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the Exchange Act violations committed by 1Globe and the Chiang Li Family.

## XV.        **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.        Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.        Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.        Requiring Defendants to cease their actions that are preventing Sinovac's shares from trading on the NASDAQ and to take such actions that will allow the renewed trading of Sinovac's shares;

D.        Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

E.    Awarding such other and further relief as this Court may deem just and proper.

## XVI.    DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  _____, 2025                          Respectfully submitted,

**POMERANTZ LLP**
/s/ *Michael Grunfeld* _____

Jeremy A. Lieberman (*pro hac vice*)
Michael Grunfeld (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
Email: mgrunfeld@pomlaw.com
Email: ahood@pomlaw.com

*Lead Counsel for Lead Plaintiff MW Gestion and the Class*


**ANDREWS DEVALERIO LLP**
Glen DeValerio (BBO #122010)
Daryl Andrews (BBO #658523)
P.O. Box 67101
Chestnut Hill, MA 02467
Telephone: (617) 999-6473
Email: daryl@andrewsdevalerio.com
Email: glen@andrewsdevalerio.com

*Counsel for Lead Plaintiff MW Gestion and Liaison Counsel for the Class*

68