# EXHIBIT 3



**Hilary Term**
[2025] UKPC 3
**Privy Council Appeal Nos 0041 and 0062 of 2022**

# JUDGMENT

# 1Globe Capital LLC (Appellant) *v* Sinovac Biotech Ltd (Respondent) (Antigua and Barbuda); 1Globe Capital LLC (Appellant) *v* Sinovac Biotech Ltd (Respondent) (Antigua and Barbuda) No 2

## From the Court of Appeal of the Eastern Caribbean Supreme Court (Antigua & Barbuda)

before

**Lord Hodge**
**Lord Briggs**
**Lord Sales**
**Lord Burrows**
**Lord Richards**

**JUDGMENT GIVEN ON**
**16 January 2025**

**Heard on 10 and 11 July 2024**

*Appellant*
David Chivers KC
Samuel Parsons
(Instructed by Herbert Smith Freehills LLP (London))


*Respondent*
Stuart Alford KC
James Potts KC
Andrew Blake
(Instructed by Latham & Watkins LLP (London))

**LORD BRIGGS:**

1.      This appeal from the Court of Appeal of the Eastern Caribbean raises some important points about the company law of Antigua and Barbuda ("Antigua" for short), in particular that part of it which regulates the conduct of shareholders' meetings of a company incorporated under the International Business Corporations Act of Antigua ("IBCA companies" and "the IBCA"). As will appear, the Board has been able to resolve only some of the points of law which the underlying facts might be thought to have raised for decision, and which one or other of the parties wished to argue before the Board. This is because, as the result of earlier choices by the parties as to the issues which they wished to raise or pursue before the lower courts, the Board has not had the benefit of the views of the local courts on those additional issues, important though they might be thought to be, both for the outcome of the proceedings and for the operation of the affairs of IBCA companies, both in Antigua and other common law jurisdictions which have enacted similar legislative structures.

2.      The perhaps unfortunate result of these choices by the parties is that the Board's opinion as to the overall outcome of this appeal should not be regarded as the outcome which might have ensued if all the potentially arguable points had been raised in time, and then argued before the courts below and before the Board. The appeal has turned as much upon the way in which a complicated litigation game has been played as upon the application of all the available law to the relatively straightforward and uncontentious facts, which the Board will now describe.

3.      Sinovac Biotech Ltd ("the Company") is an IBCA company, incorporated in Antigua. It is the respondent to this appeal. Its business activities, in the field of biopharmaceuticals, are based in China, as have been its directors, board meetings and shareholders' meetings. Its shares are listed on the NASDAQ stock exchange. At the material time it had some 3,300 shareholders, although legal title to many of those beneficial holdings was concentrated in a much smaller number of depositaries and brokers ("street names"). From 2012 until the Annual General Meeting in February 2018 which lies at the heart of the dispute, its directors were Weidong Yin (Chairman, and CEO); Kenneth Lee; Simon Anderson; Yuk Lam Lo; and Meng Mei ("the Incumbent Directors").

4.      The appellant 1Globe Capital LLC ("1Globe") is a limited liability company incorporated in Delaware USA. It is a major shareholder in the Company.

5.      In early 2016 two different consortia made offers to purchase the Company's shares. The first ("the Management Consortium") was led by Weidong Yin and included the Incumbent Directors and affiliates of theirs. The second ("the Sinobioway

Consortium") included Sinobioway Biomedicine Co Ltd ("Sinobioway") which was a minority shareholder in one of the Company's major operating subsidiaries.

6.     On 1 February 2016 the Company announced that it had received a non-binding privatisation acquisition offer from the Management Consortium at US$6.18 per share. On 4 February the Sinobioway Consortium made a competing offer at $7.00 per share.

7.     On 28 March 2016, the Incumbent Directors adopted (on the Company's case) or purported to adopt (on 1Globe's case) a rights agreement governed or purporting to be governed by the laws of the State of Delaware designed to "guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain control of the Company" ("the Rights Agreement"). It was expressed to be made between the Company and Pacific Stock Transfer Company as Rights Agent.

8.     The Rights Agreement is a long and complex document, in a form probably developed over time in Delaware, but its essential effect has been summarised by the parties to this appeal in the Agreed Statement of Facts and Issues ("SFI") as follows, and the Board gratefully adopts it as sufficient for what it has to decide:

(i)     "The Company declared a dividend of one preferred share purchase right (a "Right") in respect of each Common Share of the Company that had been issued or was outstanding as at 8 April 2016. The Right was a "right to purchase" one-thousandth of a Series A Junior Participating Preferred Share upon terms and subject to conditions set out in the Rights Agreement.

(ii)     A "Trigger Event" would be caused by any Person (with any Related Persons, as defined) acquiring 15% or more of the Common Shares, thereby becoming an "Acquiring Person". Under the extended definition of "Acquiring Person", in the absence of any actual acquisition of any shares, the Person would still be deemed to have acquired shares (including exempted shares purchased before the adoption of the Rights Agreement) beneficially owned by other parties with whom the Person had an agreement, arrangement or understanding for the purposes of acquiring, holding, voting or disposing of shares.

(iii)     The board of directors retained a discretion to decide that someone was not an Acquiring Person, including if that Person did not intend "changing or influencing control of the Company". Persons who already held over 15% would similarly fall into a separate category of "Exempt Persons".

(iv)     The Rights had to be exercised on the earliest of (a) the close of business on 27 March 2017, (b) the time at which the Rights were redeemed as provided in

section 23 of the Rights Agreement, (c) the closing of any amalgamation, merger or other acquisition transaction involving the Company pursuant to an agreement of the type described in section 13.3 of that agreement at which time the Rights were deemed terminated, or (d) the time at which the Rights were exchanged as provided in section 27 of that agreement.

(v)      Section 11.1.2 provided that, subject to section 27, when a Trigger Event occurred, "each holder of a Right … would then have the right to receive … such number of Common Shares as shall equal the result obtained by [the formula that follows]"; but the Rights of Acquiring Persons would "become void without any further action" and may not be exercised in any way.

(vi)      Section 27.1 provided that, at any time following a Trigger Event, the board may "exchange Common Shares for all or part of the then outstanding and exercisable Rights (which shall not include Rights that have become void [ie because they belonged to Acquiring Persons]) by exchanging at an exchange ratio of one Common Share per Right".

To that summary the Board would make only two additions. First, the termination provisions referred to in sub-paragraph (iv) (contained in section 7.1) were expressly made subject to section 11.1.2, summarised in sub-paragraph (v) above. Second, and this is of importance when the Board comes to consider the relevance of section 161 of the IBCA later in this judgment, the Rights allocated to the Common Shares are evidenced by the certificates for those Shares and are transferable only with those Common Shares, until the Distribution Date (defined as the date of distribution of new distinct Rights Certificates after the occurrence of a Trigger Event). The Rights Agreement provides that until the Distribution Date transfer of any Common Share constitutes the transfer of the Rights associated with that Share.

9.      In June 2017 the Incumbent Directors announced their decision to sell the Company to the Management Consortium at $7.00 per share. Two days later the Sinobioway Consortium increased its offer to $8.00 per share.

10.      The Company's By-laws provided (at para 7.2) for an Annual Shareholders Meeting ("AGM") to be held every year in Antigua, and para 8.1 provided for directors to hold office until the next AGM. On 28 December 2017 the Company gave notice to shareholders of its next AGM, to be held in Beijing on 6 February 2018, specifying as one of three items of business the re-election of the Incumbent Directors, and adding:

> "The annual meeting will also transact such other business as properly may be brought before it or any adjournment thereof."

11.    On 31 January 2018 Sinobioway published by online press release, addressed to all shareholders in the Company, a recommendation that shareholders should attend the AGM and vote against the re-election of the Incumbent Directors. The press release did not propose who (if anyone) should be appointed in their stead.

12.    It appears that, by this time, 1Globe (which had been courted by both consortia) had decided to support the Sinobioway Consortium.

13.    The AGM took place in Beijing on 6 February 2018, as notified. Most of the shareholders who attended did so by proxy, pursuant to proxy forms lodged with the Company prior to the meeting, there being facilities for lodging proxy forms electronically, ie online or by email.

14.    At the AGM, James Chang (a partner in the law firm DLA Piper) acting as the proxy of JP Morgan with shares beneficially owned by OrbiMed Advisors LLC ("OrbiMed") proposed motions, including to (i) amend the ballot paper provided by the Company to include an "Against All" option to vote against the Incumbent Directors; (ii) remove all Incumbent Directors except Yuk Lam Lo; and (iii) nominate an alternative slate of directors, comprising Yuk Lam Lo and four new directors (one of whom was a manager of a company affiliated with 1Globe and 1Globe's sole factual witness at the trial) ("the New Directors").

15.     As at the record date for the AGM, the Company's issued share capital comprised 57,269,861 common shares. Shareholders holding 47,267,302 shares (constituting 82.53% of the issued share capital) voted at the AGM either in person or by proxy. 21,194,518 of those shares (constituting 44.84% of the shares voted and 37.00% of the total issued share capital) were voted in accordance with proxy forms issued by the Company and lodged in advance of the AGM, and of these between 98.24% and 98.87% (varying on a director by director basis) were voted in favour of the re-election of the Incumbent Directors. Shareholders (or their legal proxies) holding 26,072,784 shares (constituting 55.16% of the shares voted and 45.5% of the total issued share capital) attended, and voted (on 1Globe's case) or purported to vote (on the Company's case) on the alternative ballots at the AGM against the re-election of the Incumbent Directors and for the election of the New Directors. 10,002,559 shares, constituting 17.47% of the Company's issued shares, were not voted, nor were the holders of those shares present, in person or by proxy, at the AGM.

16.    Leaving aside issues as to the validity of the proxies voted for the New Directors, a tabulation of the votes cast showed that the New Directors had obtained the majority of votes, but there was no declaration of the results of the election by the scrutineer, who stated that she needed to confirm the validity of the votes cast with the Company's

Page 5

Antiguan counsel. The AGM then concluded. There was no request that the meeting be adjourned, nor was it adjourned by the chairman of his own motion.

17.    The dispute which is (in part only) now before the Board then rapidly emerged. On 5 March 2018, the Company (de facto still controlled by the Incumbent Directors) published an announcement of the re-election of the incumbent board of directors. On the same date, the Incumbent Directors directed and authorised the Company to file a claim in the Delaware Court against 1Globe, OrbiMed and other shareholders who had voted on the alternative ballots against the re-election of the Incumbent Directors and for the New Directors (together representing 45.5% of the Company's issued share capital), asserting there had been a Trigger Event under the Rights Agreement before the AGM, which would purportedly dilute the voting rights of these "dissenting shareholders".

18.    In response, on 13 March 2018 1Globe filed the present claim in the Antiguan High Court, seeking declarations and orders under section 122 IBCA in relation to the validity of the vote against the re-election of the Incumbent Directors, namely that

    1)    the New Directors were duly elected at the AGM;

    2)    the New Directors be installed as the Company's board of directors; and

    3)    a declaration that the Incumbent Directors were no longer the directors of the Company and any actions taken on behalf of the Company at their direction after the AGM were null and void.

These are in substance the claims that 1Globe seeks to pursue by the present appeal, having had all of them refused by the courts below.

19.    The events (or non-events) occurring during the litigation are almost as important to the outcome of this appeal as are the primary facts, summarised above. On 10 April 2018, 1Globe filed an application for interim relief in the Antiguan proceedings, including seeking an order for a new election of directors. The Court refused to make the order sought following a hearing on 6 July 2018, as recorded in an order dated 9 July 2018. That appears to have been the last occasion when any party sought or made mention of such a possibility. On enquiry by the Board, we were informed by Mr David Chivers KC for 1Globe that an issue of further shares to supporters of the Incumbent Directors (which has not itself been separately challenged) made that option unattractive. The Company has not at any time shown any interest in it.

20.     An application by the Company for partial summary judgment on its claim in the Delaware proceedings proved to be the occasion for the Delaware court to stay its proceedings pending the outcome of 1Globe's proceedings in Antigua. It appears to be common ground that, if the Rights Agreement is not declared invalid in the Antiguan proceedings, issues as to whether there has been a Trigger Event and, if so, with what consequences, are for the Delaware Court to decide, since the Rights Agreement is governed by Delaware law.

21.     Although the outcome of the AGM was delayed pending the receipt of legal advice as to the validity of the proxy forms cast in favour of the election of the New Directors, the Company did not seek to justify its determination that the Incumbent Directors had been re-elected on the ground that they had been invalid. Rather, the outcome was sought to be justified first, as alleged in the Delaware proceedings, upon the ground that a Trigger Event under the Rights Agreement had altered relevant shareholdings before the AGM and later, on the ground that the attempt to elect the New Directors had been invalidated by a lack of notice of what was alleged to have been an ambush at the AGM by those seeking the election of the New Directors.

22.     Nonetheless a case was advanced at a late stage before trial in Antigua that the proxy forms used to vote for the election of the New Directors were indeed invalid, because they contravened regulation 15 of the International Business Corporation Regulations ("regulation 15") which provides that:

> "A form of proxy must not confer authority to vote in respect of … the election of a director unless a *bona fide* proposed nominee for the … election is named in the form of proxy."

It is not in dispute that the proxies used as authority for the votes in favour of the election of the New Directors did not contain their names, so as to undermine the apparent majority in their favour. The Board will label this as "the invalid proxy issue".

23.     The trial of the Antiguan proceedings took place in December 2018, before Smith J. There were only rudimentary pleadings, but the substance of the parties' cases was set out in detail in affidavits. The essence of the Company's case, apart from the invalidity of the proxies and the Trigger Event claim in Delaware, was that the nomination for election of replacement directors from the floor at an AGM was a pre-planned ambush which fell foul of requirements for basic fairness and transparency in the conduct of the affairs of an Antiguan IBCA company, which called for prior notice of the proposal for replacement directors, both to enable the existing directors to respond as they had a statutory right to do, and to enable shareholders voting by means of the appointment of proxies in advance, or deciding whether to vote at all, to have sufficient disclosure of what was proposed to enable them to make an informed choice before voting.

24.    While denying participation in any ambush, 1Globe's case was that the election of directors, including the replacement of those due to retire (unless re-elected) at an AGM, was ordinary business rather than special business, of which advance notice by the proponents was not required under Antiguan law about IBCA companies so that, validity of the proxy forms apart, there was nothing unlawful or improper in the conduct of the proponents of the appointment of the New Directors so as to undermine the validity of their appointment at the AGM. As to the invalid proxy issue, 1Globe's main point was that regulation 15 applied only to proxy forms issued by the Company, not (as here) by the shareholders seeking the appointment of the New Directors.

25.    As for the Rights Agreement, 1Globe advanced two arguments for its invalidity. One was that Antiguan law does not allow defensive rights plans (like the Rights Agreement) without shareholder consent. The other was that section 161 of the IBCA prohibited the addition of rights to shares without an amendment of the articles supported by a shareholders' special resolution, and that this was what the Rights Agreement purported to do: "the section 161 issue". The Company challenged both of those arguments as unsound in law.

26.    It will be necessary to review the detail of the judge's treatment of these issues in due course. But in outline he found for the Company on all of them, apart from the invalid proxy issue, which he expressly refused to decide, although he said that he took it into account when exercising his discretion as to relief. In particular, he found that the proposal at the AGM to appoint the New Directors was a pre-planned ambush, which the court ought not to endorse by granting the relief sought by 1Globe. He dismissed both of 1Globe's arguments about the invalidity of the Rights Agreement. Bearing in mind his discretion as to relief under section 122 of the IBCA (set out at para 77 below), he took account of what he evidently regarded as the impropriety of the ambush in declining to grant any relief on 1Globe's application. For its part the Company did not seek any relief.

27.    It is worth pausing as at the end of the trial to note what had not been argued. At no point had the Rights Agreement been attacked (if otherwise within the directors' powers to cause the Company to enter into it according to the provisions of the IBCA) as involving any breach of fiduciary duty on the part of the Incumbent Directors (such as a duty only to exercise their powers for proper purposes), still less that it had been made in bad faith. Nor had it been attacked as involving an unlawful dividend. As already noted, no part of either party's case was (by the time of the trial) that the AGM should have been adjourned, or re-held. Nor did the judge take that point of his own motion.

28.    1Globe's appeal to the Court of Appeal was heard in September 2019 by Baptiste, Blenman and Thom JJA. Their reserved judgment, handed down in December 2021, upheld the judge on every live point. 1Globe had interpreted the judge's judgment as deciding the invalid proxy point in favour of the Company, and sought to challenge it on appeal. The Company's response, which the Court of Appeal accepted, was that the judge

had not decided the point, so that there was nothing about it which could be appealed. So its merits were not addressed in the Court of Appeal, as a result of the Company's submission.

29.     Pausing again there, nothing had been said or argued in the Court of Appeal about breach of fiduciary duty or bad faith (in making the Rights Agreement), nor did either side, or the court, suggest that a proper response to the ambush would have been to adjourn the AGM, or that this is what the judge should have ordered.

30.     There then ensued a change in 1Globe's legal team, following which a largely new case was advanced that the Rights Agreement was invalid because of bad faith, or breach of the fiduciary duty to exercise powers for proper purposes. It was also attacked, for the first time, as an unlawful dividend. Finally, 1Globe sought to introduce a new case that the judge's exercise of discretion as to relief under section 122 had been flawed, even if his legal analysis of the merits of the ambush had been correct. Permission to appeal on these grounds was obtained from the Privy Council, but subject to the caveat that the Company be at liberty at the full hearing to submit that it should not have been granted, of which Mr James Potts KC and Mr Andrew Blake availed themselves with vigour, both in writing and orally.

31.     After brief oral submissions the Board ruled against giving permission to appeal on any of the new grounds, save two, and then only on the basis that submissions would be heard de bene esse, pending a final decision to give or refuse permission. Brief reasons were given orally, which will have been recorded on the live video recording of the hearing. But the Board wishes to emphasise two points. The first is that bad faith could not properly be entertained on a second appeal without that serious allegation having been made before trial, and the Incumbent Directors given the opportunity to answer it. The second is that the allegation of improper purpose in the making of the Rights Agreement, while raising very important issues of Antiguan law (including whether directors of an Antiguan IBCA company owe such a duty at all) cannot be properly resolved without an examination of the subjective intentions of the directors concerned, or without the views of the local courts having first been obtained, after full argument before them. None of this took place, because the proper purpose point, which was for 1Globe to take, was not advanced in either of the courts below. Antiguan law may have been extensively derived from English common law, but its law about IBCA companies is largely to be found in the IBCA itself, which follows a Canadian model.

32.     The outcome of that litigation history is that the issues which survive for the Board to determine may be grouped under the following three heads:

    (1)     The AGM issues: these include most of those argued below about the lawfulness, propriety and consequences of the alleged ambush at the AGM, in

seeking the appointment of the New Directors as replacements for the Incumbent Directors. For reasons explained below, these issues exclude the invalid proxy issue.

(2)    The validity of the Rights Agreement. This raises only two issues: the section 161 issue and the dividend issue.

(3)    The discretion issue, but only if the judge was right on the AGM issues. If he were wrong, then his original discretion as to relief will have to be re-exercised in any event, by the Board or on a referral to a lower court.

The AGM issues

33.    For the reasons which follow, the Board does consider that the judge made errors of law in his analysis of the AGM issues, which inexorably led him to an exercise (or rather non-exercise) of his remedial discretion under section 122 of the IBCA which cannot stand. His conclusion was that, for reasons of what he called a minimum standard of basic fairness, a group of shareholders could not be acting lawfully by proposing for the first time the replacement of directors by new directors during (on the floor of) an AGM, without prior notice to the company, in time for the proposal to be responded to by the directors proposed to be replaced, and communicated to shareholders before appointing and instructing their proxies, necessarily in advance of the meeting. His sheet anchor for connecting that overall conclusion to the framework of the IBCA was that, because section 71 gave directors a statutory right to reply to a proposal that they be removed or replaced, there had to be implied an obligation on the proponent of the removal or replacement to notify the company of the proposal in good time before the shareholders' meeting at which it was to be voted upon.

34.    Nothing in the following analysis of the Board should be understood as suggesting that the affairs of IBCA companies should not be conducted in a way that is fair to shareholders and which gives them the information they need to make important decisions about the company, or that the IBCA, Antiguan law and the company's own constitutional documents should not be interpreted, so far as possible, to facilitate that outcome.

35.    Nonetheless the starting point for an understanding about what is fair or unfair in any particular situation affecting the affairs of the company and its shareholders must be the bargain between the company and the shareholders, and between the shareholders inter se, which is set out in the company's constitution in the context of the relevant statutory framework, here the IBCA: see *Tianrui (International) Holding Co Ltd v China Shanshui Cement Group Ltd (Cayman Islands)* [2024] UKPC 36, [2024] 3 WLR 986. It is true that the relations between shareholders in particular companies may become governed by supervening equitable principles, but there can be no such intervention of

equity among the ever-changing body of thousands of investor shareholders in an IBCA company listed on NASDAQ, as the Company is. The shareholders' bargain between them is that laid down by their company's constitution and by statute.

36.    The IBCA makes a very clear division within the business which may be transacted at a shareholders meeting (including an AGM) between business which is, or is not, "special". If it is special business, then section 109(2) provides that:

> "Notice of a meeting of shareholders at which special business is to be transacted must state –
>
> (a)    the nature of that business in sufficient detail to permit the shareholder to form a reasoned judgment thereon; and
>
> (b)    the text of any special resolution to be submitted to the meeting."

37.    Section 109(1) provides that:

> "All business transacted at a special meeting of shareholders and all business transacted at an annual meeting of shareholders is special business, except –
>
> (a)    the consideration of financial statements;
>
> (b)    the auditors report;
>
> (c)    the election of directors; and
>
> (d)    the re-appointment of the incumbent auditor."

38.    Thus the default position in relation to business transacted at an AGM (because all business is special business unless excluded) is the requirement that shareholders be given a sufficient explanation of the nature of the business in advance of the meeting to be able to form a reasoned judgment about it. But the election of directors is expressly excluded from that requirement. It is not "special" business. The Board will for convenience call it "ordinary" business. It is common ground that the phrase "the election of directors"

includes the replacement of directors who are not re-elected at an AGM and who therefore cease to hold office under by-laws like the Company's By-Law 8.1.

39.    Just as shareholder democracy is fortified by the requirement that shareholders must be notified in advance of an AGM of any special business, so it is an important aspect of shareholder democracy that shareholders retain the freedom to elect whom they choose as directors at an AGM, without that being subject to a requirement for prior notice. Section 109 places the duty to give notice of special business upon the company, in the notice convening the AGM. The exclusion of the election of directors from special business ensures that the shareholders retain dominion over who the directors should be, without interference from the company, at the direction of the current board.

40.    Where shareholders are on notice that the business of an AGM is to include the election of directors, they are taken to have it within their reasonable contemplation that any appointments of directors, within the powers of the shareholders to do so under the company's constitution, might be made: see *Betts & Co Ltd v Macnaghten* [1910] 1 Ch 430. In that case the company's constitution made the election of directors special business, but an election was notified to shareholders in the notice of the AGM, which set out three proposed nominees as one of the resolutions proposed "with such amendments and alterations as shall be determined upon at such meeting". The election of two further directors was proposed by amendment (without prior notice) at the meeting, and carried. A challenge to the validity of the appointment of the additional two directors was rejected by Eve J, who applied a test of how a reasonable person who read the notice would understand it and concluded (p 436):

> "The special business indicated in the notice being the election of directors for the ensuing year, I think that a recipient of the notice must be taken to have known that the company in general meeting might make any appointments within the limit imposed by their regulations …"

41.    That the election of directors at the Company's AGM was not special business requiring notice is fortified by the Company's By-Laws. By-Law 7.4 headed "Proceedings" provides that:

> "All business shall be deemed special that is transacted at a Special Shareholders' Meeting, and also that is transacted at any Annual Shareholders' Meeting, with the exception of the consideration of the accounts and auditor's report, if any, the election of directors and the reappointment of any incumbent auditor."

Furthermore the notice convening the 2018 AGM stated not only that the re-election of the Incumbent Directors was to be voted upon, but also that:

> "The annual meeting will also transact such other business as properly may be brought before it or any adjournment thereof".

This is also reinforced by By-Law 8.1 which (as already noted) provides for directors to serve only until the next AGM, and then be either re-elected or replaced.

42.     On the face of it, this designation of the election of directors as the ordinary rather than special business of an AGM has the consequence (because of the absence of a requirement for notice) that the bargain between shareholders enables those who choose to attend the AGM to elect whom they choose as directors for the following year, without giving prior notice of their proposed directors, either to the Company or, a fortiori, to shareholders who choose not to attend. Putting this another way, it means that those shareholders who choose not to attend the AGM take the risk that those who do attend (in person or by proxy) may make their own choice as to who is to serve as directors for the following year. It also means that those who attend by proxy will not personally have the opportunity to consider proposals as to new directors made by other shareholders at the meeting, unless it is adjourned for long enough for their proxies, or the Company, to tell them what has been proposed, before a vote is taken on the proposal. (Of course, since the Company allows voting by proxy, if that is to be done properly regulation 15 ought to be complied with.)

43.     Smith J did not feel compelled to this conclusion for three main reasons. First, he considered that the apparent authority of *Betts* was undermined by modern developments in electronic communication, making it possible to vote at company meetings online, before the meeting, and for companies incorporated in one jurisdiction to carry on business in another while listed on NASDAQ, an exchange governed by USA securities law. Secondly, he discerned in Canadian authority a general principle equally applicable to IBCA companies that shareholders have a general entitlement to "full, fair and plain disclosure to make an informed decision on affairs of the company which call for a vote". Thirdly, he considered that effect could be given to that general principle by reading into section 71 of the IBCA an obligation on a shareholder seeking the appointment of a new director in place of a director proposed to be re-elected at an AGM to notify the company in advance, so that the director proposed to be replaced should have the opportunity to make a written statement, and for the company to send it to shareholders, before the meeting. The Court of Appeal broadly endorsed the judge's reasoning, on this as on all other issues which the judge had decided.

44.     The respondent Company also supported the judge's reasoning, although Mr Potts KC presented a broader and perhaps more sophisticated argument, by identifying a

mosaic (as he put it) of factors which, he submitted, led to the conclusion that shareholders receiving notice of an AGM in the form used in the present case would not reasonably expect different directors to be proposed for the first time at the meeting without prior notice at least of their identity. Accordingly, he submitted, applying the test of how a reasonable person would understand the notice enunciated in *Betts*, the nomination of new directors for appointment without prior notice was not within the confines of business which could properly be transacted at the meeting.

45.    Mr Potts' mosaic included all the factors relied upon by the judge, but also (i) the expectations of proper shareholder behaviour to be derived from the listing rules governing NASDAQ and (ii) the requirement in regulation 15 that a proxy form supporting the appointment of a director should name that person.

46.    The Board has not been persuaded, either by the judge's reasoning or by Mr Potts' development of it, to depart from the apparently clear effect of section 109, replicated in the Company's own By-Laws, that since the election of directors at an AGM is ordinary rather than special business, a proposal to replace existing directors with new directors may be made at the meeting without a requirement for prior notice or disclosure either to the Company or to shareholders. As will appear however, although such a proposal may lawfully be put to the meeting, even by way of ambush, it does not necessarily follow that it should be voted upon there and then.

47.    First, the Board does not consider that the reasoning in *Betts* has been overtaken by modern developments in communication, at least in relation to this Company. There is no provision in its constitution, or in the IBCA, for voting to take place in advance of the meeting, whether online or otherwise. Votes have to be cast by shareholders, in person or by proxy, at the meeting, or at any adjournment of it. True it is that proxy forms have to be completed, and usually are completed, and then sent off before the meeting, but that was no less true in 1909 than in 2018. The difference between then and now, which supports rather than undermines the reasoning in *Betts*, is that then they had to be hand delivered or posted, whereas now they can be sent, instantaneously, online.

48.    It is of course the case that where, as here, there is a company incorporated in Antigua, with a business in China, a NASDAQ listing and thousands of shareholders, many of whose shares are held by street names, voting at an AGM is likely to be overwhelmingly by proxy. Furthermore, although neither the IBCA not the Company's constitution imposes any requirement that proxies be delivered before the day of the meeting, the shareholders who do vote by proxy will have chosen and authorised their proxies before they learn of any proposal made for the first time at the meeting to appoint replacement directors. But none of this distances the Company from the basic reasoning, affirmed by section 109, that where the election of directors is on the agenda (either because it is notified special business as in *Betts* or ordinary business as here) then shareholders must be taken to appreciate that persons nominated for the first time at the

meeting may get elected by those who attend, in person or by proxy. In the present case, By-Law 8.1 made it inevitable that the election of directors would be on the agenda of every AGM, and the notice of the 2018 AGM expressly so stated. And if the Company's recommendation that the Incumbent Directors be re-elected were voted down, it must be taken as at least on the cards that others would be proposed for appointment in their place.

49.    Nor does the Board consider that the Canadian authorities cited by the parties provide otherwise, by imposing some overarching duty of disclosure which applies even to the proponents of a resolution about ordinary business at a general meeting. The Canadian authority mainly relied upon by the judge was *Kluwak v Pasternak* 2006 CarswellOnt 7766, [2006] OJ No 4910, 153 ACWS (3d) 857, 26 BLR (4th) 215. In that case rival contenders for control of the company's board both sent out circulars to shareholders. The dissentient group (ie opposed to the then incumbent directors) was led by Mr Kluwak. The chair of the meeting ruled that Mr Kluwak's circular was misleading and therefore disallowed the dissenters' proxy votes, so that the incumbent directors were declared to be duly elected. Mesbur J held that Mr Kluwak's circular was indeed misleading, and that the long-settled principle that explanatory circulars to shareholders should be perfectly fair and give all the information reasonably necessary to enable the recipients to decide how to vote applied as much to dissenting circulars as to company circulars. Nonetheless he held that the chair should not have disallowed the dissenting proxies but rather adjourned (or re-held) the meeting to enable the misleading circular to be corrected, before the shareholders' votes were taken, in that respect following the precedent set by the Supreme Court of Canada in *Blair v Consolidated Enfield Corp* [1995] 4 SCR 5.

50.    Nothing in *Kluwak* amounts to authority, in Canada or elsewhere, that shareholders who wish to propose ordinary business at an AGM are under a positive duty to disclose to shareholders in advance the names of replacement directors. It is a case which establishes that, if a circular be sent to shareholders, it must be fair and not misleading, regardless of whether it comes from the company or from dissenting shareholders. Nonetheless, it does at least point the way in the Board's opinion to a possible solution to the difficulty raised by such a proposal (that shareholders will not know about the proposal when deciding whether to attend or when appointing proxies), namely the adjournment of the meeting for such time as will enable all shareholders to have an opportunity to make an informed decision on the matter in question.

51.    The reading into section 71 of the IBCA of an implied obligation on shareholders to give advance notice of a proposal to appoint replacement directors at an AGM formed the centrepiece of the judge's analysis. Section 71 provides as follows:

> "(1) A director of a corporation is entitled to receive notice of, and to attend and be heard at, every meeting of shareholders.

(2) A director -

    (a) who resigns;

    (b) who receives a notice or otherwise learns of a meeting of shareholders called for the purpose of removing him from office; or

    (c) who receives a notice or otherwise learns of a meeting of directors or shareholders at which another person is to be appointed or elected to fill the office of director, whether because of his resignation or removal or because his term of office has expired or is about to expire,

may submit to the corporation a written statement giving the reasons for his resignation or the reasons why he opposes any proposed action or resolution.

(3) The corporation shall forthwith send a copy of the statement referred to in subsection (2) to the Director and to every shareholder entitled to receive notice of any meeting referred to in subsection (1).

(4) No corporation or person acting on its behalf incurs any liability by reason only of circulating a director's statement in compliance with subsection (3)."

The judge reasoned that, unless section 71 was construed as containing a provision to the effect that a director (in this case) being replaced upon the expiry of his term of office would be ensured the opportunity given in subsection (2) to make a written statement and have it distributed to shareholders, then that important statutory right, and the benefits thereby afforded to shareholders in receiving such a statement, would be rendered nugatory. Therefore he interpreted section 71 as containing an obligation on shareholders to give advance notice to the company of such a proposal to replace.

52.    The Board might have been prepared to follow the judge toward such an implication if that really were necessary, as the only way of preventing section 71 being rendered nugatory, in the face of an ambush by some shareholders. But it is not the only way of ensuring that what the judge called its "spirit and intent" be achieved. Section 71

expressly acknowledges (twice) that a director may learn of a proposal to remove or replace him otherwise than by receiving notice. He is entitled by section 71(1) to attend all shareholder meetings and may learn of the proposal simply by being there when the resolution is proposed. Thus the section is not drafted in a way that assumes that notice of a proposal to replace him must always be given to the company (and passed on to him).

53.    Furthermore section 71 does not, as it might have done, simply confer on every director proposed to be replaced an unqualified statutory right to make the written statement contemplated by subsection (2). It is only those directors who are notified or otherwise learn of such a proposal upon whom the statutory right alights. It may be said to contemplate a situation where, for one reason or another, that does not happen.

54.    Nonetheless the spirit and intent is clearly there, as the judge rightly observed. Directors proposed to be removed or (as here) replaced should if possible be given the opportunity to have their say, in writing, and shareholders should be given the opportunity to consider what the directors have to say before voting on the proposal. But in a case where there is a proposal to remove or replace a director made at a meeting without prior notice, then the practical solution may be said, with respect, to be obvious. Provided that the chair of the meeting has the requisite power to do so, he or she should in general adjourn the meeting to enable that to take place. There may be cases where that is unnecessary, such as where the director is present with all the shareholders and is content to have his say orally. But that will be rare at the AGM of a listed IBCA company. Or it may be that the director proposed to be removed does not wish to make a written statement. Or it may be clear that an adjournment would make no difference to the voting intentions of shareholders where, for example, they are already divided into irreconcilable camps.

55.    There having been no submissions at trial or on appeal that the AGM should have been adjourned, the Board received no assistance on the question whether the chair of the AGM of an IBCA company has the requisite power to adjourn. The Board notes that the notice of the AGM referred in terms to the possibility that it might be adjourned (para 10 above). English common law suggests that the chair of a meeting has a residual discretionary power to adjourn a meeting "so as to give all persons entitled a reasonable opportunity of voting": see *Byng v London Life Association Ltd* [1990] Ch 170, 186 per Sir Nicolas Browne-Wilkinson VC, citing with approval from *R v D'Oyly* (1840) 12 Ad & El 139, 159. The identity of directors appointed to run a company's affairs is of obvious significance for shareholders and in ordinary circumstances, if their right to vote on that matter is not to be rendered nugatory, they should have sufficient information and a fair opportunity to be able to consider their options and decide how to cast their vote. Where the general law imposes specific requirements in that regard, as regulation 15 does, that opportunity has to allow for compliance with those requirements so that their vote is valid. Where a proposal to replace directors is made at an AGM, attended by many shareholders only by proxy, then the authority conferred by the proxy forms may be insufficient to enable the proxies to vote, one way or the other, on the newly tabled resolution, so that

their principals are indeed deprived of the opportunity of voting, even though present (by proxy) and in principle entitled to vote. An adjournment to enable the proxies to obtain the requisite authority or instructions on the new proposal would appear to fall, at least prima facie, within the scope of the common law power.

56.     An alternative solution to the apparent inroad upon the director's right of reply to a proposal made to remove him sometimes adopted by Canadian companies is to include in the By-Laws a requirement for advance notice of a proposal to replace him to be given to the company.

57.     It follows that the implication inserted into section 71 by the judge cannot be justified on the grounds of necessity, nor is it one which goes with the grain of the express terms of section 71. The object of section 71 is not to ensure that shareholders are provided with information (since it is clear that according to its terms a director can opt not to provide any statement at all), but rather to provide a qualified personal right for the affected director exercisable in his or her own interests; and, having regard to its purpose, the implication proposed by the judge of a general obligation to inform shareholders of a proposal to replace a director cannot be justified. It would undercut by a sidewind what is otherwise the clear intent of section 109, which is that proposals about the election of directors at an AGM do not require prior notice.

58.     Nothing in Mr Potts' submissions on section 71 dissuaded the Board from a conclusion that, in making this implication, the judge erred in law. He sought to rely upon two further Canadian cases, *Kaiser v Borillia Holdings Inc* 2007 CarswellOnt 3207, [2007] OJ No 2010, 157 ACWS (3d) 537, 32 BLR (4th) 306, and *Olson v River Green (Thunder Bay)* 2022 CarswellOnt 18597, 2022 ONSC 7039. But they do not assist him. *Kaiser* was about the express requirement in sections 122 and 123 of the Ontario Business Corporations Act that a director be given notice of the meeting at which he is proposed to be removed. The sole shareholder of the company had simply removed the director without notice and protested that requiring him to go through the notice process before removing him again would be a waste of time. The judge held that the removal was invalid nonetheless. *Olson* was a case about the removal of a director by written resolution. It turned on the construction of section 104(1) of the Ontario Business Corporations Act, about written resolutions, and adds nothing to enlighten the present debate.

59.     Turning to Mr Potts' broader submission about the reasonable understanding of shareholders in a listed IBCA company, the Board can see nothing in the points made by reference to the listing rules governing NASDAQ. There must have been a time when the Company existed before its shares were listed on NASDAQ, when it had the same constitution as it has now. That constitution cannot have changed as the result of its being listed. Furthermore, the expectation arising from its listing can have been no more than that shareholders subject to NASDAQ rules would in general comply with them, or face stiff financial penalties if found to be in breach.

60.     Mr Potts sought to avoid this difficulty by submitting that what matters was the reasonable understanding of shareholders as to the permissible business of the AGM when reading the Company's notice calling the meeting, by which time the Company had been listed for some time. The Board considers that this emphasis upon reasonable understanding and the meaning of the notice convening the AGM is misplaced. The reasonable understanding of shareholders as to the business which might be transacted at the meeting in the *Betts* case really mattered, because election of directors was special business, the content of which therefore had to be sufficiently specified in the notice calling the meeting. But here the election of directors at an AGM is general business which does not have to be notified at all (although it was). The content of the notice calling the AGM is therefore irrelevant.

61.     What matters in this case, as explained at the outset of the analysis of this issue, is the content of the bargain between shareholders and company, and between the shareholders inter se, constituted by its Articles and By-Laws, read in the context of the IBCA ("the shareholder bargain"). The reasonable expectation of shareholders was that the shareholder bargain would be adhered to, no more and no less.

62.     The final point taken by the Company about shareholders' reasonable understanding of what business was covered by the notice of the AGM was that, since regulation 15 requires a proxy form in favour of the appointment of directors to name the proposed directors, then shareholders would expect that, if only by the advance lodging of proxy forms with the Company, prior notice to all shareholders of a proposal to replace outgoing directors with new directors was a necessary precondition of any resolution to appoint the New Directors at the meeting.

63.     The Board has not been persuaded by this point, either on its own or as part of any mosaic contributing to reasonable shareholder understanding. The theory behind the point was that, if proxy forms had to specify the identity of any proposed new directors, then the Company would have sufficient advance notice both to notify the directors proposed to be removed and also to notify all shareholders other than the proponents of the new directors, before they decided whether to attend at all and, if by proxy, who to appoint and how to instruct the proxy to vote.

64.     This theory is simply unworkable as a supposed part of the shareholder bargain. There is nothing in the IBCA or in the Company's constitution which requires the proxy forms to be lodged before the day of the meeting, still less in sufficient time for the directors proposed to be replaced to prepare a written statement and have it circulated to other shareholders before they decide whether to attend and how to appoint and instruct their own proxies. There is nothing standing in the way of all proxy forms being lodged on the same day. Thus, the revelation to the Company from the content of a supposedly regulation 15 compliant proxy form that new directors were going to be proposed for appointment at the AGM would, again, just lead to an adjournment of the meeting while

directors and other shareholders were notified. Therefore the regulation 15 point does not support the contention that a reasonable shareholder would have understood that the appointment of replacement directors required notice sufficiently in advance for shareholders to make informed decisions before the meeting even started, which is the Company's case. A reasonable shareholder would have understood from the notice of the AGM that the election of directors was business to be conducted at the AGM, with such adjournment as might be necessary to allow shareholders to have a proper opportunity to vote on such matters.

65.    The Board's view is therefore that, in concluding that the dissenting shareholders' votes to remove the Incumbent Directors and the proposed resolution to elect the New Directors were vitiated by their failure to give advance notice, the judge made a serious error of law which requires that his decision not to grant any relief must be considered afresh. Voting to remove the Incumbent Directors and advancing the proposed resolution to appoint the New Directors were steps which, under the shareholder bargain, the dissenting shareholders were entitled to take, without giving prior notice, at the AGM. Whatever the merits of taking such a course might have been, no-one submitted at trial or thereafter, and no-one now submits in this appeal, that the AGM should then have been adjourned to enable the directors proposed to be replaced, and the other shareholders, particularly those not in attendance, to be notified and to consider their position. So there is no basis for a conclusion that the vote to remove the Incumbent Directors or the resolution to appoint the New Directors or the vote upon that resolution which then took place, were invalid due to the absence of prior notice. The Board will return to this question when re-exercising the discretion as to relief under section 122. But first the Board will give its ruling on the other issues.

66.    The invalid proxy issue was, as already described, live before the judge but not, in the view of the Court of Appeal, actually decided by him. It is plainly arguable that the proxies lodged in favour of the appointment of the New Directors failed to comply with regulation 15 because they did not name the New Directors as the intended appointees. But there are arguments against invalidity. One, pursued before the judge, is that regulation 15 only applies to proxy forms issued by the Company. Another is that non-compliance is solely a matter between the appointors and their proxies, so that it gives rise to no claim either by the Company or by other shareholders that the votes cast by the proxies were invalid. None of these sub-issues have been resolved, and the Court of Appeal has not opined on any of them.

67.    Nonetheless the Appellant seeks declarations that the outcome of the meeting was the valid appointment of the New Directors, and the removal (or rather retirement because of non-re-election) of the Incumbent Directors. The question therefore arises whether the question as to the invalidity of the proxies must now be decided, before that declaration can be made.

68.     The Board considers that it does not need to be decided. The onus of proof as to the alleged invalidity of the dissenters' proxies lies, and always has lain, upon the Company. It did not rely upon such alleged invalidity when it announced that the Incumbent Directors had been re-elected, after having delayed announcing the outcome of the AGM precisely in order to obtain legal advice upon that question. Thereafter the Company did raise the issue before the judge, but he declined to decide it. Although 1Globe sought permission to appeal to the Court of Appeal on the mistaken assumption that the judge had decided it against validity, the Company successfully opposed the grant of permission to appeal to the Court of Appeal on that issue on the basis that it had not been decided, and did not advance any cross-appeal or case by respondent's notice that it should have been decided in its favour. Thus, as a result of the position which the Company chose to adopt in the course of the proceedings the invalid proxy issue dropped out of contention and the point slipped quietly away. The Board does not consider that it is now open to the Company to pursue the issue as to the invalidity of the proxies, having been solely responsible, as between the parties, for the point not having been grappled with by the Court of Appeal. The Company has, in effect, waived or abandoned the objection to the validity of the proxies. It does not seek a new vote on that or any other ground, so the Board considers that the Company must take the consequences.

69.     Leaving aside discretion as to remedies, there remain to be addressed the two narrow issues which go to the validity of the Rights Agreement.

Section 161 – rights added to shares

70.     Section 161 of the IBCA lists a large number of things which a company may do, provided that it does so by an amendment to its articles, backed by a special resolution of shareholders. One of them, at section 161(1)(e), is:

> "to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued;"

The issue for decision is whether the Rights Agreement did "add … rights … in respect of all or any" of the Company's shares.

71.     1Globe's submission was that it did just that. Shorn of all its complexities the purpose and effect of the Rights Agreement was to confer upon certain shareholders the right to receive additional shares in stated circumstances, by purchase, subscription or exchange, so as to increase both the voting power and proportion of share-ownership of the Company over that of those shareholders who were defined as "Acquiring Persons". As earlier explained, the Rights were not simply allocated in respect of issued Common

Shares but were attached to them; until the Distribution Date following a Trigger Event, Rights were transferable only with Common Shares. In substance and in form, the Rights were attached to the Common Shares. They were added rights in respect of shares within the meaning of section 161(1)(e).

72.    The Company advanced two main arguments against that apparently simple submission. The first was that in substance the Rights Agreement conferred share options, which the Company acting by its directors had power to grant pursuant to section 35 of the IBCA, which provides that a corporation may grant conversion privileges, options or rights to acquire shares of the corporation, and make such options and rights separable or inseparable from any securities to which they are attached.

73.    The Board accepts that the Rights conferred under the Rights Agreement have some of the characteristics of share options, and that section 35 expressly contemplates that such options may be attached to existing shares. But section 35 is silent as to how these rights may be conferred. It does not, in the Board's view, detract from the requirement in section 161(1)(e) that rights which are added to the rights conferred by shares must be conferred by amendment of the Articles supported by a special resolution. When this was put to Mr Potts during the hearing before the Board, he had no cogent answer to it, other than his second argument which was that the IBCA was framed on the Canada Business Corporations Act and that Rights Agreements of the type in issue in this appeal had never been challenged on this ground in any reported case in Canada, despite being unsupported by any special resolution.

74.    The Board is unable to accept this second argument. It is unsupported by any evidence, and the Board knows too little about how structures similar to the Rights Agreement are put in place in Canada, let alone enough about the constitutions of the companies concerned.

75.    The judge rejected in very short form 1Globe's argument that the Rights Agreement fell foul of section 161. He simply did not regard the Rights Agreement as changing the designation of, or removing any rights or privileges attaching to any shares, and the Court of Appeal agreed. In the Board's view the courts below simply failed to address the argument that the Rights Agreement added to the rights in respect of shares.

76.    For those reasons the Board concludes that the Rights Agreement was invalid as claimed by 1Globe. It is therefore unnecessary to decide the issue, raised for the first time before the Board, that the Rights Agreement was also invalid as an unlawful dividend. Permission to appeal on that ground is refused. It would have involved a deep analysis of the Antiguan regime for the maintenance of capital, which differs substantially from that in force in England, without the necessary assistance of the views of the local courts.

Discretion

77.    Section 122 of the IBCA provides as follows:

> "(1) A corporation or a shareholder or director thereof may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.
>
> (2) Upon an application made under this section, the court may make any order it thinks fit including, without limiting the generality of the foregoing -
>
> > (a) an order restraining a director or auditor whose election or appointment is challenged from acting pending determination of the dispute;
> >
> > (b) an order declaring the result of the disputed election or appointment;
> >
> > (c) an order requiring a new election or appointment and including in the order directions for the management of the business and affairs of the corporation until a new election is held or appointment made; and
> >
> > (d) an order determining the voting rights of shareholders and of persons claiming to own shares."

78.    The judge decided to grant no order for relief on 1Globe's application, but he did so on the legally flawed basis that in seeking by ambush to obtain the replacement of the Incumbent Directors (bar one) by the New Directors, the dissenting shareholders had failed validly to exercise their voting rights and had proposed an invalid resolution because of their failure to give advance notice of their proposal to the Company, or to other shareholders. The fact that this breach of what he regarded as the rules (encapsulated in his erroneous construction of section 71) was deliberate only added to his disinclination to assist 1Globe as a matter of discretion.

79.    The effect of the judge's decision to grant no relief was in substance to leave the Incumbent Directors in de facto control of the Company, a position which they might in

any event by then have been able to secure by the votes of supporters of the Management Consortium to whom additional shares had by then been issued without challenge. It is possible that the judge may in any event have regarded the ambush as having the consequence that the dissenters' vote not to re-appoint the Incumbent Directors was itself invalid, leaving them with a clear majority of votes in favour of their re-election. But he did not spell this out in his judgment.

80.    By the time of trial neither side was asking the judge to order a further or replacement meeting under section 122(2)(c). Each side was in effect going for broke, hoping that it would prevail by reference to the votes validly cast at the AGM.

81.    The Board has concluded by contrast that there was nothing unlawful in the dissenting shareholders' proposal at the meeting to replace the Incumbent Directors with the New Directors, so that, if the controversy had to be decided by reference to the votes cast at the AGM without reference to the proxy invalidity issue (which is not now in play) and without ordering a new meeting (by way of the adjourned continuation of the AGM, for which neither side contends), the dissenting shareholders should have prevailed and the New Directors been validly elected. It might have been argued, by either side, that after the dissenters' resolution had been tabled, the AGM thereafter went seriously off the rails by reason of a failure of the chairman to have it adjourned, pending notification of the proposal to the Incumbent Directors, the exercise (if they wished to do so) of their rights to make a written statement under section 71, its circulation to shareholders and a consideration by all shareholders of the dissenters' proposal before a vote on their resolution, with proxy voting in compliance with regulation 15. But no such argument was advanced, at trial, on appeal, or before the Board.

82.    Where an appellate court has to re-exercise a judicial discretion which has been legally flawed, it usually does so by reference to the state of relevant facts as they are now, rather than as they were before the lower court, which may have been a long time previously. In this case the AGM took place in February 2018, the judge handed down judgment with commendable speed in December 2018 after a trial earlier that month, and it is now January 2025.

83.    The parties have continued to go for broke, each seeking only a determination wholly favourable to their cause, with neither suggesting the holding of a fresh meeting. 1Globe continues to seek the declarations which it has always sought, while the Company opposes any departure from the decision of the courts below to grant no relief at all. Virtually no factual update about the Company has been provided, save that (through counsel on instructions) the Incumbent Directors or supporters of the Management Consortium remain in de facto control, and that there have been no further AGMs. The Board does not even know whether all the Incumbent and New Directors are still alive, or whether they all remain willing, after all this time, to undertake that fiduciary role.

84.    The considerations which have affected the Board in deciding what if any relief should now be granted are as follows. First, an adjournment of the AGM would have been unlikely to alter the voting intentions of those who actually did attend and vote, in person or by proxy, at the AGM in February 2018. Those who used the proxy forms supplied by the Company overwhelmingly voted for the re-election of the Incumbent Directors, and there is no reason to suppose, since the take-over battle lines had already been drawn between the two consortia, that receipt of notice of the resolution to appoint the New Directors, or written statements from the Incumbent Directors, would have made any difference to their voting intentions. Even if it had, this would only have increased the majority for the appointment of the New Directors. The same can confidently be said of the dissenters, who of course needed no such disclosure. They would have continued to vote for the New Directors, being perpetrators rather than victims of the alleged ambush.

85.    The real potential prejudice arising from there having been no adjournment of the AGM concerns those who, ignorant of what the dissenters proposed, decided not to attend, or at least did not attend, even if through general indifference. They amounted to owners of about 17% of the shares. But none of them has sought to join in these proceedings to make complaint about how they have been affected by the conduct of the AGM.

86.    A reading of the translation of the Chinese transcript of the AGM suggests that all those present, including the chair, were acting out parts prepared for them by their various lawyers, rather than thinking for themselves what really needed to be done. Bearing in mind that they were for the most part Chinese businessmen with no training in the company law of Antigua, the Board does not wish to attach personal blame to any of them as individuals.

87.    A court which is called upon to exercise a broad discretion as to remedy is not of course constrained simply to choose between what may be the two opposed extremes proposed by the warring parties. Something quite different from that proposed by either party may be perfectly appropriate. But the options available to the court may be limited by the way in which the parties have chosen to identify and litigate the issues in the proceedings, as they are here. In the present case there is little that the Board can usefully do other than choose between the only alternatives being proposed by counsel. The only middle ground would consist of ordering a fresh meeting, but the parties have not canvassed that option in the proceedings, more than five years have elapsed and the Board knows nothing of the current distribution of the shares. In some Canadian cases the risk or probability that a change in shareholding patterns between the original and court-ordered meeting could cause injustice has been remedied by requiring the new meeting to be conducted on the old shareholder base. But in the context of this Company, and the delay which has occurred between February 2018 and now, that would be a highly artificial and probably impossible exercise.

88.     Faced therefore, however unwillingly, with that binary choice, the Board considers that it should grant 1Globe declaratory relief to the effect that the New Directors were duly elected at the AGM and that the Incumbent Directors ceased to hold office as directors at the AGM. This is primarily because the Company has not succeeded in demonstrating that in voting to remove the Incumbent Directors and in proposing the election of the New Directors at the AGM ─ without prior notice to the Company, the Incumbent Directors or their fellow shareholders─ the dissenting shareholders, including 1Globe, did anything unlawful. And once, whether wisely or not, the chairman allowed an immediate vote on the dissenters' resolution, rather than adjourning the AGM, they were in the majority of those shareholders present, in person or by proxy. The New Directors were therefore validly appointed and the Incumbent Directors have been imposters ever since.

89.     The outcome of this necessarily complex analysis is that the Board will humbly advise His Majesty that this appeal be allowed.